THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, vs.
LEN SMALL et al. Appellants.          ·

*Opinion filed December 16, 1925—Rehearing denied Feb. 9, 1926.*

1. ACCOUNTING—*when equity will take jurisdiction—decree.*
Equity will not entertain jurisdiction of suits for accounting where
the law affords an adequate and ample remedy, but where there
is a clear right and the remedy is not plain, adequate and com-
plete, equity will take jurisdiction and will grant complete relief,
even though its decree may establish purely legal rights and grant
legal remedies otherwise beyond the scope of its authority.

2. SAME—*remedy at law must be complete to bar jurisdiction
of equity.* Jurisdiction of equity in matters of accounting does
not depend upon the existence of a remedy at law but upon the
adequacy and practicability of such remedy, and to bar the juris-
diction of equity the remedy at law must be as practical and effi-
cient to the ends of justice and its prompt administration as the
remedy in equity.

3. SAME—*equity will take jurisdiction where accounts are com-
plicated.* Equity will take cognizance of matters of account which,
though cognizable at law, are so complicated that it would be dif-
ficult to present the various items to a jury in such a manner as
to enable the jurors satisfactorily to determine the amount due.

4. SAME—*when equity will require a public officer to account.*
Equity will take jurisdiction of an action for accounting where the
purpose of the suit is to require a public official to account for
moneys alleged to be wrongfully withheld from the public treas-
ury and when it is alleged that the accounts are complicated and
that public records necessary to a proper accounting have been lost,
concealed or destroyed.

5. SAME—*acquittal in criminal prosecution will not bar subse-
quent civil suit.* The general proposition that a matter formerly
adjudicated by a court of competent jurisdiction is deemed finally
and conclusively settled in any subsequent litigation between the
parties cannot be applied to bar a civil suit because of an acquit-
tal in a criminal prosecution; and where a public officer is acquit-
ted of a charge of conspiracy to obtain public money, the verdict
of acquittal does not bar prosecution of a civil suit for an account-
ing by the People to recover losses which the State has sustained.

6. SAME—*Administration act does not bar suit for accounting
after expiration of year.* The provision of section 70 of the Ad-

ministration act that all demands not exhibited within one year from the granting of letters shall be forever barred does not bar a suit for an accounting after the expiration of the year, but the judgment or decree rendered on the final accounting should order payment only out of assets which have not been inventoried or accounted for by the administrator or administratrix.

7. SAME—*when no presumption of accounting for interest on State funds can arise.* In a suit against a former State treasurer and others for an accounting of interest earned on State funds in the custody of the treasurer, where there is no evidence of a settlement of the State's claim for interest, no presumption of settlement can arise from the mere fact that the auditor authorized the treasurer to receive into the State treasury a certain amount of money paid as "interest on public funds" for a specified period.

8. SAME—*when rule as to proof of criminal acts need not be applied.* Proof of the fact that a public official having custody of public funds loaned these funds to others with a secret arrangement respecting the payment of interest, and that in reporting interest collected he did not reveal the source of the payments, is sufficient to justify an order to account in a civil suit, and the fact that the bill for an accounting charges criminal acts will not require the court to apply the rule of evidence applicable to criminal cases.

9. PUBLIC OFFICERS—*a public officer must account for interest on public funds.* Where a treasurer or other public official has the custody of public funds and such funds earn interest, he is required, under the law, to turn such interest into the public treasury as soon as it is received by him; and this liability to account for profits is the same whether the interest or discount is paid to the officer directly as such, or whether it comes to him indirectly as a partner or stockholder in a bank where public funds are deposited.

10. SAME—*presumption is against public official converting trust funds.* Where it is established that a public official having public funds in his custody deals with the trust money in his own name, directly or indirectly, every presumption is indulged against the trustee, and he is held to a strict accountability for the conversion.

11. CONSTITUTIONAL LAW—*when court will not consider validity of statute.* A court will not, as a general rule, consider or determine the constitutionality of a statute unless a decision upon that point becomes necessary effectually and properly to dispose of the case at hand, and it will not avail appellants to raise the question where no attempt is made to make any application of the statute which will prejudicially affect their interests.

12. CONSPIRACY—*what necessary to establish a conspiracy.* To establish a charge of conspiracy in an action for accounting it is

not necessary to prove that the conspirators actually came together and agreed in terms to pursue their common design by common means, but it is sufficient to prove that they pursued by their acts the same object, one performing one part and another another, and the circumstances may show that the acts of each resulted from concerted and associated action.

13. SAME—*what evidence is admissible against parties charged with conspiracy.* Where a conspiracy is once established, every act and declaration of each member in furtherance of the common design is in contemplation of law the act and declaration of all the members and is original evidence against each of them.

14. SAME—*each conspirator must account for all resultant damage.* Where a liability arises from an intentional wrongful act of several parties conspiring together each is liable for all resulting damage, and the rule applies to a conspiracy by which several wrongfully obtain the money or property of another and misappropriate it.

15. EVIDENCE—*effect of failure or refusal to produce books or papers in evidence.* Where a party fails or refuses to produce books and papers shown to be in his possession or under his control his opponent may give secondary proof of their contents or establish his case by circumstantial evidence, and if such secondary or circumstantial evidence is imperfect, vague and uncertain as to dates, sums, etc., every presumption is against the party who might remove all doubt by producing the better evidence.

16. SAME—*when books of account are admissible in evidence.* To render an account book admissible in evidence there must be proof as satisfactory as the transactions are reasonably susceptible of that the entries made are correctly recorded, and such proof must be made by one who knows that the record was made in the usual course of business; but where the testimony of the person who made the entries is not available the proof may be made by the one under whose supervision the record or account book was kept, regard being had to the nature of the business and the method of its conduct in determining what is the best evidence.

DUNCAN and HEARD, JJ., dissenting.

APPEAL from the Circuit Court of Sangamon county; the Hon. FRANK W. BURTON, Judge, presiding.

WERNER W. SCHROEDER, SIMS, WELCH, GODMAN & STRANSKY, and DAILEY, MILLER, McCORMICK & RADLEY, (F. J. STRANSKY, and R. H. RADLEY, of counsel,) for appellants.

OSCAR E. CARLSTROM, Attorney General, CHARLES W. HADLEY, ALBERT D. RODENBERG, ASHTON E. CAMPBELL, and WILLIAM E. TRAUTMANN, for the People.

Per CURIAM: This appeal is from a decree of the circuit court of Sangamon county ordering that Len Small and the other appellants jointly and severally account for all money received by or paid to Small, Edward C. Curtis and Verne S. Curtis, or either of them, as discount or interest on funds of the State of Illinois loaned by Small during his term as State treasurer through the Curtises or the Grant Park Bank to Armour & Co., Swift & Co. and other persons and corporations.

The bill of complaint filed November 26, 1921, after alleging the election of Len Small to the office of State treasurer in 1916 and his qualification and assumption of the duties of that office January 8, 1917, charges that Small, in combination with E. C. Curtis and V. S. Curtis, entered upon the execution of a plan by which large sums of money from the State treasury were to be used to their personal advantage and profit; that pursuant to said unlawful plan Small from time to time turned over to an alleged private banking institution, called "Grant Park Bank," large sums of public moneys; that said public moneys were carried on the books of the State treasurer in an account called by Small "Safe Fund" for the purpose of concealing the fact that said public moneys were being used by Small and the Curtises for their private gain; that the public moneys so turned over by Small to the Curtises were used in the purchase of notes and other securities of Armour & Co., Swift & Co. and divers other persons and corporations; that Small and the Curtises collected from said persons and corporations, as interest and discounts on the notes so purchased, large sums of money, aggregating more than $1,000,000; that all of this sum is the property of the State of Illinois and that appellants are liable to account for the

same; that Small has not paid into the State treasury any portion of the interest or discount collected from that part of the public moneys designated Safe Fund; that in neither of the two reports made by Small, as treasurer, of interest received by him on public moneys deposited in banks in the State is there an itemized statement of interest received; that such lump sum reports were made for the purpose of concealing the amount of money received through the Grant Park Bank transactions; that the account of public funds invested by Small through the Curtises was kept by Small personally in his private office above his bank in Kankakee, and that this private account book and certain records of the State treasurer's office have been destroyed by Small for the purpose of concealing the amount of interest and discounts realized from the private use of said public moneys. It is further charged that the number, nature and complexity of the accounts involved in this litigation render appellee's remedy at law wholly inadequate, and that it is without remedy except in a court of equity. The bill concludes with a prayer that an accounting may be had, that the amount of interest and profits realized from the use of said public moneys by Small and the Curtises may be determined, and that appellants be decreed to pay to appellee the amount that may be found due appellee upon such accounting.

Appellants filed demurrers, both general and special, in which, among other things, they charged that the act providing for the deposit of State moneys by the State treasurer and for the payment of interest on the same, and for an appropriation for the cost of the official bonds of the treasurer and his employees, approved March 7, 1908, is unconstitutional, and that equity is without jurisdiction to entertain this proceeding because complainant has an adequate remedy at law. The act was held void but all other causes of demurrer were overruled. Thereupon Small filed a special and separate plea, averring that he had been in-

dicted, tried and acquitted upon a charge of conspiracy on account of the identical matters and things set forth in the bill of complaint, and that appellee is now estopped by the verdict in the criminal case from again litigating material questions of fact by it decided. This plea in bar was held insufficient. On Small's motion he was given leave to insert the substance of his plea in his answer. This was done and an exception to that part of the answer was sustained.

By his separate answer, which covers ninety pages of the record, Small admits his incumbency of the office of State treasurer for the two-year term beginning January 8, 1917, the duty of holding and safely keeping the public moneys of the State, and the duty to account for the principal and all the interest or other profit earned on said moneys. He denies the failure to make proper reports, the non-existence of the Grant Park Bank, the unlawful combination and confederacy with the Curtises, the use of public moneys to his personal advantage, the receipt of interest, fees or other profit derived from the use of public moneys for which he has not accounted to the State, the keeping of the books of the office of State treasurer so as to conceal the deposits in the Grant Park Bank, the destruction of records and books, and all other charges of wrongdoing. He alleges that he has accounted for all of the interest, discounts and profits received by him during his term as State treasurer for the use of public moneys deposited in the banks of the State; that the Grant Park Bank was a legitimate private bank owned by Edward C. Curtis and was doing a general banking business during the period here involved; that all moneys deposited in the Grant Park Bank were charged to an account called "Safe Account" in the treasurer's office; that all such deposits were evidenced by certificates of deposit issued by the Grant Park Bank and were secured by collateral deposited with him by the owner of said bank; that the Grant Park Bank paid interest on the moneys deposited with it; that he has accounted to the State for all

interest received on such account; that he has filed all re-
ports required by law and has in all other respects fully
discharged his duties and obligations as State treasurer. He
charges that appellee has an adequate and complete remedy
at law and that equity is without jurisdiction.

Appellant Etha G. Curtis, administratrix of the estate
of Edward C. Curtis, deceased, neither admits nor denies
most of the allegations of the bill but prays strict proof of
all of them. She admits that Curtis died March 8, 1920,
and that she was appointed administratrix of his estate by
the county court of Kankakee county. She denies the un-
lawful confederacy and that appellee is entitled to an ac-
counting against the estate of her intestate, and denies that
there is a liability or any basis for an accounting. She
charges that this demand of appellee is barred by statute
for the reason that she filed an inventory of the estate, and
that this action was not commenced within one year from
the granting of letters of administration.

Verne S. Curtis filed a plea reciting that certain crimi-
nal proceedings were pending against him arising out of
the same transaction, and that he could not answer the bill
for the reason that his answer might tend to incriminate
him. This plea was sustained and an order entered that
the same should stand as his answer to the bill.

The master to whom the cause was referred took and
reported over 11,000 pages of evidence, consisting largely
of records from the State treasurer's office, of the five prin-
cipal packers, (Armour & Co., Swift & Co., Morris & Co.,
Cudahy & Co. and Wilson & Co.,) of the Fort Dearborn
National Bank, the Live Stock Exchange National Bank,
the Grant Park Trust and Savings Bank, the First Trust
and Savings Bank of Kankakee, and of divers other persons
and banks. He recommended a decree in accordance with
the prayer of the bill. Exceptions to the master's report
were filed and overruled and a decree entered finding that
the court had jurisdiction of the subject matter and the par-

ties; that Small, as State treasurer, and the Curtises, entered into a fraudulent scheme through and by which large sums of money belonging to the State of Illinois, in possession of Small as State treasurer, were invested through the Curtises for the private gain of said persons under the pretense of depositing public funds in the Grant Park Bank, which had no existence as a banking institution; that large sums of money were collected by the Curtises for the benefit of Small, and that Small and the Curtises jointly and severally became liable and obligated to pay over to the State of Illinois all such discounts, interest, profit and income paid to or received by them from the use of such public funds. The decree orders appellants to account for all such sums of money due the State of Illinois and again referred the cause to the master, with directions to take and state the account of appellants in accordance with the terms of the decree, upon the pleadings and all the testimony and exhibits in the master's report, and upon such further proof as may be offered by any of the parties material and relevant to such accounting.

We are met at the threshold of this case with a challenge to the jurisdiction of equity. It may be stated as a general rule that courts of equity will not entertain jurisdiction of suits for accounting where the law courts are competent to afford an adequate and ample remedy, (*County of Cook* v. *Davis,* 143 Ill. 151,) but where there is a clear right and there is no remedy at law, or where the remedy is not plain, adequate and complete and adapted to the particular exigency, equity will take jurisdiction. (*Townsend* v. *Equitable Life Assurance Society,* 263 Ill. 432; Story's Eq. Pl.—6th ed.—sec. 473; Pomeroy's Eq. Rem.—2d ed.— sec. 930.) The remedy at law which precludes relief in equity must be as practical and efficient to the ends of justice and its prompt administration as the remedy in equity. (Fletcher's Eq. Pl. sec. 208.) Jurisdiction of equity in matters of accounting does not depend upon the existence of a

remedy at law but upon the adequacy and practicability of such remedy. (*Miller* v. *Russell*, 224 Ill. 68; *Crown Coal and Tow Co.* v. *Thomas*, 177 id. 534; *Appeal of McMullin*, 131 Pa. St. 370, 18 Atl. 1056.) No principle of equity jurisdiction is more generally recognized than its taking cognizance of matters which, though cognizable at law, are yet so involved with a complex account that a court of law is incompetent to adequately examine it. (*Taff Vale Railway Co.* v. *Nixon*, 1 H. L. C. 111, 1 E. R. C. 406; *Ludlow* v. *Simond*, 2 Caines' Cas. 1, 2 Am. Dec. 291; *Blodgett* v. *Foster*, 114 Mich. 688, 72 N. W. 1000.) Where the accounts involved are so complicated that it would be difficult to present the various items to a jury in such a manner as to enable the jurors satisfactorily to determine the amount due, it is definitely settled that the case is one proper for a court of equity. (*Ely* v. *King-Richardson Co.* 265 Ill. 148; *Kirby* v. *Lake Shore and Michigan Southern Railroad Co.* 120 U. S. 130, 7 Sup. Ct. 430.) Where the purpose of the suit is to require a public official to account for moneys alleged to be wrongfully withheld from the public treasury, and the allegations of the bill that the accounts are complicated are supported by further allegations that public records necessary to a proper accounting have been lost, concealed or destroyed by such public official, there can be no doubt of the jurisdiction of a court of equity. In this case the loss, concealment or destruction of public records of the State treasurer's office has made it necessary to examine the public records kept in other offices and the private records of many banks and corporations. There are in evidence in this case more than 1300 exhibits, consisting of ledger pages, journal pages, cash book sheets, draft requisitions, deposit slips, canceled notes, checks bearing endorsements of the payee and the banks through which they passed, records and files of the State treasurer's office, and other kindred documents. They fill thirteen of the twenty-eight volumes of the transcript of record. The number and com-

plexity of accounts in this case clearly bring it within the jurisdiction of equity.

In July, 1921, Small was charged by indictment with conspiring with the Curtises to obtain from the State of Illinois, by false and fraudulent means, certain large sums of money. He was tried and acquitted of the charge of conspiracy, and it is contended by him that since both actions arose from the same transactions, appellee is by the verdict rendered in the criminal case estopped from again litigating the question whether a conspiracy existed between Small and the Curtises and whether the Grant Park Bank was in existence at the time Small was treasurer. There is no doubt about the general proposition that a matter, whether consisting of one or many questions, which has been solemnly adjudicated by a court of competent juris-diction is deemed finally and conclusively settled in any subsequent litigation between the parties, where the same question or questions arise; (*Chicago Title and Trust Co.* v. *National Storage Co.* 260 Ill. 485; *Markley* v. *People,* 171 id. 260; *Hanna* v. *Read,* 102 id. 596;) but as a gen-eral rule this principle is not applicable where it is sought to use a judgment in a criminal prosecution to bar a sub-sequent civil suit arising from the same transaction. (*Stone* v. *United States,* 167 U. S. 178, 17 Sup. Ct. 778; *State* v. *Bradneck,* 69 Conn. 212, 37 Atl. 492; *Micks* v. *Mason,* 145 Mich. 212, 11 L. R. A.—n. s.—653; *State* v. *Lewis,* 164 Wis. 363, 159 N. W. 746; *State* v. *Roach,* 83 Kan. 606, 31 L. R. A.—n. s.—670.) As a foundation for the rule that a record of a judgment in a criminal case is in-admissible in a civil suit it has been pointed out that there is a dissimilarity in objects, issues, results, procedure, par-ties to the action, rules of evidence, weight of evidence, burden of proof and competency of witnesses. Ordinarily, a judgment of acquittal in a criminal case is not even ad-missible in evidence in a subsequent civil suit. (*Corbley* v. *Wilson,* 71 Ill. 209; *State* v. *Corron,* 73 N. H. 434, 62 Atl.

1044.)    In harmony with these general principles of law
is section 21 of division 2 of the Criminal Code, which
provides: "Nothing in this act contained shall be so con-
strued as to prevent the party injured from having and
maintaining a civil action for all damages and losses that
he may have sustained in consequence of the commission
of any criminal offense herein provided for; and no court
shall allow or entertain the plea that the private injury
is merged in the crime, or in any manner affected there-
by." This act is general in its terms and is as applicable
where the State is the party injured as where an individual
is the victim. This section means that the criminal prose-
cution and the civil action shall be wholly independent of
each other and the result in one shall in no manner affect
the result in the other. The criminal prosecution is for
an entirely different purpose than the civil action, and rea-
son and authority sustain our conclusion that the verdict
of acquittal in the criminal case does not estop the People
from prosecuting a civil suit to recover losses which the
State has sustained. The chancellor properly sustained the
exception to this part of the answer.

Appellant Etha G. Curtis contends that appellee's right
of action against her as administratrix is barred by sec-
tion 70 of the Administration act, which provides that all
demands not exhibited within one year from the granting
of letters shall be forever barred unless the creditor shall
find other estate of the deceased not inventoried by the ad-
ministrator, in which case his claim shall be paid *pro rata*
out of such subsequently discovered estate. The act plainly
states that failure to present within one year does not bar
the claim, but limits the right to recover against the estate
to property of the deceased not inventoried by his personal
representative. (*Waughop* v. *Bartlett,* 165 Ill. 124; *Pea-
cock* v. *Haven,* 22 id. 23.) In this case, as the claim was
not filed within one year from the granting of letters of
administration, the decree, if any is rendered on the final

accounting, must be special, ordering payment out of assets of the E. C. Curtis estate which have not been inventoried or accounted for by the administratrix.

Appellants contend that the act of 1908 providing for deposit of State moneys by the State treasurer and for payment of interest on the same contravenes several provisions of the constitution and is therefore void. There is no attempt in this proceeding to make any application of this statute which will prejudicially affect the interests of any of the appellants, and its validity or invalidity is therefore wholly immaterial to the issues of this case. (*State of Texas* v. *Interstate Commerce Com.* 258 U. S. 158, 42 Sup. Ct. 261.) A court will not, as a general rule, consider or determine the constitutionality of a statute unless a decision upon that point becomes necessary to effectually and properly dispose of the case at hand. (*People* v. *Long,* 297 Ill. 194; *State* v. *State Board of Equalizers,* 84 Fla. 592, 30 A. L. R. 362; *Kimbley* v. *Adair,* 32 Ida. 790, 189 Pac. 53; *Sabre* v. *Rutland Railroad Co.* 86 Vt. 347, 85 Atl. 693; *Bedford* v. *Shilling,* 4 S. & R. 401, 8 Am. Dec. 718.) The act in question was repealed in 1919. A decision of the constitutional questions presented would not in any way affect the decision of this case, so we decline to consider them.

The bill alleges and the decree finds that Small and the Curtises entered into an unlawful confederacy to use the public moneys for their private gain. In order to support this allegation and finding it is essential that the conspiracy be established by the evidence, but it is not necessary to prove that the co-conspirators came together and actually agreed, in terms, to pursue their common design by common means. If it is proven that the co-conspirators pursued by their acts the same object, often by the same means, one performing one part and another another part of the same, so as to complete it with a view of attainment of the same object, the natural deduction from this proof is that

they were engaged in a conspiracy to effect that object. (*People* v. *Lloyd*, 304 Ill. 23; *Musser* v. *State*, 157 Ind. 423, 61 N. E. 1; *State* v. *Caine*, 134 Iowa, 147, 111 N. W. 443; *Kelley* v. *People*, 55 N. Y. 565, 14 Am. Rep. 342; Roscoe on Crim. Evidence, *386.) A conspiracy may generally be inferred from circumstances. It is seldom that any one act, taken by itself, will establish a conspiracy, but when taken in connection with other acts it may appear clearly that the series of wrongful acts result from concerted and associated action. Considered separately the acts of a conspiracy are rarely of an unequivocally guilty character, and they can be properly estimated only when connected with all the surrounding circumstances. Where a conspiracy is once established, every act and declaration of each member in furtherance of the common design is in contemplation of law the act and declaration of all the members and is therefore original evidence against each of them. *People* v. *Lloyd, supra; Lasher* v. *Littell*, 202 Ill. 551; 2 Wigmore on Evidence,—2d ed.—sec. 1079; 2 Jones' Com. on Evidence, sec. 254.

Saturday, April 21, 1917, Small ordered the clerks in the treasurer's office to open on the "tickler," or daily cash statement which showed the distribution of funds within the treasury, an additional account called "Safe Account." He directed the assistant treasurer to issue a draft for $50,000 payable to the Grant Park Bank, to mail the draft to said bank at Grant Park, and to charge the amount of the draft to Safe Account. No record was kept in the treasurer's office which showed that a deposit had been made in the Grant Park Bank or that any collateral had been deposited to secure it. The only record of this deposit was the private account kept by Small personally in his private safe in his private office above his bank in Kankakee. On the same day the Safe Account was initiated and the draft for $50,000 issued to the Grant Park Bank, some person whose identity is not revealed by this record opened an ac-

count called "Grant Park Bank" at the Grant Park Trust
and Savings Bank and deposited $5000 to the credit of this
account. On the same day some unidentified person with-
drew $3000 from this account and opened an account called
"Grant Park Bank" at the Fort Dearborn National Bank in
Chicago. The State treasurer had a checking account at the
Fort Dearborn National Bank, and on the same day Small
ordered the $50,000 draft issued to the Grant Park Bank
this checking account shows a debit of $50,000, indicating
the presentation and payment of a check or draft for that
amount on that day. The $50,000 sent to the Grant Park
Bank from the State treasury was not deposited in either
of the accounts bearing that name, but E. C. Curtis pur-
chased with this treasurer's draft a cashier's check of the
Fort Dearborn Bank for $50,000, payable to himself. He
endorsed this to the Live Stock Exchange National Bank,
and that bank delivered to him a note of Swift & Co. for
$50,000. It discounted this note for 184 days at four and
one-half per cent and gave the discount of $1150 to Curtis
by cashier's check, which he endorsed and deposited in an
account known as "E. C. Curtis, Special," in the Grant
Park Trust and Savings Bank. Swift & Co.'s account at
the Live Stock Exchange Bank was credited with $48,850
and the note which Curtis received was delivered to Small.
While Curtis was arranging this loan with Swift & Co. he
told its treasurer that he and his associates were in control
of some twenty-odd banks throughout the State and that
he was acting as the agent of these banks in making loans.
On the same day V. S. Curtis ordered certain supplies
printed for the Grant Park Bank, explaining to the printer
that he and his brother were rejuvenating a private bank
that had been dormant for several years, that it was being
revived for a special purpose, and that they wanted the
matter treated confidentially. He ordered a ledger, a rub-
ber stamp, a few deposit slips, a few time certificates of
deposit and a few demand certificates, and said he would

not need any checks, drafts or other bank supplies, because the bank would not do a regular banking business. These transactions show concerted action on the part of Small and the Curtises and establish that they were by their acts pursuing the same object, one performing one part and another another part of the same so as to complete the plan with a view of attainment of the object.

While it is not essential to show the non-existence of the Grant Park Bank in order to sustain the decree requiring appellants to account to appellee, it becomes important in the consideration of the case to determine whether the Grant Park Bank was doing a legitimate banking business or whether it was a mere makeshift used by Small and the Curtises to defraud the State of interest due it on several million dollars of public money used to buy notes of the packers and other securities.

Between 1890 and 1898 Alonzo Curtis conducted at Grant Park, at first in his general store and later in a separate building, a private bank called the Grant Park Bank. In the latter year he and his sons, E. C. and V. S., organized the Grant Park National Bank, which took over all the business and assets of the Grant Park Bank and continued thereafter to conduct a general banking business in the building formerly occupied by the latter. In 1907 the National bank, with the savings department organized as an auxiliary to it, was changed into a State bank, known as the Grant Park Trust and Savings Bank. Five people testified that they had made deposits in the Grant Park Bank between 1898 and 1917, and three people testified that they had borrowed money from such a bank during the same period. This testimony, if given full credit, proves only that E. C. Curtis was doing business with a few relatives and business associates under the style "Grant Park Bank." During this period Grant Park was a village of about 500 people, with twelve or fifteen business houses. Twenty-two people, who had lived and transacted business in Grant Park

and that section of Kankakee county for many years and
who were well acquainted with the Curtises, testified that
the Grant Park Bank went out of existence in 1898 and
that they had not heard of its doing any business since;
that checks were generally used in the transaction of busi-
ness in Grant Park, and that they had never since 1898 seen
a check drawn on the Grant Park Bank.   While millions
of dollars went out of the State treasury by drafts pay-
able to the Grant Park Bank, not a single dollar was ever
paid back into the treasury in its name or by its check or
draft.   None of the public moneys "deposited" with it
were loaned in its name.   None of the interest and dis-
counts on the loans to the packers was paid by the pack-
ers to the Grant Park Bank.   Small says that the Grant
Park Bank was doing a general banking business in 1917
and 1918, but he could not give the name of a single de-
positor except the State of Illinois.   The Grant Park Bank
had no place of business, no furniture or fixtures, no rec-
ords or files.   Small testified that he transacted his business
with the Grant Park Bank wherever he met Edward C.
Curtis; that sometimes it was in the Grant Park Trust and
Savings Bank and sometimes in the office of the Curtis
Trust Company, at Grant Park.   Ole T. Olesen, one of
Small's appointees and one of the persons who testified that
he borrowed some money from the Grant Park Bank in
1907, says the money was delivered to him by E. C. Curtis
in Small's office in Kankakee and that he re-paid the money
to Curtis in the Lafayette Hotel, in Kankakee.   Appellants
did not produce any of the certificates which Small says
were issued to him by the Grant Park Bank, nor did any
person who claims to have borrowed money from this bank
produce a canceled note or other record to substantiate his
testimony.   No useful purpose will be served by stating in
detail the testimony with reference to the existence of the
Grant Park Bank.   It is established by the evidence in this
record that the Grant Park Bank was a mere temporary ex-

pedient used by Small and the Curtises to conceal the transactions with the packers.

The manner in which the records were kept in the treasurer's office in reference to the Safe Account, which was the money turned over to the individuals doing business as the Grant Park Bank, is a marked departure from the usual manner in which money was deposited in banks by the State treasurer. This system was inaugurated under the directions of Small on April 21, 1917. Prior to that time, when a bank desired to obtain a deposit of State money, securities were delivered to the treasurer and examined before any deposit was made; securities to be used as collateral for a deposit were never purchased with the proceeds of that deposit; a certificate of deposit was delivered to the treasurer before the draft was issued transmitting the deposit; a certificate of deposit was never paid out of the proceeds of the collateral; the collateral was retained until the certificate of deposit was paid; the name of the bank issuing the certificate of deposit appeared in the record in the treasurer's office showing the date and amount of certificates of deposit and the securities deposited as collateral; all the records of such certificates and securities were kept at the treasurer's office at Springfield and the clerical work of keeping such records was performed by the clerks in the treasurer's office; interest statements were mailed to each bank holding such deposits on the first of each month, and the interest payment was sent to the treasurer's office at Springfield. During Small's term between 200 and 300 banks in the State of Illinois had small deposits of State money under this usual and regular plan. The "deposits" made in the Grant Park Bank took a different course. The money from the treasury was sent to the Grant Park Bank by mailing a draft to it at Grant Park. This money was used by Curtis to buy securities. The certificates of deposit were issued, if at all, on the receipt of the deposit but before the delivery of collateral. Neither the collateral, nor a record of it, was kept

in the treasurer's office at Springfield. No interest statements were rendered and no interest was paid at the treasurer's office. From two to six days before maturity of the securities alleged to have been deposited with Small as collateral for deposits in the Grant Park Bank they were surrendered to Curtis, collected by him, and Small directed whether the proceeds should be re-loaned or returned to the treasury. For instance, in item 4, analyzed in a subsequent paragraph, Small surrendered to E. C. Curtis an Armour note for $300,000, which he says he was holding as collateral to secure a deposit of $300,000 in the Grant Park Bank, six days before it was due, and for that six days the "deposit" was not secured. In item 5 all of the $300,000 "deposit" was unsecured for two days and half of it for four days. Two hundred fifty thousand dollars used in item 19 was held by Curtis from item 18 six days before it was loaned. Items 23 and 25, which are $500,000 Armour notes, were surrendered by Small at least four days before maturity, so that $1,000,000 of State money was in the hands of E. C. Curtis unsecured. And so in many other instances was Curtis in possession of thousands of dollars of public funds from the State treasury for several days and Small had no collateral to secure these "deposits." The only record kept showing the number and amount of certificates issued and the collateral deposited was kept personally by Small at his private office at Kankakee. If any interest was paid into the State treasury upon any of the moneys represented by the Safe Account, which was often half the total sum in Small's custody as State treasurer, there is no record or writing of any kind or character to show such payment. E. C. Curtis visited the treasurer's office at least once a month, and often weekly, and walked inside the cashier's cage and looked over the tickler, which was the only record in the office showing the Safe Account.

As a justification for the establishment of the Safe Account, Small points out that the heaviest receipts into the

State treasury are from April 1 to August 1, when the taxes from the various counties are received, and that the disbursements are heaviest between September 1 and February 1, making it necessary to have a large part of the funds deposited so that they can be called into the treasury upon short notice. He testifies that E. C. Curtis, as president of the Grant Park Bank, agreed to accept as deposits the portion of the funds in the State treasury which would be subject to call and to place with the treasurer, as collateral, securities which were readily· marketable and which could be converted into cash on short notice. On this point the record shows that while E. C. Curtis was laying the foundation for the loans to the packers he told them that he was acting as the financial agent for a string of banks which he and his associates controlled, and that he pooled the funds of these banks and bought notes for large sums directly because he could loan the surplus of the several banks to better advantage than they themselves could, and because he could make more favorable terms to the borrowers by giving them advance notice if he found it necessary to have the loan paid when the note was due. That Small co-operated with Curtis in carrying out this arrangement is clearly shown by the fact that he advised Curtis whether the proceeds of a packer's note were to be turned into the treasury or re-loaned when collected and that he delivered the notes to Curtis several days before they were due. The more important fact showing that the moneys deposited with the Grant Park Bank were not call moneys is, that in no instance during the two years was any of the $30,000,000 loaned to the packers called by the treasury before the note was due. Almost all the loans were discounted for a definite period, usually six months. The agreement made by E. C. Curtis with the packers that money would be available for definite periods and that the payment of the notes would not be demanded without due notice was carried out.

Before making an analysis of the transactions with the packers we present herewith a table showing in tabular form and chronological order all packers' notes which appellee contends were purchased with funds from the State treasury, and a few smaller notes directly connected with these transactions:

| Line | Item | Date | Money from | Amount | Loaned to | Amount | Int. Paid | Disposition of Principal |
|---|---|---|---|---|---|---|---|---|
| | | 1917 | | | | | | |
| 1 | 1 | April 21 | Treasury | $50,000.00 | Swift | $50,000 | $1,150.00 | Ret. to treasury. |
| 2 | 2 | April 27 | Treasury | 250,000.00 | Swift | 50,000 | 1,284.72 | Ret. to treasury. |
| 3 | 2 | | | | Morris | 50,000 | 1,156.25 | Ret. to treasury. |
| 4 | 2 | | | | Wilson | 50,000 | 1,156.25 | Ret. to treasury. |
| 5 | 2 | | | | Armour | 100,000 | 2,350.00 | Ret. to treasury. |
| 6 | 4 | May 11 | Treasury | 300,000.00 | Armour | 300,000 | 7,833.33 | Ret. to treasury. |
| 7 | 4-A | May 15 | Interest, line 6 | 7,312.50 | Unknown | 7,500 | 187.50 | Into note, line 40½. |
| 8 | 5 | May 18 | Treasury | 300,000.00 | Wilson | 50,000 | 1,284.72 | Ret. to treasury. |
| 9 | 5 | | | | Swift | 100,000 | 2,569.44 | Ret. to treasury. |
| 10 | 5 | | | | Armour | 150,000 | 3,854.17 | Ret. to treasury. |
| 11 | 5-A | May 21 | Dis. Item 5_____ G. P. T. & S. acct. Grant Park Bk 579.17 | | Unknown | 8,500 | 212.50 | Edward C. Curtis. |
| 12 | 6 | May 25 | Treasury | 100,000.00 | Morris | 100,000 | 2,125.00 | Ret. to treasury. |
| 13 | 7 | July 6 | Treasury | 300,000.00 | Swift | 100,000 | 2,697.91 | Swift note, line 42. |
| 14 | 7 | | | | Armour | 150,000 | 4,025.00 | Ret. to treasury. |
| 15 | 7 | July 5 | E. C. C. Special | 30,000.00 | Armour | 30,000 | 805.00 | Armour note, line 43. |
| 16 | 7 | | (See line 13) | | Morris | 50,000 | 845.84 | Swift notes, lines 39 and 40. |
| 17 | 8 | July 13 | Treasury | 300,000.00 | Morris | 100,000 | 1,555.54 | Swift notes, lines 39 and 40. |
| 18 | 8 | | | | Armour | 100,000 | 2,597.22 | Armour note, line 46. |
| 19 | 8 | | | | Swift | 100,000 | 2,569.44 | Swift note, line 45. |
| 20 | 9 | July 14 | Treasury | 400,000.00 | Swift | 150,000 | 3,833.33 | Ret. to treasury. |
| 21 | 9 | | | | Armour | 150,000 | 3,833.33 | Ret. to treasury. |
| 22 | 9 | | | | Morris | 100,000 | 1,513.89 | Swift notes, lines 39 and 40. |
| 23 | 10 | July 25 | Treasury | 300,000.00 | Morris | 100,000 | 1,388.89 | Swift notes, lines 39 and 40. |
| 24 | 10 | | | | Swift | 100,000 | 2,555.56 | Ret. to treasury. |
| 25 | 10 | | | | Armour | 100,000 | 2,541.67 | Ret. to treasury. |
| 26 | 11 | July 27 | Treasury | 300,000.00 | Armour | 100,000 | 2,583.33 | Arm'r notes, line 48. |
| 27 | 11 | | | | Swift | 100,000 | 2,555.56 | Ret. to treasury. |
| 28 | 11 | | | | Morris | 100,000 | 1,319.46 | Swift notes, lines 39 and 40. |
| 29 | 51 | July 26 | Account G. P. Bk. | 19,500.00 | Swift | 20,000 | 500.00 | Swift note, line 47. |
| 30 | 12 | July 30 | Treasury | 400,000.00 | Morris | 150,000 | 1,958.34 | Swift notes, lines 39 and 40. |
| 31 | 12 | | | | Armour | 150,000 | 3,812.50 | Arm'r notes, line 48. |
| 32 | 12 | | | | Swift | 100,000 | 2,555.56 | Swift note, line 49. |
| 33 | 13 | Aug. 3 | Treasury | 400,000.00 | Swift | 400,000 | 5,000.00 | Ret. to treasury. |
| 33½ | 51 | Aug. 5 | Account G. P. Bk. | 26,325.00 | Unknown | 27,000 | 675.00 | Note, line 50½. |
| 34 | 15 | Sept. 8 | Treasury | 300,000.00 | Cudahy | 50,000 | 882.29 | Cudahy note, line 44. |
| 35 | 15 | | | | Wilson | 100,000 | 2,245.80 | Wilson note, line 51. |
| 36 | 15 | | | | Wilson | 100,000 | 2,654.20 | Wilson note, line 55. |
| 37 | 15 | | | | Wilson | 50,000 | 1,327.08 | Wilson note, line 56. |
| 38 | 16 | Sept. 11 | Treasury | 300,000.00 | Swift | 300,000 | 2,583.33 | Ret. to treasury. |
| 39 | 12-A | Nov. 2 | Morris notes, lines 16, 17, 22, 23, 28, 30 | 600,000.00 | Swift | 300,000 | 5,800.00 | Swift note, line 53. |
| 40 | 12-A | Nov. 2 | | | Swift | 300,000 | 6,100.00 | Swift note, line 54. |
| 40½ | 56 | Nov. 14 | Account G. P. Bk. Proceeds note, line 7 | 19,600.00 7,073.75 | Unknown | 27,500 | 825.00 | Swift note, line 76. |
| 41 | 17 | Dec. 10 | Treasury | 200,000.00 | Swift | 200,000 | 2,400.00 | Swift note, line 52. |
| | | 1918 | | | | | | |
| 42 | 7 | Jan. 7 | Swift note, line 13 | 100,000.00 | Swift | 100,000 | 3,033.33 | Ret. to treasury. |

| Line | Item | Date | Money from | Amount | Loaned to | Amount | Int. Paid | Disposition of Principal |
|---|---|---|---|---|---|---|---|---|
| 43 | 7 | Jan. 7 | Arm'r note, line 15 | $30,000.00 | Armour___ | $30,000 | $910.00 | Paid into treasury. |
| 44 | 15 | Jan. 10 | Cudahy note, line 34_____ | 50,000.00 | Cudahy___ | 50,000 | 1,508.33 | Ret. to treasury. |
| 45 | 8 | Jan. 14 | Swift note, line 19 | 100,000.00 | Swift_____ | 100,000 | 3,033.33 | Swift note, line 93. |
| 46 | 8 | Jan. 16 | Arm'r note, line 18 | 100,000.00 | Armour___ | 100,000 | 3,016.67 | Ret. to treasury. |
| 47 | 51 | Jan. 26 | Swift note, line 29 | 20,000.00 | Swift_____ | 20,000 | 603.33 | Swift note, line 94. |
| 48 | 12 | Jan. 30 | Arm'r note, line 26  Arm'r note, line 31 | 100,000.00  150,000.00 | Armour___ | 250,000 | 7,541.67 | Swift note, line 94. |
| 49 | 12 | Jan. 31 | Swift note, line 32 | 100,000.00 | Swift_____ | 100,000 | 3,016.70 | Swift note, line 94. |
| 50 | 12-B | Jan. 31 | Int. lines 47-49__  Curtis Tr. Co. Ck. | 11,055.00  19,500.00 | Armour___ | 31,500 | 945.00 | Swift note, line 94. |
| 50½ | 51 | Feb. 6 | Note, line 33½__ | 27,000.00 | Unknown_ | 27,000 | 690.00 | Paid into treasury. |
| 51 | 15 | Feb. 11 | Wilson note, line 35_____ | 100,000.00 | Wilson____ | 100,000 | 3,033.33 | Edward C. Curtis. |
| 52 | 17 | Feb. 20 | Swift note, line 41 | 200,000.00 | Swift_____ | 200,000 | 6,033.33 | Ret. to treasury. |
| 53 | 12-A | Feb. 26 | Swift note, line 39 | 300,000.00 | Swift_____ | 300,000 | 9,050.00 | Swift note, line 95. |
| 54 | 12-A | Mar. 4 | Swift note, line 40 | 300,000.00 | Swift_____ | 300,000 | 9,200.00 | Swift note, line 96. |
| 55 | 15 | Mar. 11 | Wilson note, line 36_____ | 100,000 | Wilson ___ | 100,000 | 4,625.00 | Ret. to treasury. |
| 56 | 15 | Mar. 11 | Wilson note, line 37_____ ___ | 50,000.00 | Wilson____ | 50,000 | ___ | Ret. to treasury. |
| 57 | ___ | _____ | Unascertained__ | ___ | Swift_____ | 15,000 | 460.00 | Paid into treasury. |
| 58 | 56 | April 8 | G. P. T. & S. Bk. | 27,146.00 | Armour___ | 28,000 | 854.00 | Paid into treasury. |
| 59 | 18 | April 10 | Treasury (see line 61)_____ | 500,000.00 | Wilson____ | 250,000 | 13,270.87 | Ret. to treasury. |
| 60 | 18 | April 12 | Interest, line 59 _ | 13,210.00 | Wilson____ | 13,950 | 740.50 | Paid into treasury. |
| 61 | 19 | April 15 | Treasury_____ | 500,000.00 | Armour___ | 1,000,000 | 52,305.56 | Armour notes, lines 111 and 112. |
| ___ | ___ | April 16 | Treasury_____ | 250,000.00 | _____ | | | |
| 62 | 19 | April 16 | Interest, line 61 _ | 52,123.19 | Armour___ | 55,000 | 2,876.81 | Paid into treasury. |
| 63 | 21 | April 17 | Treasury_____ | 500,000.00 | Armour___ | 500,000 | 26,055.56 | Amr'r note, line 113 |
| 64 | 22 | April 18 | Treasury_____ | 500,000.00 | Armour___ | 500,000 | 25,958.33 | Arm'r note, line 114. |
| 65 | 22 | April 18 | Int. lines 61,63,64 | 144.58 | Armour___ | 55,000 | 2,855.42 | Paid into treasury. |
| 66 | 23 | April 19 | Treasury_____ | 500,000.00 | Armour___ | 500,000 | 25,569.44 | Ret. to treasury. |
| 67 | 25 | April 20 | Treasury_____ | 500,000.00 | Armour___ | 500,000 | 25,472.22 | Ret. to treasury. |
| 68 | 25 | April 20 | Int. lines 66 and 67 | 47,452.78 | Armour___ | 50,000 | 2,547.22 | Paid into treasury. |
| 69 | 26 | April 23 | Treasury_____ | 500,000.00 | Swift_____ | 500,000 | 25,123.30 | Swift note, line 108. |
| 70 | 27 | April 25 | Treasury_____ | 500,000.00 | Swift_____ | 500,000 | 24,835.60 | Swift note, line 107. |
| 71 | 27 | April 25 | Int. lines 65,68-70 | 52,268.09 | Swift_____ | 55,000 | 2,731.91 | Paid into treasury. |
| 72 | 29 | May 2 | Treasury_____ | 500,000.00 | Swift_____ | 500,000 | 18,083.30 | Swift note, line 100. |
| 73 | 30 | May 3 | Treasury_____ | 500,000.00 | Swift_____ | 500,000 | 16,041.67 | Swift note, line 99. |
| 74 | 29 | May 6 | Int. lines 72 and 73 | 33,775.00 | Swift_____ | 35,000 | 1,225.00 | Paid into treasury. |
| 75 | 31 | May 7 | Treasury_____ | 500,000.00 | Swift_____ | 500,000 | 13,513.90 | Swift note, line 98. |
| 76 | 56 | May 13 | Note, line 40½__ | 27,500.00 | Swift_____ | 27,500 | 740.34 | Paid into treasury. |
| 77 | 32 | May 16 | Treasury_____ | 500,000.00 | Armour___ | 500,000 | 12,736.11 | Swift note, line 97. |
| 78 | 33 | May 17 | Treasury_____ | 500,000.00 | Armour___ | 500,000 | 15,652.78 | Ret. to treasury. |
| 79 | ___ | May 17 | Acct. G. P. Bank.  Int. lines 77, 78__ | 671.94  28,388.89 | Armour___ | 30,000 | 939.17 | Paid into treasury. |
| 80 | 34 | June 1 | Treasury_____ | 500,000.00 | Armour___ | 500,000 | 17,013.89 | Swift note, line 101. |
| 81 | 35 | June 3 | Treasury_____ | 500,000.00 | Armour___ | 500,000 | 17,694.44 | Swift note, line 103. |
| 82 | ___ | June 3 | Int. lines 80 and 81. | 33,761.39 | Armour___ | 35,000 | 1,238.61 | Paid into treasury. |
| 83 | 36 | June 7 | Treasury_____ | 500,000.00 | Swift_____ | 500,000 | 15,652.80 | Ret. to treasury. |
| 84 | ___ | June 7 | Int. lines 75 and 83 | 29,060.83 | Swift_____ | 30,000 | 939.17 | Edward C. Curtis. |
| 85 | 37 | June 11 | Treasury_____ | 500,000.00 | Swift_____ | 500,000 | 20,322.61 | Ret. to treasury. |
| 86 | 38 | June 11 | Treasury_____ | 500,000.00 | Swift_____ | 490,000 | 6,533.33 | Ret. to treasury. |
| 87 | 38 | _____ | _____ | ___ | Swift_____ | 100,000 | 4,763.90 | Edward C. Curtis. |
| 88 | 11 | July 2 | Treasury_____ | 500,000.00 | Cudahy___ | 500,000 | 18,666.67 | Cud'y note, line 115. |
| 89 | 12 | July 5 | Treasury_____ | 500,000.00 | Cudahy___ | 500,000 | 18,375.00 | Cud'y note, line 116. |
| 90 | 43 | July 10 | Treasury_____ | 500,000.00 | Swift_____ | 500,000 | 17,888.88 | Swift note, line 110. |
| 91 | 44 | July 11 | Treasury_____ | 500,000.00 | Swift_____ | 500,000 | 17,597.22 | Swift note, line 106. |
| 92 | 45 | July 15 | Treasury_____ | 500,000.00 | Cudahy___ | 500,000 | 17,402.78 | Cud'y note, line 117. |
| 93 | 46 | July 16 | Treasury_____  Swift note, line 45 | 400,000.00  100,000.00 | Swift_____ | 500,000 | 17,305.43 | Swift notes, Nos. 7577-9. |
| 94 | 51 | July 31 | Treasury_____ | 98,500.00 | Swift_____ | 500,000 | 12,055.60 | Swift note, line 102. |
| ___ | ___ | July 30 | Arm'r note, line 48 | 250,000.00 | _____ | | | |
| ___ | ___ | _____ | Arm'r note, line 50 | 31,500.00 | _____ | | | |
| ___ | ___ | July 31 | Swift note, line 49 | 100,000.00 | _____ | | | |
| ___ | ___ | _____ | Swift note, line 47 | 20,000.00 | _____ | | | |
| 95 | 12-A | Aug. 26 | Swift note, line 53 | 300,000.00 | Swift_____ | 300,000 | 7,991.90 | Swift notes, Nos. 7577-9. |

| Line | Item | Date | Money from | Amount | Loaned to | Amount | Int. Paid | Disposition of Principal |
|---|---|---|---|---|---|---|---|---|
| 96 | 12-A | Sept. 4 | Swift note, line 54 | $300,000.00 | Swift____ | $300,000 | $7,466.67 | Swift notes, Nos. 7577-9. |
| 97 | 32 | Sept. 25 | Arm'r note, line 77 | 500,000.00 | Swift____ | 500,000 | 10,402.77 | Swift note, line 109. |
| 98 | 31 | Oct. 3 | Swift note, line 75 | 500,000.00 | Swift____ | 500,000 | 9,333.33 | Swift note, line 105. |
| 99 | 30 | Oct. 15 | Swift note, line 73 | 500,000.00 | Swift____ | 500,000 | 6,125.00 | Swift note, line 104. |
| 100 | 29 | Nov. 4 | Swift note, line 72 | 500,000.00 | Swift____ | 500,000 | 5,055.55 | Ret. to treasury. |
| 101 | 34 | Nov. 25 | Arm'r note, line 80 | 500,000.00 | Swift____ | 500,000 | 17,500.00 | Swift note, No. 4481. |
| 102 | 51 | Dec. 2 | Swift note, line 94 | 500,000.00 | Swift____ | 500,000 | 17,694.44 | Swift note, No. 4482. |
| 103 | 35 | Dec. 2 | Arm'r note, line 81 | 500,000.00 | Swift____ | 500,000 | 18,958.33 | Swift note, No. 8101. |
| 104 | 30 | Dec. 17 | Swift note, line 99 | 500,000.00 | Swift____ | 500,000 | 18,472.22 | Ret. to treasury. |
| | | 1919 | | | | | | |
| 105 | 31 | Jan. 7 | Swift note, line 98 | 500,000.00 | Swift____ | 500,000 | 5,347.20 | Ret. to treasury. |
| 106 | 44 | Jan. 8 | Swift note, line 91 | 500,000.00 | Swift____ | 500,000 | 5,930.60 | Cudahy notes, Nos. 8616-25. |
| 107 | 27 | Jan. 9 | Swift note, line 70 | 500,000.00 | Swift____ | 500,000 | 6,806.00 | Wilson note No. 4482 Cudahy notes, Nos. 8640-44. |
| 108 | 26 | Jan. 10 | Swift note, line 69 | 500,000.00 | Swift____ | 500,000 | 26,541.70 | Swift note, No. 6606. |
| 109 | 32 | Jan. 10 | Swift note, line 97 | 500,000.00 | Swift____ | 500,000 | 22,847.00 | Armour note, No. 41528. |
| 110 | 43 | Jan. 10 | Swift note, line 90 | 500,000.00 | Swift____ | 500,000 | 28,875.00 | Ret. to treasury. |
| 111 | 19 | Jan. 10 | Arm'r note, line 61 | 1,000,000.00 | Armour___ | 500,000 | 20,708.33 | Ret. to treasury. |
| 112 | 19 | Jan. 10 | ____ | ____ | Armour___ | 500,000 | 21,583.33 | Armour note, No. 40845. |
| 113 | 21 | Jan. 10 | Arm'r note, line 63 | 500,000.00 | Armour___ | 500,000 | 23,625.00 | Ret. to treasury. |
| 114 | 22 | Jan. 10 | Arm'r note, line 64 | 500,000.00 | Armour___ | 500,000 | 24,791.67 | Ret. to treasury. |
| 115 | 41 | Jan. 10 | Cudahy note, line 88 | 500,000.00 | Cudahy___ | 500,000 | 3,986.11 | Ret. to treasury. |
| 116 | 42 | Jan. 10 | Cudahy notes, line 89 | 500,000.00 | Cudahy___ | 500,000 | 20,125.00 | Armour note, No. 40301. |
| 117 | 45 | Jan. 10 | Cudahy notes, line 92 | 500,000.00 | Cudahy___ | 500,000 | 22,069.44 | Ret. to treasury. |

The first transaction was analyzed in reciting the occurrences of April 21, 1917. Six days later the second draft (item 2 in the tabulation) was issued to the Grant Park Bank and it was added to the Safe Account, making its total $300,000. On the day this addition of $250,000 was made to the Safe Account, E. C. Curtis purchased four cashier's checks at the Fort Dearborn National Bank payable to himself and totaling $250,000, and the treasurer's checking account at that bank was charged the amount of these checks. Curtis used the checks at the Live Stock Exchange National Bank to buy three notes due October 29, 1917,—Swift & Co. $50,000, discounted five per cent, Wilson & Co. $50,000, discounted four and one-half per cent, and Morris & Co. $50,000, discounted four and one-half per cent,—and one note of Armour & Co. for $100,000, due November 1, 1917, and discounted four and one-half per cent. The discounts on these four notes were paid to

Curtis by four cashier's checks for the respective amounts of the several discounts, and these checks were used to purchase a draft at the Grant Park Trust and Savings Bank, of which Curtis was president. When the Swift and Morris loans came due they were paid at the Live Stock Exchange and the next day a cashier's check for $100,000 was delivered to Curtis. The Wilson note was paid and Curtis was given another cashier's check for $50,000. These checks were endorsed by Curtis, and his endorsement is followed by the clearing house stamp of the Fort Dearborn. October 30, 1917, that bank issued a deposit slip depositing to the credit of the State treasurer two checks, one for $100,000 and the other for $50,000. The Armour note came due the following day and it was paid through the Live Stock Exchange. On the same day item 13 (a Swift note for $400,000) was paid and a cashier's check payable to Curtis for $500,000 was issued. This check is endorsed by Curtis, and his endorsement is followed by the Fort Dearborn clearing house stamp. November 2 that bank issued a deposit slip showing the deposit of a check for $500,000 to the credit of the treasurer's account. The tickler in the treasurer's office indicated a reduction in the Safe Account of $150,000 October 30 and one of $500,000 November 2 and corresponding increases in the treasurer's account at the Fort Dearborn. None of these Live Stock Exchange checks were deposited to the account designated "Grant Park Bank" at the Fort Dearborn. If certificates of deposit were issued to Small at the time the drafts were issued by him to the Grant Park Bank there is no record to show that these certificates of deposit have been paid and canceled.

There is no item 3. Item 4 is a "deposit" of $300,000 in the Grant Park Bank. This went into an Armour note for $300,000, dated May 12, 1917, and due November 16, 1917. It was discounted at five per cent and the Live Stock Exchange issued to E. C. Curtis its cashier's check for

$7833.33. This discount check is endorsed by Curtis and the Grant Park Trust and Savings Bank and cleared through the Continental and Commercial National Bank in Chicago. Six days before this Armour note became due it was delivered to the Live Stock Exchange, which sent it to the Continental and Commercial National for collection. The latter collected it on its due date, November 16, and credited the proceeds to the account of the Live Stock Exchange. The latter issued its cashier's check to Curtis for $300,000, which check bears the endorsement of Curtis and the clearing house stamp of the Fort Dearborn. The Fort Dearborn credited the State treasurer's account with the proceeds of this check and sent a duplicate deposit slip to the treasurer's office at Springfield. There the tickler showed the Safe Account reduced $300,000 and the Fort Dearborn account increased a like amount. It will be· noted that this deposit of $300,000 made by the State treasurer did not pass through any account called "Grant Park Bank," going out of the treasury or returning to it, nor is the discount check credited to any "Grant Park Bank" account.

Item 4-A shows a disposition of some of the discount received on item 4. As we have stated, this discount check for $7833.33 cleared at the Continental and ·Commercial National May 15. This, together with a demand certificate for $272.22 surrendered at the Grant Park Trust and Savings, makes a total in Curtis' hands of $8105.55. He deposited at the Grant Park Trust and Savings to his account called "Grant Park Bank" $793.05, leaving in his hands $7312.50. With this sum he purchased a draft of the Grant Park Trust and Savings on its account at the Continental and Commercial National, which was paid and charged against that account May 15. This sum ($7312.50) would exactly purchase a six-months note for $7500 at five per cent discount, and such a note would be due November 14, 1917, on which date the Live Stock Exchange collected that sum for Curtis and credited his account accord-

ingly. On the same day it issued to him a cashier's check for $7500, which he endorsed at the Grant Park Trust and Savings. November 15 the latter bank credited Curtis' account called "Grant Park Bank" with $426.25 and issued its draft for $7073.75, which November 16 was charged against its account at the Continental and Commercial National. November 14, $19,600 was withdrawn from the account called "Grant Park Bank" at the Grant Park Trust and Savings. These two sums total $26,673.75, which would almost exactly purchase a note for $27,500 discounted at six per cent for 180 days. Such a note would be due May 13, 1918, and on that date Swift gave Curtis a check for $740.34, which would pay the discount on a note for $27,500 at seven per cent due September 29, 1918. Curtis deposited this check to the account called "Grant Park Bank" at the Grant Park Trust and Savings. A Swift note for $27,500 and another for $15,000 were paid September 30, 1918, and the proceeds ($42,500) credited to Curtis' account at the Live Stock Exchange. This sum was paid to Curtis by a cashier's check, which was deposited to the credit of the State treasurer's account at the Fort Dearborn and the Safe Account at the office in Springfield was reduced $42,500. These transactions are shown in the foregoing table in lines 7, 40½, 57 and 76. It will be noted that this sum, made up in part, if not altogether, from discounts on packers' notes, was not paid into the State treasury by the Grant Park Bank, and none of the accounts called "Grant Park Bank" reflect the transaction. This money paid into the treasury had not come out of it. It was not paid into the treasury as interest earned on State money but was put there as principal. This item of $42,500 is a part of the item of $328,950 mentioned in a subsequent paragraph.

May 18, 1917, a treasurer's draft for $300,000 was presented at the Fort Dearborn and by it paid and charged against the treasurer's account. On the same day there

was added to the Safe Account on the tickler at the treasurer's office in Springfield the sum of $300,000. For the first time since it was opened, April 21, 1917, the account called "Grant Park Bank" at the Fort Dearborn shows a deposit. Three hundred thousand dollars was deposited in the account and a like amount immediately withdrawn to purchase a cashier's check payable to E. C. Curtis. The treasurer's draft did not go through any regular banking institution, as it would have done if a deposit had been made by the treasurer in an existing bank, but it was deposited directly to the account called "Grant Park Bank" in the Fort Dearborn. Instead of a Grant Park Bank check being used to purchase a packer's note, a cashier's check payable to Curtis was charged against the account called "Grant Park Bank" and was used by him at the Live Stock Exchange to buy a Wilson note for $50,000 due in 185 days at five per cent, a Swift note for $100,000 due in 185 days at five per cent, and an Armour note for $150,000 due November 20, 1917, at five per cent. The discount on the three notes ($7708.33) was paid to Curtis. When the Wilson and Swift notes came due, on November 19, they were paid, and the proceeds ($150,000,) were credited to Curtis' account at the Live Stock Exchange. Four days before the Armour note became due it was delivered to the Live Stock Exchange for collection and that bank transmitted it to the Continental and Commercial National, which collected it on its due date and credited the proceeds to the Live Stock Exchange, which in due course credited Curtis' account with $150,000. November 21 a cashier's check was issued by the Live Stock Exchange to Curtis for $300,000. This check was deposited at the Fort Dearborn to the credit of the State treasurer. A duplicate deposit slip was found in the treasurer's office, which apparently was the method by which the Springfield office was advised when to increase or reduce the Safe Account. On the day this deposit was made the Safe Account was reduced $300,000, showing

a return to the treasury of that amount. It will be remembered that this item of $300,000 went out of the State treasury May 18 into the account at the Fort Dearborn designated "Grant Park Bank," but when it came back into the treasury it was not by draft or check of the Grant Park Bank, nor is it shown in any account called "Grant Park Bank." If the Grant Park Bank issued a certificate of deposit for this sum there is no record or writing of any kind to show that such a certificate was issued, nor is there anything in this record to show that the certificate was paid and canceled.

Item 5-A, like item 4-A, relates not to money out of the State treasury but to circumstances showing the disposition of the discount on packers' notes. The check of the Live Stock Exchange for $7708.33 to Curtis' order for the discounts in item 5 cleared through the Continental and Commercial National on May 22. May 21 Curtis' account called "Grant Park Bank" at the Grant Park Trust and Savings is charged $529.17, which added to the amount of the Live Stock Exchange check makes $8237.50, and the next day a draft of the Grant Park Trust and Savings on the Continental and Commercial National for that identical sum was presented and paid at the latter bank, which indicates that the Live Stock Exchange check was probably used by Curtis at the Grant Park Trust and Savings on May 21, the proceeds going into the draft. The draft for $8237.50, and another of the same date for $50 charged to the same account called "Grant Park Bank," were used in Chicago by Curtis. The total ($8287.50) will exactly buy a six-months note for $8500 discounted at five per cent. On November 21, which is the date such a note would be due, the collection teller at the Live Stock Exchange collected for Curtis a note for $8500 and issued to him its cashier's check, which cleared through the Continental and Commercial National. The disposition of the proceeds of this check can not be determined from this record. This transaction, like

many others in the record, shows that the discount from the packers' notes did not go to the Grant Park Bank as an institution, and when it was put into the account called "Grant Park Bank" it went out, sooner or later, into drafts of the Grant Park Trust and Savings. This item is considered further in a later paragraph as a part of the item of $328,950.

Item 6, shown in the foregoing tabulation in line 12, took substantially the same course as item 5. The transactions with respect to item 7, shown in the tabulation in lines 13 to 16, inclusive, are somewhat complicated. July 6, 1917, $300,000 from the State treasury bought a Swift note of $100,000, an Armour note of $150,000 and a Morris note of $50,000, and the discount on these notes went into the account called "Grant Park Bank" at the Grant Park Trust and Savings. A $30,000 note of Armour & Co. bought by Curtis with funds from his "special" account also becomes involved in this item. On this day Small's account as State treasurer at the Fort Dearborn is charged with the payment of a draft for $300,000, but the account there called "Grant Park Bank" was not disturbed nor was any cashier's check issued to Curtis on this date. How Curtis conveyed the $300,000 from the Fort Dearborn to the Live Stock Exchange does not appear in the record, but the Live Stock Exchange books show that Curtis bought a Swift note for $100,000 discounted at five and one-fourth per cent for 185 days, and that there was credited to Curtis the $200,000 balance from the treasurer's draft, together with the discount of $2697.91 and the $30,000 withdrawn from the account "E. C. Curtis, Special" at the Grant Park Trust and Savings. With this credit Curtis on July 7 purchased two Armour notes,—one for $150,000 and the other for $30,000,—and withdrew $4830, which was the total discount. Of this, $4025 was deposited in the account called "Grant Park Bank" at the Grant Park Trust and Savings. It appears that the balance of $805 was deposited in the E. C. Curtis special account. The $50,000 remaining to

Curtis' credit out of this $300,000 transaction was used at the Live Stock Exchange on July 9, three days after it was turned over by Small, to purchase a Morris note for $50,000 discounted at five and one-fourth per cent for 184 days, and the discount ($1341.67) was paid to Curtis. The account called "Grant Park Bank" in the Grant Park Trust and Savings was credited July 14 with $9077.77, made up of this check and another for $7736.10, representing discount received July 13 on item 8. The proceeds from the Morris note go into the Swift note shown in item 12-A. The Swift note for $100,000 and the Armour notes for $150,000 and $30,000 in this item came due January 7, 1918, and were paid at the Live Stock Exchange. A cashier's check for $150,000 was issued to E. C. Curtis and bears his endorsement in the handwriting of V. S. Curtis and the clearing house stamp of the Fort Dearborn. Small's account at the Fort Dearborn was credited with $150,000 and the Springfield office advised accordingly. The "Grant Park Bank" account at the Fort Dearborn was undisturbed. On the same day Curtis purchased at the Live Stock Exchange a Swift note for $100,000 discounted at six per cent for 182 days, and the discount ($3033.33) was paid to Curtis and deposited by him to the account called "Grant Park Bank" at the Grant Park Trust and Savings. The $30,000 remaining was loaned to Armour, and the discount ($110) was paid to Curtis by cashier's check, but what became of the proceeds of this check is not revealed by this record. It was not credited to the account called "Grant Park Bank" nor to "E. C. Curtis, Special." The $100,000 Swift note and this $30,000 Armour note became due July 8, 1918, and were paid at the Live Stock Exchange. The cashier's check for $130,000 payable to E. C. Curtis and bearing the endorsement "E. C. Curtis by V. S. Curtis" and the clearing house stamp of the Fort Dearborn was deposited to Small's account as State treasurer at the Fort Dearborn and a duplicate deposit slip sent to the Springfield office. The $30,000

319—30

which becomes mingled with the $300,000 from the State treasury is not identified as State money nor as interest on State money nor as money belonging to any account called "Grant Park Bank." Notwithstanding this, the $30,000 is paid directly into the State treasury when a part of the $300,000 is returned. Later we shall show this $30,000 replaced principal "deposited" in the Grant Park Bank which was used in the transactions other than those with the packers.

We have analyzed all of the items shown by the detailed tabulation hereinbefore set out and find each transaction took substantially the same course as those outlined above, but we shall not further extend this opinion by setting out the details. This tabulation shows that through the device called the "Grant Park Bank" the Curtises, with the co-operation of Small, withdrew from the State treasury and invested in packers' notes $16,448,500, and that the investments and re-investments amounted to more than $30,000,000 during Small's term. The treasurer's drafts, totaling $16,883,500, were drawn in Springfield by one of the clerks in the treasurer's office pursuant to instructions from Small. Each draft was drawn on the Fort Dearborn payable to "Grant Park Bank" and sent to Grant Park by mail. E. C. Curtis received the draft so sent, and the same day he and Small would go to Chicago and Curtis would buy a packer's note or notes with the money and deliver the same to Small. None of such drafts issued during Small's term are in evidence. All canceled drafts and the draft registers for Small's term are missing from the treasurer's office. Except in two instances (items 4 and 7) drafts payable to "Grant Park Bank" purchased cashier's checks of the Fort Dearborn payable to E. C. Curtis. Eight treasurer's drafts amounting to $2,450,000 purchased directly Fort Dearborn checks, and these, together with the two drafts totaling $600,000, (items 4 and 7,) were not run through the account at the Fort Dearborn called "Grant Park Bank." All

the rest, totaling $13,833,500, were first deposited to the account called "Grant Park Bank" and a check immediately drawn against it, which directly paid for the Fort Dearborn checks to Curtis. It is evident the later items were run through the "Grant Park Bank" account to conceal the fact that public funds from the State treasury were being used to purchase packers' notes. Of the $16,883,500 withdrawn from the State treasurer's account, $16,448,500 was taken to the Live Stock Exchange, where it purchased packers' notes, and of the balance $50,000 was used by Curtis at the National City Company in Chicago, $50,000 purchased drafts of the Grant Park Trust and Savings, $100,-000 purchased American Thread Company bonds, $60,000 purchased Armour debentures, and appellee contends that the remaining $175,000 went into the purchase of stock of the Ridgely National Bank of Springfield. Of the part loaned to the packers, appellee's evidence tends to show $100,000 (proceeds of the Wilson note shown in line 51 of the tabulation) was used in the purchase of the Ridgely National stock, leaving $16,348,500 out in packers' notes. Of this amount $6,700,000 was returned to the treasury during Small's term directly from the proceeds of the collection of packers' notes, leaving at the end of Small's term $9,648,500 of principal outstanding in packers' notes. This, with the small Armour note ($31,500) shown in line 50, and the small Swift note ($20,000) shown in line 47, which did not represent principal directly from the treasurer's account but which went into the treasurer's account through a Swift note, (item 41, shown in line 94 of the tabulation,) makes the total shown in the Safe Account at the end of Small's term $9,700,000.

In the preceding paragraph we have seen that $535,000 withdrawn from the State treasury was used to purchase divers securities other than packers' notes. The question now before us being merely whether there is a liability to account, it is not necessary to lengthen this opinion by

a discussion of the details of the transactions involving
the Armour debentures, the American Thread bonds, the
Ridgely National stock, and the other items involved in
this sum. All of the $535,000 is traced back into the
treasurer's account in connection with the transactions with
the packers, and substantially all, if not all, of it was re-
placed by discounts collected from the packers. The tabu-
lation shows that during Small's term as treasurer more
than $1,000,000 in discounts was collected from the pack-
ers as a result of loans directly from the State treasury.
During 1917 and the early part of 1918 most of the dis-
count checks were made payable directly to E. C. Curtis
and were deposited to the credit of the account called
"Grant Park Bank" at the Grant Park Trust and Savings,
or bought drafts of that bank which were used by Curtis
to purchase other securities. All Cudahy discount checks
were payable to the Grant Park Trust and Savings. No
discount check was ever made payable to the Grant Park
Bank and none of the packers ever heard of such a bank
being connected with these transactions. From April, 1918,
to the end of Small's term, the discounts paid by the pack-
ers were generally paid by notes made to come due at the
same time as the principal notes, and the proceeds of these
discount notes were paid directly into the State treasury. In
this way $328,950 was returned to the treasury to replace
principal during November and December, 1918, and Janu-
ary, 1919. From July to November, 1918, most of the dis-
count collected in cash was used to buy demand certificates
at the Grant Park Trust and Savings. Since the canceled
certificates and the certificate register of that bank were lost,
concealed or destroyed, and therefore not produced, nothing
is known as to where or to whom this money, amounting
to $145,856.47, ultimately went, except that a portion of it
was used to buy drafts, which were deposited to the treas-
urer's account at the Fort Dearborn to replace principal
used in the purchase of the securities, other than packers'

notes, heretofore mentioned. There is $124,055.46 collected as discount during the last six months of Small's term which the evidence does not trace from the person collecting it. During the last three days of Small's term $214,050 collected as discount was deposited to Small's account as treasurer at the Fort Dearborn. There is traced into the State treasury a total of $842,000, which corresponds in amount to principal used in transactions other than those with the packers. None of this amount was money from the treasury nor was any of it paid into the treasury as interest. These transactions are important in the consideration of the question whether the State's money was used for private investment pursuant to an understanding between Small and the Curtises.

We have shown that Small established the Safe Account on April 21, 1917, with an initial charge of $50,000 to it. This account was used by Small to show the total of public funds represented by packers' notes and other special items of private investment noted in preceding paragraphs. During the last six months of Small's term substantially half of the total in the State treasury was represented by the Safe Account. July 31, 1918, there was in the treasury $26,268,688.71, and of this amount $13,908,500 was in the Safe Account. This was the largest amount of State money "on deposit in the Grant Park Bank" at any one time, and at that time the record shows it had no other depositor. We have also shown that the accounts called "Grant Park Bank" at the Grant Park Trust and Savings and the Fort Dearborn were opened April 21, 1917. An examination of the account called "Grant Park Bank" at the Fort Dearborn shows that, excluding $250.18 interest paid upon the daily balance, this balance remained at $3000 from the time the account was opened until it was closed, April 5, 1921, yet $25,336,750.18 passed through this account. All of this money except the original deposit of $3000 and the $250.18 interest, was money from the State treasury. No other fund

went into this account. None of the money collected as discount was deposited to the credit of this account, and only $112,434.75 out of more than $1,000,000 collected from the packers as interest during Small's term was deposited to the credit of the account called "Grant Park Bank" at the Grant Park Trust and Savings. No deposit was made in the latter account after September 26, 1918,—four days before Small got his first order from the State auditor to receive into the treasury interest collected. The initial deposit was made by some unknown person April 21, 1917, and the same or some other unknown person withdrew the balance of $2000 April 4, 1921. At no place in this record is there a document of any character showing a payment on account of interest or anything else by the Grant Park Bank to the State treasurer. Small says it paid him some interest but he does not state any amount, nor does he produce any evidence of any character to corroborate his statement. That the accounts called "Grant Park Bank" were used by Small and the Curtises to conceal their transactions with the packers is established beyond all reasonable doubt.

In addition to the funds represented by the Safe Account, Small had $3,000,000 on deposit during his term at a private bank in Jacksonville. Small says he had an agreement with this bank respecting interest, but it is not shown what, if any, interest was paid by this bank for the deposit, or, if Small received interest on this deposit, what part, if any, he paid into the State treasury. In addition to the Safe Account and the account with the bank at Jacksonville, which accounts often represented more than half the money in the State treasury, Small had deposits with more than 200 banks throughout the State, with which he had definite agreements as to interest to be paid to the State. These banks, though the deposits were small and some of them active, paid interest varying from two to

three per cent on monthly balances by sending drafts to the treasurer's office at Springfield. It is reasonable to assume that the Jacksonville bank did not pay less on its $3,000,000 steady account. Instead of receiving the money paid as interest into the State treasury, as the law specifically directs shall be done, Small diverted this to an account called "Len Small, Special" in the First Trust and Savings Bank at Kankakee. The first official notice the auditor had that any interest had been received was about twenty-one months after Small went into office, when the first interest payment was made. When Small secured from the auditor on September 30, 1918, the order to receive $306,424.33, he did not itemize his remittance nor in any respect show from whom or when the interest was collected. No money actually changed hands in this transaction, but Small simply charged himself, as treasurer, with this sum and squared the treasurer's books by adding $307,000 to the Safe Account, showing a deposit of that amount in the Grant Park Bank. This is a part of the $842,000 mentioned in a preceding paragraph. The next time Small made a payment of interest into the State treasury was April 23, 1920, sixteen months after the expiration of his term of office. On that day Sterling, who succeeded Small as treasurer, obtained an order from the auditor to receive $143,585.83 interest collected by Small. On the same day Sterling transmitted to the Fort Dearborn for deposit in his treasurer's account a First Trust and Savings Bank of Kankakee draft on the Corn Exchange National Bank for $73,585.79 and three drafts of the Grant Park Trust and Savings on the Continental and Commercial National for $30,000, $15,000 and $25,000, respectively. These drafts were used by Small in making his second interest payment. Neither of his payments of interest into the State treasury was made from the "Len Small, Special" account, which is the one in which he deposited the amounts re-

ceived as interest from the legitimate banks. The record of this "Len Small, Special" account kept in Small's bank was not produced on demand of appellee.

Whatever uncertainty appears in this record is due to the loss, concealment or destruction of records having to do with the transactions in connection with the public funds represented by the Safe Account and the Small and Curtis special accounts. There are missing from the treasurer's office at Springfield the following: (1) The tickler or daily cash statement showing distribution of funds within the treasury; (2) the ledger containing a permanent record of all certificates of deposit in legitimate banks throughout the State, showing when and how much interest was paid and containing a description of the collateral pledged to secure each deposit; (3) the interest ledger, showing in detail the interest collected from legitimate banks and transmitted to Small at Kankakee; (4) the draft register, showing in detail all transfers of money from the treasurer's checking accounts; and (5) all canceled drafts, including the drafts payable to the Grant Park Bank. Employees of the treasurer's office testify that it was customary to send such records to the treasurer at the close of his term, and that the records in question were placed in a box shortly after Small's term ended and the box was taken from the treasurer's office. Presumably it was sent to Small, but he denies having received it. Small kept many records pertaining to transactions in the treasurer's office at his private office in Kankakee. Principal among these was the Safe Account ledger prepared by Small personally, in which he says he kept an account of every certificate of deposit and every piece of collateral turned over to him by the Grant Park Bank. There was also sent to him remittance letters transmitting all checks and drafts received at the Springfield office from banks paying interest on deposits, memoranda showing changes as they occurred in deposits in the legitimate banks, and daily copies of the tickler. He

must also have kept some record of interest received from the Jacksonville bank and the Grant Park Bank, because they did not pay interest directly to the office in Springfield and he admits he had a private arrangement with these two banks concerning interest. He must also have had in his office duplicate deposit slips, monthly statements, canceled checks and check stubs showing his transactions in the "Len Small, Special" account. He admits that he destroyed these records, kept in his private office, shortly after his term as State treasurer closed, his explanation being that he had made full settlement and that he was not in the habit of preserving old records. It is significant that these records were destroyed many months before he made his last lump sum interest settlement, April 23, 1920. Small, as examiner of securities under Sterling, had special charge of the Grant Park Bank transactions and kept a Safe Account ledger at his private office, which would have shown the state of the account of the Grant Park Bank at the end of Small's term, but that disappeared before this hearing was concluded. At the First Trust and Savings Bank in Kankakee, of which Small was and is president, all the bank records pertaining to the "Len Small, Special" account, the "Len Small, Treasurer" account, and the "Len Small" account are missing from the store-room of the bank. The rule of the bank, according to the testimony of its officers, was to keep the ledger sheets of customers, and they knew of no other sheets than those pertaining to Small's three accounts that were missing. At the Grant Park Trust and Savings Bank, which was and is controlled by the Curtises, pertinent records, including the draft register and demand certificate register, are missing. This draft register is important, because it would show the payee or payees of the many drafts purchased there with funds from the account called "Grant Park Bank" and with the cashier's checks issued to Curtis in payment of discount on packer's notes. It will be remembered that all of the dis-

count collected from Cudahy was paid directly to the Grant Park Trust and Savings, but its cashier could not locate any records showing any of these payments or what became of the funds. No records of any kind or character of the Grant Park Bank were produced. Small says that this was a *bona fide* bank, and that it transacted its business in the rooms of the Grant Park Trust and Savings Bank and of the Curtis Trust Company. The secretary of the Curtis Trust Company says that it was a *bona fide* bank but that it did not transact any business at the trust company offices, and that he understood it did transact its business at the Grant Park Trust and Savings. The cashier of the latter says the Grant Park Bank was a *bona fide* bank but that all of its business was transacted at the Curtis Trust Company. Those directly interested in this bank could not locate it or anything connected with it. Notwithstanding this, they were certain it existed and was actively engaged in the banking business. April 21, 1917, V. S. Curtis purchased, among other things, a ledger for this Grant Park Bank, but that ledger is also missing. No witness was produced who ever saw this ledger after the printer delivered it or any other book in which the accounts of the Grant Park Bank were kept, notwithstanding this bank had on deposit millions of dollars of State money during the two years covered by Small's term. Nineteen certificates of deposit of the Grant Park Bank turned over in 1921 by Small and V. S. Curtis to Miller, who succeeded Sterling as treasurer, were signed by V. S. Curtis and one by E. C. Curtis. The body of each certificate was in other handwriting, and it must be assumed that the person who wrote the body of these documents knew something about the inner working of the Grant Park Bank, but that person, who is, of course, known to appellants, was not produced. In view of all these facts, the maxim *"Omnia præsumuntur contra spoliatorem"* is properly applied to this case. (*Hudson v. Hudson,* 287 Ill. 286; 1 Wigmore on Evidence,—2d ed.—

sec. 291.) When a party fails or refuses to produce books and papers shown to be in his possession or under his control, his opponent may give secondary proof of their contents or establish his case by circumstantial evidence, and if such secondary or circumstantial evidence is imperfect, vague and uncertain as to dates, sums, etc., every intendment and presumption shall be against the party who might remove all doubt by producing the better evidence. *Nofftz* v. *Nofftz,* 290 Ill. 36; *Rector* v. *Rector,* 3 Gilm. 105.

Many of the conclusions we have reached are deductions from admitted facts and authenticated records. Appellants contend that these deductions are not justified. Small's testimony supports the denials and allegations of his answer. He denies emphatically that he engaged in a conspiracy with the Curtises or anyone else to defraud the State of Illinois of interest earned on deposits, that he directed books at the treasurer's office to be kept so as to conceal these deposits, that he concealed or destroyed any of the missing documents, and that he has failed to account for any money due the State. He says that he has fully performed each and every obligation to the State and that he has paid over to the State every cent of money collected by him as interest on deposits of public funds. He denies that State money was used to buy the stock of the Ridgely National Bank, and the Armour debentures, American Thread bonds and other similar securities traced into his hands.

Appellants contend that a proper foundation was not laid for the admission of the records of the National City Company, and we think this objection must be sustained. The foundation for the admission of these records was laid by the testimony of William H. Smith, employed by the company since January 3, 1921, but in no way connected with it in 1917 or 1918. He identified exhibits 1390 to 1403 as files of the company, but there was no witness employed by the company in 1918 who supplemented his testimony by stating that these records were kept in due course

of business and that they were correctly kept. In order to render an account book admissible, it is essential that proof as satisfactory as the transactions are under the circumstances reasonably susceptible of, shall be given that the entries made are correctly recorded. (*Chisholm* v. *Beaman Machine Co.* 160 Ill. 101; *House* v. *Beak,* 141 id. 290.) Before a record can be admitted there must be proof by one who knows that it was made in the usual course of business, in accordance with a uniform practice to make them, when the transaction occurred, and to record the transaction precisely as it occurred. (*State Bank of Pike* v. *Brown,* 165 N. Y. 216, 59 N. E. 1, 53 L. R. A. 513.) Where the record is made in due course of business and according to methods proven accurate by many years' test it is competent. (*Pittsburg, Cincinnati, Chicago and St. Louis Railway Co.* v. *City of Chicago,* 242 Ill. 178; *Chicago and Northwestern Railway Co.* v. *Ingersoll,* 65 id. 399.) Where the testimony of a witness who made the entries is not available, it is competent to establish the authenticity of the books by other evidence. As Prof. Wigmore in his treatise on evidence, after discussing cases within the exception where it is impossible to produce the witness who actually made the record, says (vol. 3,—2d ed.—sec. 1530) : "The ordinary conditions of mercantile and industrial life in some offices do in fact constantly present just such a case of practical impossibility. Suppose an offer of books representing transactions during several months in a large establishment. In the first place, the employees have in many cases changed and the former ones cannot be found; in the next place, it cannot always be ascertained accurately which employee was concerned in each one of the transactions represented by the hundreds of entries; in the third place, even if they could be ascertained, the production of the scores of employees to attend court and identify in tedious succession the detailed items of transactions would interrupt and derange the work of the establishment, and the evidence would

be obtained at a cost practically prohibitory; and finally, the memory of such persons, when summoned, would usually afford little real aid. If unavailability or impossibility is the general principle that controls, is not this a real case of unavailability? Having regard to the fact of mercantile and industrial life, it cannot be doubted that it is. In such a case it should be sufficient if the books were verified on the stand by a supervising officer who knew them to be the books of regular entries kept in that establishment." This exception to the hearsay rule is fully supported by the authorities. (*Pittsburg, Cincinnati, Chicago and St. Louis Railway Co.* v. *City of Chicago, supra; French* v. *Virginian Railway Co.* 121 Va. 383, 93 S. E. 585; *Delaney* v. *Framingham Gas, Fuel and Power Co.* 202 Mass. 359, 88 N. E. 773; *Continental Nat. Bank* v. *First Nat. Bank,* 108 Tenn. 374, 68 S. W. 497; *Fielder* v. *Collier,* 13 Ga. 496.) The cashier, whose function it is to oversee all transactions and test each through all its stages, is the person most competent to produce the books of a bank and vouch for their accuracy. In a large bank little could be accomplished by calling the book-keeper who made the entry. At most he could only testify that the entry made by him is a true entry of the transaction reported to him by others. In a large bank each transaction passes through the hands of several, and often many, persons. A deposit, for instance, goes into the hands of the receiving teller, thence into the hands of a journal clerk and thence to a book-keeper, who makes the final entry which stands as the statement between the bank and the depositor. This transaction may have gone through the hands of a dozen persons, and the last one only records what has come to him through so many hands and probably knows nothing of the actual transaction. The business of this great commercial country is transacted on records kept in the usual course of business and vouched for by the supervising officer, and such evidence ought to be competent in a court of justice. Modern authority sustains this

view.  (*Continental Nat. Bank* v. *First Nat. Bank, supra;
Cooke* v. *People,* 231 Ill. 9; *Heid Bros.* v. *Commercial Nat.
Bank,* (Tex.) 240 S. W. 908, 24 A. L. R. 904.)  In determining what is the best evidence of a transaction, regard
must be had to the nature of the business and the method
of its conduct.  The records of the National City Company
are not essential to this hearing, and if they become material on the hearing before the master, appellee will probably not experience any difficulty in producing witnesses
to meet the requirements necessary to their admission.  In
laying the foundation for the admission of the records of
the Fort Dearborn National Bank and the Live Stock Exchange National Bank, appellee met all the requirements
hereinbefore stated and fully established the competency of
these records by the testimony of officers in charge of them.

Objection is made to the admission of the bills-payable
registers of Armour & Co. and of Swift & Co., but we do
not consider it necessary for the purposes of this hearing
to consider this objection.  Taking into consideration the
usual course in dealing with the packers, there is abundant
evidence in the records of the Live Stock Exchange National
Bank to trace the several items.  If it becomes necessary,
in stating the account before the master, to introduce these
records, the testimony now in the record can undoubtedly
be sufficiently supplemented to meet the rules stated.  There
is in this record abundant competent evidence to sustain the
decree, and no useful purpose can be served by discussing
in detail the many objections to the competency of evidence
made by appellants.

It is contended by appellants that the orders of the Auditor of Public Accounts authorizing Small to receive into
the treasury the amount of interest reported September 30,
1918, and April 23, 1920, establish the correctness of
Small's report of the amount of interest earned and due the
State during his term as State treasurer and are conclu-

sive in the absence of fraud or mistake.   The first of these
auditor's orders reads:

"AUDITOR OF PUBLIC ACCOUNTS, STATE OF ILLINOIS,
*Springfield, Sept. 30, 1918.*
No. 940.                                            $306,424.33.
   "Receive of Len Small, State Treasurer, Three Hundred Six
Thousand Four Hundred Twenty-Four and 33-100 Dollars, amount
of interest on public funds Jan. 8th, 1917, to Sept. 30th, 1918.
              ANDREW RUSSEL, *Auditor of Public Accounts.*
To the State Treasurer of the State of Illinois."

The second order is the same, except that it is dated
April 23, 1920, and the amount stated is $143,585.79.
Whether the Auditor of Public Accounts has the authority
to audit the interest accounts of the State treasurer, or
whether it is his duty to require an itemized list of inter-
est payments before issuing his order to receive the same
into the State treasury, are questions wholly immaterial to
the issues in this suit.   Whatever the authority or duty of
the Auditor of Public Accounts, there is nothing in this
record to suggest, much less show, that he audited the in-
terest accounts of Small.   The auditor's orders shown in
this record constitute evidence that he authorized the re-
ceipt into the State treasury of the amounts of money
stated, but it is not evidence of the amount of money due
the State on account of interest payable by persons with
whom State funds were deposited or of the amount of
money received by the State treasurer on account of inter-
est upon public money in his custody.   Section 8 of the
State Treasurer's act provides:   "All persons paying money
into the State treasury shall first obtain from the auditor an
order, directing the treasurer to receive the same.   *   *   *
When moneys are sent to the treasury, by express or other-
wise, it shall be the treasurer's duty to obtain the auditor's
order, hereinbefore required, before receipting therefor."
The two orders on which appellants base their contention
were issued as a pretended compliance with this section of

the statute. The requirement that no money shall be received into the State treasury except upon the order of the auditor, and that the treasurer's receipt for money so received shall be presented to the auditor for countersigning and a duplicate of the receipt left with him, is for the purpose of providing a complete record in the hands of the Auditor of Public Accounts of all money in the State treasury. The orders in the record do not state that the moneys which the treasurer is ordered to receive are in full settlement of the State's claim for interest on deposits of State moneys, nor is there in the order the slightest suggestion that an audit of the State's account with the treasurer has been made. It is unnecessary to follow appellants through their discussion of the origin of the office of Auditor of Public Accounts and of the powers and duties of such officer under the constitution of this State. A discussion of these questions would throw no light on the issues here involved. Where, as in this case, there is no evidence showing a settlement of the State's claim for interest earned on public moneys in the custody of the State treasurer, no presumption of settlement can arise from the mere fact that the auditor has authorized the treasurer to receive into the State treasury a certain amount of money paid as interest on deposited public funds.

Some objection is made to the form of the decree holding appellants jointly and severally liable to account, but this objection is without merit. Where a liability arises from an intentional wrongful act of several parties conspiring together, each is liable for all resultant damage. A conspiracy by which several wrongfully obtain the money or property of another and misappropriate it is not to be distinguished in the joint and several liability of each from a trespass in which all are alike guilty and jointly and severally liable for the damage sustained. (*Farwell* v. *Great Western Telegraph Co.* 161 Ill. 522.) This case being clearly within the field of equity, equity should grant com-

plete relief, though its decree may establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority. *Drum* v. *Drum,* 251 Ill. 232; *Kelly* v. *Galbraith,* 186 id. 593; *Stickney* v. *Goudy,* 132 id. 213.

It is finally contended that criminal acts are charged in the bill in this suit, and that the rule that such charges must be proven beyond a reasonable doubt before a decree can be entered against the party so charged is applicable. We shall not lengthen this opinion by discussing this question. Whether this court will again apply to civil actions the rule of evidence applicable to criminal cases merely because the pleadings charge and the proof shows that the loss or damages arose out of a criminal act (see *Rost* v. *Noble & Co.* 316 Ill. 357,) need not be decided in this case, for the reason that whatever rule is applied, the evidence in this record shows, beyond all reasonable doubt, a liability to account. Proof of the fact that a public official having custody of public funds loaned these funds to others with a secret arrangement respecting the payment of interest and that in reporting interest collected he did not reveal the source of the payments, without more, would be sufficient to justify an order to account.

Where a treasurer or other public official has the custody of public funds and such funds earn interest, he is required by the settled law of this State to turn such interest into the public treasury as soon as it is received by him. (*County of Lake* v. *Westerfield,* 273 Ill. 124; *Hughes* v. *People,* 82 id. 78.) This is now, and has always been, the law in this State without regard to a statute on the subject. This liability to account for profits made on public funds is the same whether the interest or discount is paid to the officer directly as such, or whether it comes to him indirectly as a partner or stockholder in a bank where public funds are deposited. (*Whitney* v. *Peddicord,* 63 Ill. 249.) Where it is established that a public official

319—31

having public funds in his custody deals with the trust money in his own name, directly or indirectly, every presumption is indulged against the trustee and he is held to a strict accountability for the conversion. *White* v. *Sherman,* 168 Ill. 589.

From the careful examination of this record which the public interests involved and the importance of the results which follow our decision demand, we are convinced that the chancellor would not have been justified, under the evidence, in entering any decree other than the one directing appellants to account to appellee. The decree of the circuit court is therefore affirmed. *Decree affirmed.*

Mr. JUSTICE DUNCAN, dissenting:

After careful readings and full consideration of all the evidence in this case, including the exhibits, we are unable to concur in the decision or with the conclusion therein by the court. We deem it necessary to a clear understanding of the issues to state accurately the substantial averments or charges in the bill.

The bill as framed by the State contained one separate and distinct charge which applied to Small, only, which we will designate as the first charge and which is substantially the following:

First, that it was the duty of the defendant Small, during his term of office, to receive all revenues and all public moneys authorized by law to be paid to him and safely keep the same; to disburse the same in the manner prescribed by law and to deliver to his successors all moneys remaining in his hands and all papers, books and records of his office; to keep a regular and fair account of all moneys so received, stating particularly from what source the same was received, and make semi-annual reports of all moneys paid out and received by him, at least ten days before each regular session of the General Assembly; and to account

also for all interest and profits received by him on public funds in his hands as treasurer.

It was Small's duty to deposit all moneys received by him as treasurer, within five days after receiving the same, in such banks in the cities of the State as in his opinion were secure and which should pay the highest rate of interest; that it was his duty to account to the State for all moneys received by him as interest on public moneys deposited in banks pursuant to the statute, and to account for all interest or profits received from the use of public moneys in his custody not deposited in banks of said cities as provided by statute and pay the same to the State.

The second paragraph of the above charge was, in effect, taken out of the bill by the decision of Judge Jones in sustaining the demurrer to certain parts of the bill, as stated below. That decision left the charge against Small only that part of it which is stated in the first paragraph, and which merely states the duties of Small, without alleging any violation of such duties. We are disposed, however, to treat as a part of this charge against Small the following allegations found in that part of the bill which is the charge against Small and the Curtises jointly, inasmuch as such allegations are applicable to this first charge. The allegations which we substitute in lieu of the second paragraph of the first charge, and as part of the first charge, are the following, and are taken from the last and next to the last paragraphs of the second charge, to-wit:

"It is alleged that the only reports made by Small of interest received by him upon public moneys while he was treasurer was, first, on September 30, 1918, in which he charged himself with $306,424.33 as interest received by him as treasurer; and second, on April 23, 1920, in which he charged himself with the sum of $143,585.79 as interest upon public money; that in neither of the reports is there any itemized statement of interest and profits realized [by him] from the use of public moneys of the State while he

was such treasurer; * * * that Small, at the expiration of his term as treasurer, unlawfully and wrongfully removed from the office of State treasurer all books and records relating to interest which has been collected by him upon public moneys, *and no public record was ever made or left by Small in the office of the State treasurer from which the amount of interest and profits can be determined,* and complainant charges upon information and belief that the amount of such interest so collected by him as treasurer largely exceeds the amount so reported by him, and that such reports do not include anything whatever on account of interest and profits realized [by him] from the use of public moneys turned over by him to Ed C. Curtis and Verne S. Curtis."

The second charge of the bill, omitting the parts thereof to which the demurrer was sustained, and which parts we contend are no longer parts of that charge, is substantially in the following language:

Second, that Small, acting in combination with Edward C. and Verne S. Curtis, entered upon the execution of a plan whereby a large portion of the moneys in his possession as treasurer were to be used for the personal advantage and benefit of the three of them, and the State of Illinois was to be deprived of the interest and profits resulting from the use of such moneys; that in furtherance of said plan Small * * * turned over such large part of the moneys to the control of Edward C. and Verne S. Curtis, who, with full knowledge that said moneys so turned over to them were public moneys, and acting in connivance with Small, used the same for the profit of themselves and Small; that * * * the public moneys so turned over to them were carried by Small on his books, as treasurer, in an account which was characterized by him as the "Safe Account," and the books and accounts of the treasurer's office contained no record of the public moneys

turned over to Edward C. and Verne S. Curtis or of the interest and profits realized from their investments, and the books were so kept by Small, as treasurer, as to conceal the fact that said public moneys had been turned over to Edward C. and Verne S. Curtis; that as a further device in the execution of the said fraudulent plan, Edward C. and Verne S. Curtis executed, when public moneys were turned over to them, pretended certificates of deposit purporting to be issued by the Grant Park Bank, * * * and the certificates of deposit were a mere device and pretense by which the public moneys were withdrawn from the treasury and turned over to the control of Edward C. and Verne S. Curtis, as above set forth, by which the State was deprived of a large part of the interest and profits resulting from the use of such moneys.

It is alleged that the public moneys so turned over by Small, as treasurer, to Edward C. and Verne S. Curtis were used in the purchase of notes and other securities of divers persons and corporations, and by reason of the failure of Small to keep any public records relating to such transactions, complainant is unable to state the moneys or the persons and corporations in whose notes and securities the public moneys were invested; that a large part of the public moneys so used by Small and the Curtises was invested in notes of Swift & Co. and Armour & Co.; that the Curtises collected from Armour & Co. and Swift & Co., as interest and discount on such notes purchased, large sums of money, which amounted to more than one million dollars, as complainant is informed and believes and charges the fact to be. It is alleged that complainant is unable to state the exact amount so collected as interest and discount from Armour & Co., Swift & Co. and from other persons and corporations in whose notes and securities such moneys were invested, for the reason that Small did not keep and did not leave in his office, as treasurer, any record or ac-

count relating to such moneys so used by him and the Curtises and the interest and profits derived from such use; that at all times when such moneys were being so used and invested by Small and the Curtises they all knew that the moneys were public moneys of the State and that the State was entitled to the interest and profits thereof from such use, and they all acted together in the execution of the plan whereby the State was deprived of said interest and profits; that in furtherance of said unlawful and fraudulent plan Small at the expiration of his term of office removed from his office as treasurer all books and records which related to deposits and loans of public moneys and of the interest and profits received therefrom; that no accounting was ever made by Small and the Curtises for such interest and profits received, and no public record was ever made by them or any of them, or left by Small in the office of the State treasurer, from which the amount of interest and profits can be determined. It is alleged that the only reports made by Small of interest received by him upon public moneys while he was treasurer was, first, on September 30, 1918, in which he charged himself with $306,424.33 as interest received by him as treasurer, and second, on April 23, 1920, in which he charged himself with the sum of $143,-585.79 as interest upon public money; that in neither of the reports is there any itemized statement of interest and profits realized from the use of public moneys of the State while he was such treasurer, and therefore it cannot be determined how much of said amounts, if any, was realized from the use of the public moneys turned over to the Curtises; that Small, at the expiration of his term as treasurer, unlawfully and wrongfully removed from the office of State treasurer all books and records relating to interest which had been collected by him upon public moneys, and complainant charges upon information and belief that the amount of such interest so collected by him as treasurer largely

exceeds the amount so reported by him, and that such reports do not include anything whatever on account of interest and profits realized from the use of such public moneys turned over to the Curtises, and that the amount of interest and profits from these funds realized by Small and the Curtises which Small has failed to report and account for is in excess of one million dollars.

The words in the second charge against Small and the Curtises that we have omitted because expunged therefrom by the sustaining of the demurrer are, first, "did not comply with the requirements of the statute as to a large part of the public moneys in his possession, and did not deposit such large part of said public moneys in banks in the cities of the State, but" as indicated by the first stars in the charge as we have framed it; second, the next words expunged from this charge as we have framed it are indicated by the second group of stars, which words are, "in furtherance of said unlawful and fraudulent plan large sums of the public moneys were turned over by Small, as treasurer, to Edward C. and Verne S. Curtis, and," which words are expunged merely to prevent unnecessary repetition; third, the last words expunged from the second charge as we have framed it are these: "that there was in truth and in fact no such bank," which words should be expunged as the demurrer sustained by the court necessarily removed them from the charge.

The bill does not allege, as set forth in the opinion of the court, that "such lump sum reports were made for the purpose of concealing the amount of money received through the Grant Park Bank transactions; that the account of public funds invested by Small through the Curtises was kept by Small personally in his private office above his bank in Kankakee, and that this private account book and certain records of the State treasurer's office have been destroyed by Small for the purpose of concealing the amount of interest and discounts realized from the private

use of said public moneys." The answer of Small does not contain a denial of the destruction of any records and books and no such issue was made by the pleadings. There is quite a difference in an allegation of the unlawful removal of records and the unlawful destruction of records of the treasurer's office, and the consequences of an unlawful removal of a record and the unlawful destruction of a record would necessarily be very different, particularly so if the record removed or destroyed was a public record of the treasurer's office, as intimated by the court in its decision. It is not our desire to be technical in this case, but simply to clearly set forth the issues between Small and the State on the first charge, and between Small and the Curtises and the State on the second charge. This is important, because the measure of proof on the first charge against Small and the measure of proof against Small and the Curtises on the second charge must necessarily be different, and the finding of the issues against Small individually, in the first charge, cannot affect the question whether or not there should be a finding of the issues against Small and the Curtises on the second charge.

The prayer of the bill as to the accounting is in this language: "That said Small may be required to disclose and state the items of interest included in the aggregate amounts reported by him as interest collected upon public moneys, and to state and disclose all items of interest so collected by him as interest upon public moneys deposited by him in banks which are not included in said aggregate amounts so reported by him; and that an accounting may be had and that the amount of interest and profits realized from said use of said public moneys by said Len Small, Edward C. Curtis and Verne S. Curtis may be determined, and that said defendants Len Small, Verne S. Curtis, and Etha G. Curtis, administratrix of the estate of Edward C. Curtis, deceased, to the extent of their respective liabilities, may be decreed to pay to the complainant the amount found

due to such complainant upon such accounting, and that said complainant may have such other and further relief as may be proper in a court of equity."

It will be noted that both charges in the bill, including the prayer for relief, have been fully set forth above as they were originally framed by counsel for the State and presented to the lower court. We have also indicated clearly the matters that we have considered as eliminated from the bill by the decision on the demurrer, and have also indicated what should now be regarded as the first charge in the bill which concerns Small, only, as well as the matters that should now be considered as the second charge in the bill against Small and the Curtises jointly. It will be also noted that we have considered as forming a part of the first charge certain allegations that are found in the second charge as framed by the State, and that we have also considered the same allegations as also a part of the second charge. Our position in this dissenting opinion is, that the first charge in the bill which concerns Small, only, may be sustained by a mere preponderance of the evidence or by the same measure of proof as is ordinarily required of a complainant in an ordinary bill for an accounting where no crime is charged, and that the words "unlawfully and wrongfully removed," as used in that charge, are not to be considered as having the effect to charge a felony. Merely charging the removal of records, and particularly private records, from his office as treasurer of Illinois, even though alleged to be done unlawfully and wrongfully, does not have the effect to charge a felony. We make no contention that the averments of the bill are insufficient in either charge to give the court jurisdiction to decree an accounting in equity if the averments are proved, and we concede that the bill contains sufficient averments in both charges to warrant the chancellor in entering a decree against the defendants for an equitable accounting if the facts alleged are sufficiently proved.

As to the second charge, our position is that it charges the defendants, jointly, with a felony, or an unlawful conspiracy to defraud the State of Illinois out of interest and profits upon public funds in the hands of the treasurer, or of some part thereof, to which the State is justly entitled and for which Small has not accounted; and that a felony is charged by the State as the second charge was originally framed by it, and that the charge as we have framed it, after eliminating the part taken out of it by the demurrer, still charges a felony. We have been particular to state accurately what this bill charges against Small individually and Small and the Curtises jointly, because of the fact that in the decision of the majority of the court in this case the court seems to lose sight of the proposition that the simple showing in the record that Small ought to account to the State is by no means a sufficient showing that there is any such duty upon the part of the Curtises.

The record in the case shows, without question, that Judge Jones held that the statute approved March 7, 1908, with reference to the deposit of State moneys by the State treasurer, the provisions of which are hereinafter set forth, was unconstitutional and void. The decision of the circuit court was rendered on a special demurrer to the bill, which applied to every section or part thereof alleging any duty of Small under that statute, and to every such part of the bill the demurrer was sustained. That decision had the effect to strike or remove from the bill every part thereof to which the decision of the court on the demurrer applied, which were all parts of the first and second charges based on such statute. The ruling of the court on the demurrer also amounted to a holding that the allegation "that in truth and in fact there was no such bank as Grant Park Bank," was surplusage and immaterial.

We think the court is undoubtedly in error as to the legal effect of its decision as to the validity of said statute. It is stated in the decision that the court declines to consider

the question of the validity of the statute, yet it affirms the decree of the court below in all things,—and that affirms the decree of Judge Jones on the demurrer holding the statute void. The decision of this court is therefore as clear a decision of the court that the act is invalid as if the court had directly and expressly passed on the question of its validity and had held the statute invalid so far as this case is concerned. The rule is, that where some controlling fact or question of law material to the determination of the case has been adjudicated in the lower court, and this court, though not expressly passing on the question on appeal or writ of error, affirms the decree without qualification, such affirmance is an adjudication of the fact or question of law. *Brack* v. *Boyd*, 211 Ill. 290.

There is another reason why that question of law is the settled law of this case. Appellee has assigned no cross-errors on the record and cannot be heard to contend in this court that the statute is valid. It is therefore bound by the circuit court's decision that the statute is invalid, without regard to the question of the correctness of that ruling. Appellee has sought to raise the question of the validity of the statute without assigning cross-errors. If appellee were permitted to question the validity of the statute on a proper assignment of cross-errors, the decision of Judge Jones was in every respect correct, for the reason that the statute is clearly void, as hereinafter shown.

It being the law of this case that the statute of 1908 is void, there is no provision in our constitution or in our statutes that required the State treasurer to loan the public funds in his charge and no direction as to where he should keep or deposit them. Section 4 of article 4 of the constitution provides that no person who has been or may be a collector or holder of public moneys, who shall not have accounted for and paid over, according to law, all such moneys due from him, shall be eligible to the General Assembly or to any office of profit or trust in this State. Sec-

tion 17 of the same article provides that no money shall be drawn from the treasury except in pursuance of an appropriation made by law and on the presentation of a warrant issued by the auditor thereon, and no money shall be diverted from any appropriation made for any purpose or taken from any fund whatever, either by joint or separate resolution; that the auditor shall, within sixty days after the adjournment of each session of the General Assembly, prepare and publish a full statement of all money expended at such session, specifying the amount of each item and to whom and for what paid. Section 20 of article 5 of the constitution provides that an account shall be kept by the officers of the executive department, and of all the public institutions of the State, of all money received or disbursed by them, severally, from all sources and for every service performed, and a semi-annual report thereof be made to the Governor under oath, and any officer who makes a false report shall be guilty of perjury and punished accordingly. Sections 7 to 15, inclusive, of chapter 130, (Smith's Stat. 1925, p. 2489,) provide as follows:

"The State treasurer shall receive the revenues and all other public moneys of the State, and all moneys authorized by law to be paid to him, and safely keep the same. All persons paying money into the State treasury shall first obtain from the auditor an order, directing the treasurer to receive the same; and if the treasurer shall receive and receipt for any money, without such order being presented to him, he shall be removed from office. When moneys are sent to the treasury, by express or otherwise, it shall be the treasurer's duty to obtain the auditor's order, hereinbefore required, before receipting therefor. The treasurer shall, on the receipt of any money, give the person paying the same duplicate receipts therefor; which shall be presented to the auditor, who shall countersign and return one of them to the person presenting the same, and retain the other on file in his office, and charge the amount thereof

against the treasurer. No receipt shall be of any validity unless the same is so countersigned. The treasurer shall not pay out of the treasury any money, except upon the warrant of the auditor. When any warrant is presented to him to be countersigned, or for payment, the treasurer shall personally countersign the same, and shall also enter in a book, to be kept for that purpose by him, the date, amount and name of the person to whom the same is made payable. He shall keep regular and fair accounts of all moneys received and paid out by him, stating, particularly, on what account each amount is received or paid out. On the payment of any warrant, the treasurer shall cancel the same with a canceling hammer, or some proper canceling instrument, which will cut or perforate the paper. He shall, at the close of each month, report to the auditor the amount of money received and paid out by him during the month, stating on what account the same was received and paid; and shall, at the same time, deposit with the auditor all warrants, properly canceled, which he may have paid, and take the auditor's receipt for the same. He shall also make out and present to the Governor, at least ten days before each regular session of the General Assembly, a full report of all moneys by him received and paid out, and also a general account of all the business of his office."

The provisions of the constitution and of the statute set forth every duty required of the State treasurer concerning the public funds in his possession and all other duties required of him as to receiving, keeping, paying out and accounting for the public funds during the time that Small was treasurer, from January 8, 1917, to and including January 11, 1919, when his term ended, except as to taking his official oath and giving the bond required by him, set forth in the first part of the statute. The constitution and the statute leave it solely at the discretion of the treasurer as to where he shall deposit and keep public funds. There is no duty placed upon the treasurer to loan public

funds in his custody. It is not even contemplated by the
constitution or the statute that the State treasurer has any
such duty as the loaning of public funds. His duty is to
receive the funds according to the provisions aforesaid and
to *safely* keep the same and pay them out according to law.
It is clear, therefore, from the foregoing provisions, that
there is no requirement in the law or in the constitution
that directs or commands the treasurer to keep an account
of moneys loaned by him, in case he shall loan them, as
the statute of 1908 is void by the settled law of this case.
How, then, can this court say that the records of a State
treasurer kept by him of the loans that he has made, if he
does make them, are public records, or records which he
shall preserve or keep in his office? If it be conceded,
as we think it must be, that the records that Small made
concerning loans and the collection of interest thereon are
merely his private records kept for his convenience, so that
he might at all times know to whom he had made a loan
and the terms of the loan, etc., then we ask, How long should
a State treasurer be expected to keep and preserve such
private records as evidence after he has made a complete
settlement with his successor and after the auditor of the
State has issued a certificate under his official seal that
the balance of the several funds in the retiring treasurer's
hands was on the day of such settlement with his successor
the exact amount that the retiring treasurer is turning over
to his successor in office? The evidence in the record shows
without dispute that such records of loans made by the State
treasurers were not considered as any part of the public
records of the State treasury but as mere private records
of the treasurers of the transactions between them and the
parties to whom loans were made. The State proved these
facts by its own witnesses, and the State further proved
by its witnesses that it had been the custom of all prede-
cessors of Small to have such private records shipped to
them at their homes after settlement with their successors,

because of the fact that they were only considered as their own private records. Their conclusion that they were their private records and that they had the right to the custody of them was absolutely correct, in our judgment, and the court's conclusion that they were public records is without foundation in fact or in law.

The reasons why the records of loans made by Small or any other treasurer are not public records but mere private records or memoranda of the treasurer, kept by him to show the transactions between himself and the parties to whom such loans were made, are obvious. Such loans were mere movements of public money within the treasury and not movements out of the treasury or into the treasury, and because all the funds of the treasury on any given date were in the treasury, no matter in what banks or depositories they were kept or deposited. The depositories in which Small kept the public funds were, first, the treasurer's office, in a safe in which he kept cash and from which he sometimes paid parties to whom the State owed money by a check on the treasury itself or on the safe account in the treasury; second, banks in which he deposited cash subject to check at any and all times, and which accounts were known in the treasurer's office as "open accounts" or "checking accounts;" third, banks in which he kept deposits that were made for a definite time, and which deposits were evidenced ·by certificates of deposit not subject to check or call until due, and which accounts were known by all the employees in the treasurer's office as "vault account;" and fourth, deposits of money with the Grant Park Bank or the Curtises, and which account, though not subject to check, was evidenced by certificates of deposit subject to call for payment to the treasurer at any time he was in need of public funds with which to pay claims of parties to whom the State was indebted, and which account is known and referred to in this record as "safe account." For the purposes of the consideration of this case the four

foregoing accounts are all that need explanation in order
to understand or comprehend the issues and the evidence
bearing thereon in this case.

Whenever Small, or any treasurer, deposited money
with any bank that gave a certificate of deposit to the
treasurer for the same payable on any definite date, and
which deposit was not subject to call or check, the treas-
urer, after receiving such certificate of deposit, issued his
check upon some one of his checking accounts or open ac-
counts in another bank, payable to the bank which had
given him such certificate of deposit. This movement of
money from the checking account in one bank to another
bank on time deposits was a mere movement of money
within the treasury. The treasurer did not have to obtain
a warrant from the auditor to pay the money out of one
bank into the other bank, for the simple reason that such
movement of money was not a movement of money out of
the treasury or a payment of money by the treasurer to a
party to whom the State owed money, and for that reason
Small could not credit himself on the public record here-
after explained as the cash book, as money paid out of the
treasury. The only effect the transferring of this money
from a bank in which the treasurer had a checking account
to a bank to which the treasurer was loaning money on time,
was to decrease the amount in the bank in which he had
the checking account by the amount that he loaned to the
other bank on time, and his balance in the treasury was
just the same after this transfer or time loan had been made
as before. When money was loaned to the Grant Park
Bank or to the Curtises by Small, the Curtises first de-
posited with Small a certificate of deposit not subject to
check, as already stated, but subject to call, for the entire
amount of the loan at any time the necessities of the treas-
urer required the payment of the money back to the treas-
ury. On the giving to Small a certificate of deposit by the
Curtises or the Grant Park Bank, Small then issued his

check or draft upon one of his checking or open accounts, usually on the Fort Dearborn Bank of Chicago, payable to the Grant Park Bank. The Grant Park Bank or the Curtises with this check or draft purchased a packer's note or other similar security and deposited such security with Small as security to him as treasurer. These packers' notes or securities were what is known in the record as "liquid securities" of a very high grade, readily salable on the market at any time. There is no question as to the desirable character of these securities. To put it in the language of State witnesses who testified concerning the same, they were "gilt-edged" securities. So highly were these securities valued, it is stated by one witness that if the packers should go broke all the banks in Chicago would go broke, because of their large investments therein. We also call attention to the fact that the loaning of the money in this manner to the Curtises or the Grant Park Bank was a mere movement of money within the treasury, and the only effect such a loan had was to decrease the amount of the checking account in the Fort Dearborn National Bank by the amount loaned to the Grant Park Bank, and after such transfer and loan the total funds in the treasury remained exactly the same as they were before such transfer and loan were made. Consequently, no entry whatever by reason of such transfer and loan could be made upon the public records of the treasurer's office as money received into the treasury or as money paid out of the treasury. It seems to us that these are facts overlooked by the majority of the court when speaking about the transactions and the book accounts between the treasurer and the Grant Park Bank or the Curtises.

All of the depositories or banks in which Small kept deposits of the public moneys paid interest upon their deposits except the American Exchange National Bank of New York City, and these depositories are the three different ones heretofore characterized as the checking or open

account, the vault account and the safe account. These various accounts were so kept by Small and his employees merely as a matter of convenience in the way of book-keeping. They were put into three classes because of the fact that there was a difference between the accounts, as already explained. When Small turned over the money and all other funds to his successor he had at that time ten banks or depositories called open accounts or checking accounts. He had a great number of banks to which he loaned money on time, not subject to check or call, and the accounts with these banks were all kept in the vault account, and the account with the Grant Park Bank or the Curtises was kept in the safe account. Every one of these accounts was well known to the employees of Small during his term, and the court is altogether in error in its statement in the opinion that the safe account was kept in any more secret manner than was either the open account or the vault account, as hereinafter shown. We will further say at this point that the Grant Park Bank or the Curtises had exactly the same right to receive from Small, as treasurer, deposits of public funds on a contract to pay him interest thereon as had any one of the ten depositories which had checking accounts or as any one of the two hundred or more banks whose accounts were kept in the vault account. We will further say that Small had the same right to regard his accounts with these three classes of banks as private transactions and the records of the same as private records, the custody of which belonged to him, as did any treasurer preceding him. Small stated frankly and readily on the witness stand, when asked, that he had destroyed a part of these private records of loans three months or a year after he had made his final settlement with Sterling because he thought he had no further use for them or any reason to keep them. It is therefore no more a circumstance of suspicion against Small that he received these private records, if he did receive them, and destroyed them, than it

would have been for any one of his predecesors to have done so, and according to the showing in the record it is well nigh a certainty that no previous treasurer of the State has in existence any records of private loans that he made, and it is absolutely proved in the record, without dispute, that none of Small's predecessors left such records in the treasurer's office.

There was just one part of the transaction of Small as treasurer with any one of his various depositories, whether it be a bank with a checking account, or a bank under the vault account, or the Grant Park Bank or the Curtises under the safe account, that should be made a matter of public record in his office, and that was the receiving or the collecting of interest. This is so because the paying of interest by Small into the treasury is a movement of funds into the treasury, and before Small could legally receive such interest and charge himself with it on the public record he was required to obtain the auditor's order to receive such new funds. This is exactly what Small did when he made the two payments of interest into the treasury that are referred to in the pleadings above mentioned, and he could not have legally received such interest into the treasury without an order from the auditor. The State's own witnesses testified that Small did obtain that order in the regular and legal way and that he was charged in the cash book with those two amounts of interest, and the evidence shows, without any equivocation or doubt, that his successor received the full amount of both these payments of interest and the rest of the public moneys in his hands, less what he had paid out on warrants of the auditor.

With reference to the first payment of interest by Small into the treasury of $306,424.33 on September 30, 1918, the majority opinion states: "He did not itemize his remittance nor in any respect show from whom or when the interest was collected." This statement is true, and that is the only real fault that can be found with this payment of

interest,—that it did not show the parties from whom it came or when it was collected. This statement of the court is followed by a very extraordinary and unusual statement, which is not founded upon any evidence whatever in the record but is based solely on the bare statement of counsel for the State, without any evidence whatever to substantiate the statement. In fact, the evidence in the record contradicts that statement altogether, and that evidence was nearly all furnished by the State itself. The statement referred to is in these words: "No money actually changed hands in this transaction, but Small simply charged himself, as treasurer, with this sum and squared the treasurer's books by adding $307,000 to the safe account, showing a deposit of that amount in the Grant Park Bank." We wonder if the court really understands the position that it has put itself into in making such a statement in its opinion. How could Small square his account by charging himself with $306,424.33 and by charging Curtis with $307,000 in the safe account? The very moment that Small charged himself in the cash book or the public records of the treasurer's office with that amount he became absolutely liable to the State for it, because he charged himself on the order of the auditor. That amount could not be squared by Small unless he also credited himself on the cash book, a public record of his office, with an equal amount paid out by him upon the auditor's warrant, and in the record there is not even a claim by anyone that any amount was credited by Small against this receipted interest by him by any warrant of the auditor. The statement of the court that Small charged the safe account with $307,000 in the manner aforesaid, besides being without any evidence whatever to back it, would only have gotten Small into trouble with the Curtises. They certainly would not have stood for his charging them with $307,000 that they did not get. Counsel for the State in arguing this proposition do not pretend to have any evidence to back their claim that $307,000 was

thus charged to the safe account, but their statement seems to have been sufficient for the court to reach the conclusion that it has stated in its decision.

There are many other statements of the court in its opinion, which it is claimed are facts, which are not only not proved by the evidence in the record, but the evidence in many instances is squarely against the existence of any such facts, and in a great many instances the evidence was furnished by the State. We do not wish to unnecessarily criticise the opinion of the majority of the court, but we unhesitatingly say that the mis-statements made in the opinion can only be accounted for by a misconception of the facts in the record and a misconception in regard to the system of book-keeping in the treasurer's office. We will say further that the "Analysis of Facts" furnished by counsel for the State is by no means an analysis of the real facts in the record. With all due regard for counsel and without any attempt to criticise them, the analysis is but an ingenious juggling of the facts in many instances which cover up the real facts proved in the record. The analysis of facts appears to have been made on the conclusions of an expert book-keeper trying to explain how the transactions by Small and the Curtises might have been transacted, but which must be considered as falling short of a real analysis of the facts because not based on the facts but on surmise and conjecture.

In this dissent we take the positive ground that there can be no serious question about the invalidity of the act of 1908 requiring the State treasurer to deposit money in the banks of the cities of this State which shall pay the highest rate of interest to the State for such deposits, etc. The constitution provides, in as plain and positive terms as can be written, that no person shall be eligible to either the General Assembly or to an office of profit or trust in the State who has been or may be a collector or holder of public moneys and who shall not have fully accounted and paid

over the same according to law. This provision of the
constitution indicates clearly that public treasurers are to
be held to an accounting absolutely, and that they are in-
surers of the safety and of the return of all public money
entrusted to their hands for distribution. They cannot es-
cape the penalty inflicted by this section of the constitution
by answering unto the people that they lost the money by
reason of the fact that some bank or banks became insol-
vent and could not return it to them, although they may
have used the highest degree of diligence and their best
judgment in selecting banks as their depositories. The
State treasurer is an executive officer of the State, and
the legislature has no constitutional right or power to di-
rect him as to the manner or place in which he shall de-
posit funds, and thereby subject him to an increased lia-
bility for loss of funds which the constitution has provided,
in substance and in effect, he shall safely keep, and that he
must see to it that he selects the depositories and so handles
the public funds that not one penny shall be lost, and shall
suffer the penalty if he does not safely keep and account
for the same. The provisions of the statute that we have
quoted recognize the absolute liability that the constitution
has placed upon the treasurer, and merely follow, in sub-
stance, the idea expressed in the constitution, and until
1908 the legislature never went farther than to require of
a treasurer that he shall receive the revenue from all pub-
lic money of the State and all money authorized by law to
be paid to him and safely keep the same. This was a rec-
ognition by the legislature of the absolute liability of the
treasurer for the safe keeping of the public funds, and that
upon him must rest the choice and the duty of selecting
safe depositories and of guarding and guaranteeing the dis-
tribution of the funds according to law, and of returning
the remainder thereof to his successor not legally paid out
by him. It was the privilege of the legislature, as well as
its duty to the people, to provide for the manner of ac-

counting to the State as well as the manner of receiving
and paying out funds of the State.  No one can exam-
ine and study well the foregoing provisions the legislature
put into law in 1845 without being impressed with the idea
that it has put into our statutes a masterpiece of legislation
that cannot be improved or excelled.  It is not possible for
a State treasurer to defraud the State in his accountings
and dealings with the State if the provisions of the stat-
ute are followed in all their details.  It was intended that
the Auditor of Public Accounts should at all times keep a
record of his dealings with the treasurer so that he could
at all times know exactly the amount of money paid into
the State treasury on the authority of the auditor to re-
ceive it and also the amount legally paid out on the auditor's
warrants.  Wherein can these provisions of the statute be
improved in the interest of the people of this State?

This court has repeatedly held that the aforesaid pro-
visions of the constitution and of the statute of 1845, and
other provisions of our constitution, make the liability of
public officers in the State to receive public money and dis-
tribute the same according to law that of insurers.  The
decisions of this court are to the effect that the liability of
such officers is absolute, and that they cannot plead in de-
fense that they used the highest degree of diligence and
care in depositing the funds in their hands in safe banks
or depositories.  Other courts in this country have made
the same holdings.  (*Estate of Ramsay* v. *People,* 197 Ill.
572; *People* v. *McGrath,* 279 id. 550; *Swift* v. *Trustees
of Schools,* 189 id. 584; *County of Lake* v. *Westerfield,*
273 id. 124; *State* v. *Moore,* 74 Mo. 415; *United States*
v. *Prescott,* 3 How. 578; *Boyden* v. *United States,* 13 Wall.
17; *United States* v. *Dashiel,* 71 U. S. 182; *Common-
wealth* v. *Conly,* 3 Pa. St. 972; *State* v. *Harper,* 6 Ohio St.
607.)  In Mechem on Public Offices and Officers, in sec-
tions 298 and 302, it is stated that this is the general rule
as applied to the liability of public officers whose duty it is

to receive and safely keep the funds and distribute them according to law. The statute of 1908 is void for other reasons stated by Mr. Justice Heard in his dissent.

The statute of 1908 being invalid, the State treasurer may loan or not loan the public money in his charge, as he pleases, and he may loan it to whom he pleases. He is not required to loan it to a bank or banks but may do so, and he may also loan it to any individual or individuals in this State, no matter what their business, their calling or their standing. The risk is his, and the State is not interested as to the character of the borrower or the character of security the treasurer requires. The law is, as repeatedly held by this court, that if such an officer fails or refuses to loan the public money in his hands he is only liable for the amount he receives, less the amount he has legally paid out; and if he loans for interest or if he makes a profit on such funds, in such case he is only liable for the principal and interest and profits actually realized thereon. *County of Lake* v. *Westerfield, supra.*

The court should have passed on the question of the degree of proof required of the State in this case, and particularly with reference to the second charge in the bill. It is clear, and it is practically conceded by the court, that criminal acts amounting to a felony are charged in the bill against Small and the Curtises, yet the court states that it is not necessary to decide these questions because the evidence shows, "beyond all reasonable doubt, *a liability to account.*" This statement is followed by the further statement that "proof of the fact that a public official having custody of public funds loaned these funds to others with a *secret arrangement* respecting the payment of interest and that in reporting interest collected he did not reveal the source of the payments, without more, would be sufficient to justify an order to account." This latter statement can only be sustained when applied to Small under the first charge of the bill. The court cannot well ignore the fact

that this latter statement by it can have no application to the three defendants under the second charge. We certainly cannot assent to the proposition that the three defendants should be found guilty under the second charge, which charges a felony, on the evidence or ground, alone, that the arrangement with Small for the loan of the funds to the Curtises was a *"secret arrangement,"* even if it be proved that the arrangement was, in fact, a secret one. We are not to be considered as yielding to the assertion that the arrangement was a secret one, for we assert with great confidence that there is no more reason, under the evidence in the record, for the assertion that the arrangement between Small and the Curtises for the loan of the funds was a secret one, than there is for the same assertion as to the two hundred or more loans or arrangements for loans that Small made with the other banks, yet all through the court's opinion a great deal of stress is attached to the conclusion that the arrangement with Small for the loan to the Curtises was a secret one. We assert with confidence that no bank in this State, whether it carried an open account or an account treated under the head of "vault account," would be interested in having the fact published to its patrons generally that it was borrowing money at the rate of two or three per cent from the State while it was loaning to its customers the same money at six or seven per cent interest. We assert with greater confidence, if possible, that there is no State treasurer, past or present, who has ever made it his practice of letting it be generally known that he deposited money in a certain bank under an agreement that the bank should pay interest at two or three per cent. Such an arrangement, when considered from the standpoint of either party, is not one that they would care to have generally known, even when they were acting with the best of motives. It would naturally create more or less annoyance to a treasurer to have such fact made known generally, because of the multitude of banks that would want a similar

favor. There is no reason, from a business standpoint, why a banker should want the fact published that he was one of the parties favored by the State treasurer. Bankers are a class of business men that do not publish the details of their business in that manner, and particularly if the subject matter relates to the obtaining of cheap deposits or loans,—that is, deposits at a low rate of interest. It certainly ought not then to alarm anybody,—not even this court,—if the agreement a banker makes for loans is made known only to the treasurer and his employees and those to whom the loans are made. We see no occasion for its alarming anybody because the State treasurer's loans were secured by packers' notes. We shall later undertake to show that no State treasurer ever had his loans better secured than were the loans of Small to the Curtises.

Another real question raised by the parties in the case is, What is the measure of proof required under the allegations charging a felony against Small and the Curtises as set out in the second charge of the bill? Section 80 of our Criminal Code, (Smith's Stat. 1925, p. 895,) in so far as it relates to State officers, provides that if any State officer elected or appointed under the constitution or laws of this State embezzles or fraudulently converts to his own use, or fraudulently takes or secretes with intent so to do, any money, bonds, notes, warrants, funds or securities, or other property belonging to or in the possession of the State, or in the possession of such officer by virtue of his office, he shall be imprisoned in the penitentiary not less than one nor more than fifteen years. The charge in the bill as to the three defendants is, in substance, that a State officer,—Small, as treasurer,—fraudulently converted to his own use, or had fraudulently taken money or funds belonging to the State or that were in his possession by virtue of his office, and appropriated or applied them to his own personal use; and the Curtises are each charged in the second charge with combining with Small to assist him to

commit the same crime. Even conceding, as is said in a
previous paragraph of the court's opinion, that the alleged
private injury to the State is not merged in the alleged
crime and is not in any manner affected thereby, still that
statute has nothing to do with the measure of proof that
the State must make to recover against the Curtises and
Small jointly. That statute has no reference whatever to
the degree of proof required in the civil suit, and it does
not even suggest such an idea. The rule in this State is
clearly established that where a felony is charged in the
pleadings the offense must be proved beyond all reasonable
doubt; and that rule applies to bills or pleadings in equity
as well as to pleadings in actions at law. (*Oliver* v. *Ross,*
289 Ill. 624; *McInturff* v. *Insurance Co. of North Amer-
ica,* 248 id. 92.) The rule is still adhered to in *Rost* v.
*Noble & Co.* 316 Ill. 357, that case simply holding that
the rule will not be extended so as to apply to misdemeanors.

The complete record of the indictment upon which Small
was tried and acquitted at Waukegan, from the finding of
the indictment by the grand jury of Sangamon county up
to and including the verdict of not guilty and the judgment
thereon, appears in this record and was made the basis of
a special plea by Small in this case and substantially the
same facts were set forth in his answer, by which he claimed
that the State is estopped by what is known as estoppel by
verdict, and he now claims that the conspiracy charged in
the second charge of the bill for an accounting cannot be
the subject of a second inquiry between him and the State,
as that question was settled in his favor in the criminal
case, and it was settled that there was no such conspiracy.
All the counts of the indictment in that case to which
Small's motion to quash was not sustained but was over-
ruled are therefore a part of the record in this case. The
count of that indictment found on page 43 of the abstract
makes the following charge against Small and Verne Cur-
tis: "That upon the 10th day of February, 1920, they did

then and there feloniously, unlawfully, wickedly and fraud-
ulently, designing and intending the State of Illinois to de-
fraud and cheat of its lawful money, funds, goods and prop-
erty, did then and there unlawfully, feloniously and fraudu-
lently conspire, combine, confederate and agree together to
deposit with certain persons, to-wit, one Edward Curtis,
now deceased, and Vernon Curtis, also called Verne Cur-
tis, who were assuming and pretending to do business un-
der the firm name and style of Grant Park Bank, large and
divers sums of money, the property of the State of Illinois,
to-wit, the sum of ten million dollars lawful money of the
United States of America and of the value of ten million
dollars, whereas in truth and in fact there was then and
there no such bank known and called the Grant Park Bank,
they, the said Len Small, Edward Curtis, Vernon Curtis,
also called Verne Curtis, then and there well knowing that
there was not then and there such a bank known and called
the Grant Park Bank," concluding in the usual way, "con-
trary to the form of the statute in such case made and
provided," etc. We have omitted one defendant's name ap-
pearing in the indictment as he is not a party to this rec-
ord, otherwise we have stated the substantial part of this
indictment,—the charging part,—in the identical language
found in the indictment. The circuit court before which
Small was tried overruled a motion to quash this indict-
ment. It will be seen that the substantial averments in
that count are identical with some of the averments or
charges in this bill, and we further state that every substan-
tial charge made in the bill in chancery is found in some
one of the twelve counts of the indictment upon which
Small was tried, and in the very language that is used in
this bill as originally framed by the State. There is not
a chance for the State's claim to be sustained that the sec-
ond charge of this bill did not charge a felony as framed
by the State or as we have framed it, if the indictment on
which Small was tried charges a felony. There can be no

serious question that the bill in this case charges a felony,—the felony which is penalized in section 80 of the Criminal Code.

We call attention at this time to the fact that the plea filed in this case by Verne S. Curtis as a bar to this action, and which plea was sustained by the lower court, sets forth these facts: That he is the same person and that Small is the same Len Small named in the indictment; that the alleged fraudulent plan, combination, confederacy and conspiracy charged against Verne S. Curtis and Small in the bill of complaint are the same alleged and supposed plans, combination, confederacy and conspiracy charged against them in the indictment and the bill of particulars filed thereunder; that the alleged deposits, alleged withdrawals, alleged certificates of deposit, alleged devices and pretenses, alleged notes and securities, alleged interest and profits, alleged discounts, alleged investments, alleged use of the public moneys of the State, charged in the bill of complaint to have been made, are the same instruments, etc., alleged interest, profits, discounts, investments and use of public moneys of the State charged in the indictment and bill of particulars to have been made; that the supposed transactions alleged in the indictment and bill of particulars to have been made are the same and not other or different; that the counts of the indictment set out remained pending and undetermined in the circuit court of the county of Lake as to Verne Curtis until September 20, 1923, on which date the State's attorney of Sangamon county entered his motion for and on behalf of the People of the State of Illinois to *nolle prosequi* the indictment and all of the counts thereof, which said motion was by the circuit court of the county of Lake allowed and an order of the court entered in accordance therewith. It is further averred in the plea that he was never tried upon any charge in that indictment by a jury, and that no verdict of a jury or order of a court has ever been entered to that effect and that he remains

subject and liable to an indictment and trial upon said charge; that he has been advised that the answer and discovery sought and asked by the bill of complaint in this case might subject him to penalties and punishment and might tend to incriminate him, and might be used as the basis for another indictment against him for the same alleged matters and transactions set forth and charged as aforesaid. He therefore pleads the several matters aforesaid in bar of the bill of complaint and prays judgment whether he be bound to make any further answer, etc.

The fact that Verne S. Curtis filed that plea, claiming that if he made discovery, as he was asked to do, his testimony might tend to incriminate him, or, to put it in the language of the State's counsel *many* times repeated in their argument and in their alleged analysis of facts, the fact that he claimed his privilege of refusing to testify in this case, is called to our attention very frequently by the State, and it is made use of by the court in its decision to the great prejudice of Verne S. Curtis, and particularly so to Small. There is no reason why Small should be held responsible for the position or embarrassment in which the State has deliberately placed Verne S. Curtis and he should not be prejudiced by reason of that fact. The State is entitled to every presumption that can justly and rightly be drawn in its favor from any fact or facts in this record. Small is equally entitled to full consideration of the fact that the State has deliberately placed Verne S. Curtis in the position in which he is found in the record, and he is entitled to the indulgence of this court in the further presumption that if the State had really desired the testimony in this case of Verne S. Curtis and his co-defendant named in the indictment and whose name we have refrained from mentioning, it was within the State's power, and was its right, to have put those parties in a position where they could have testified, and that they could have been compelled to testify without any pretense or claim that their

testimony might tend to incriminate them. The State could, instead of *nolleing* the indictment, have tried them upon the indictment, or if it did not desire to re-try the case as to those two defendants, it could have had them arraigned, a jury empaneled to try them on their plea of not guilty, and a direction by the court to have the jury return a verdict of not guilty because it was considered a waste of time to further prosecute the criminal case against them. In lieu of the foregoing proceedings the State might also have refused to further prosecute at that time and have entered a *nolle prosequi,* as it did do, and then in the prosecution of this suit have taken the position outright that it proposed to hold or keep its right to later prosecute them criminally, if developments justified. The State should also frankly have taken the position in this case that it was not its intention to contend that Small should be held to be prejudiced by reason of the action regarding Verne S. Curtis. The parties to this suit are in a court of equity, and the rule in equity has always been that every party to a suit should come into the court with clean hands, without any disposition to take undue advantage of a party by reason of any embarrassing position in which he or it has deliberately placed another party to the suit. We make these statements not with any intention of criticising or being unjust to the State's counsel, but for the purpose of properly stating, as we view it, that in considering the case this court should give full consideration to the entire record as it finds it. Small applied for and obtained a separate trial in the criminal case. It was not possible for him to obtain that privilege in this case under the allegations of the bill. Therefore, while we are willing to give the State all that it is entitled to in the way of presumption by reason of the fact that Verne S. Curtis by plea claims his privilege to abstain from testifying, yet we are unwilling that the State be allowed any presumption or advantage against Small by reason of that fact,—a fact which he was powerless to

change and in which the State voluntarily and deliberately placed him.

In view of what we have stated in the preceding paragraph, we call particular attention to the fact that the issue in this suit as to the charge of unlawful conspiracy in the second count is identical with the charge of conspiracy made in the indictment. Small is the only defendant tried on that indictment, and he was acquitted. That verdict and judgment of acquittal necessitated the finding as against Small, and it was a finding that the criminal conspiracy charged did not exist. That fact was a principal and controlling fact in the criminal case, as the defendant could not be convicted if that was not true. It is also a controlling fact in this suit in chancery, and Small cannot be held to a joint accounting under the second charge in the bill unless that fact is proved beyond a reasonable doubt. It is also the contention of his counsel that the State is estopped to further contest that question of fact, which is an ultimate or controlling fact in this case. It must be conceded, therefore, we think, that Small has in no way waived his right to contend that the State is estopped to again litigate or question the fact that he is guilty of the criminal conspiracy herein charged and which was also charged against him in the indictment, and that the State should not be allowed to take away from him that right and privilege by reason of its deliberate act in putting Verne S. Curtis in the embarrassing position he finds himself in this suit, and which the State has the right, as against Curtis, to so embarrass him. We therefore take the positive position that the State is estopped to contend, as against Small, that the criminal conspiracy is an ultimate question of fact which the State may prove. We want to make it plain, also, that the State may raise that question and prove it, if it can, as against Verne S. Curtis, and it may also prove it against the administratrix of Edward C. Curtis, deceased, if there is a possibility that a joint decree may be on that

theory entered against her as administratrix, which we assert cannot be done. It can so be proved against them because neither Verne S. nor Edward C. Curtis was ever tried on the indictment, and therefore a verdict of not guilty as to Small could not work an estoppel in their favor against the State. In taking the above position we do not want to be understood as holding that the doctrine of *res judicata* is to be applied in favor of Small. In other words, the criminal suit and judgment therein were not a bar in favor of Small to the prosecution of this suit on the ground of *res judicata,* the doctrine of which is quite different from that of estoppel by verdict. The distinction between these two doctrines, of estoppel by verdict and of *res judicata,* is clearly drawn by this court in *Hanna* v. *Read,* 102 Ill. 596, in an opinion written by Judge Mulkey. It is there pointed out that when a former adjudication is relied on as a bar to the whole cause of action, then it must appear that the cause of action and things sought to be recovered are the same in both suits, and that such former adjudication is known as an estoppel by judgment, and that it is the judgment itself that is a bar to the action; but when some specific fact or question has been adjudicated and determined in a former suit and the same fact or question is again put in issue in a subsequent suit between the same parties, its determination in the former suit, if properly presented and relied on, will be held conclusive upon the parties in the later suit, without regard to whether the cause of action is the same in both suits or not; that this is known as an estoppel by verdict, and is equally available to a plaintiff in support of his action, when the circumstance is warranted, as when offered by a defendant as a matter of defense. It is further stated in that decision that it is sufficient to make a former adjudication as to any material fact determined an estoppel that the parties be substantially the same, and that the fact that in the second suit one is made a party who was not a party in the first action will

not defeat the application of the rule of estoppel when such person is a mere formal party, having no interests that can be affected.

In the suit we are now considering the facts are extraordinarily favorable to the idea that the plea of estoppel by verdict of Small must be sustained. The issue in the criminal suit and in this suit is identical. The same State of Illinois was the party prosecuting Small in the criminal case. The same Small that was the defendant in that case is the defendant in this case. The same limitations upon Small or the same embarrassments against him exist in this suit as existed in the criminal suit, viz., that if he testified in this suit he might subject himself to a prosecution for a felony or might incriminate himself, for the reason that if the charge of conspiracy in this case is true, as alleged, he could be prosecuted for perjury for swearing falsely to his two reports as to the amount of interest he collected. The fact is very apparent that he could not be guilty of a conspiracy to defraud the State or the defrauding of the State, and not be guilty of making false oaths to his two reports of interest collected. Therefore we have in the criminal case and in this suit more points that are the same than are necessary to support the plea of estoppel, under the decision in the *Hanna case, supra,* as the issues are the same, the parties to the action are the same, the rules of evidence are the same, the burden of proof cast upon the State is the same, the weight of the evidence is the same and the competency of the witnesses is the same. The only things dissimilar in the two cases are the objects of the two suits, which are different, and the result to the parties is different and the procedure is different, as in this case we have no jury. These points of difference, under the authorities, have no bearing or tendency to defeat the doctrine of estoppel by verdict, as is clearly held by this court and also clearly held by other courts, and the State is in no better position in this regard than any other litigant. The cases

in Illinois that follow and support *Hanna* v. *Read, supra,* are *Leopold* v. *City of Chicago,* 150 Ill. 568, *Wright* v. *Griffey,* 147 id. 496, *Attorney General* v. *Chicago and Evanston Railroad Co.* 112 id. 520, and *Markley* v. *People,* 171 id. 260, in which the State was estopped; and *Brack* v. *Boyd, supra; Chicago Title and Trust Co.* v. *Storage Co.* 260 Ill. 485; *City of Chicago* v. *Partridge,* 248 id. 442; *Silurian Oil Co.* v. *Neal,* 277 id. 45.

The same rule is applied against the State or government where the measure of proof is the same and the cases are otherwise applicable. This is clearly laid down in *Coffey* v. *United States,* 116 U. S. 436, 6 Sup. Ct. 437, which is also cited and quoted from in *Stone* v. *United States,* 167 U. S. 178, 17 Sup. Ct. 778, and cited in the majority opinion in this case. We assert that the opinion of the majority of the court is clearly wrong on that question. The cases cited by the court in its favor are cases that do not apply, because of the fact that in several instances the parties were not the same while in others the measure of proof required in each case was entirely different. No such condition exists in this record. The statute of this State cited in the majority opinion has no effect or tendency to change the rule, and it does not change and was not intended to change it. If applied to this case, the only effect the rule would have would be to prevent the State from re-litigating the question of conspiracy as to Small, only. It would not apply to the Curtises. How often should the State be allowed to litigate over and over again some controlling fact in a case, as the majority of the court decides it may do in this case? The statute cited by the court was intended simply as a declaration of the rule that the doctrine of *res judicata* should not be applied, which would bar the suit altogether. There was no intention of upholding any party,—not even the State,—in persisting in litigating over and over again some question of fact that is controlling in the case. If applied to this case it would

simply have the effect of taking away the State's right to have a joint judgment against Small and the other defendants. It would not prevent the State from recovering every right that it had against Small individually. It would not prevent the State from recovering against the Curtises upon any theory,—not even upon the doctrine of estoppel, if the evidence warranted it,—for the reason that neither Verne S. nor Edward C. Curtis was a party to the judgment of acquittal in the criminal case. We assert that the court ought not to overrule decisions of this court that are so firmly settled and there is no occasion for overruling them.

Judge Jones did not try the case in the court below. The trial judge who followed him paid no attention whatever to Judge Jones' ruling on the special demurrer that the statute of 1908 is invalid. Apparently the main question tried and passed on by him, and the one upon which he considered the case as depending, was the question whether or not the Grant Park Bank was a real bank, and he found against the mass of testimony in the record which demonstrates positively that it was a bank,—a private bank,—under the laws of Illinois. We do not concur in the views expressed by the court that this fact was considered without prejudice to the defendants. A mass of incompetent and irrelevant evidence was heard and considered by the court. The principal finding of the lower court made in this case is in this language: "The said alleged Grant Park Bank mentioned and described in the bill of complaint in this cause had no existence and was not in fact a bank during the period of January 8, 1917, to January 11, 1919, but was a mere scheme or device used by said Len Small, Edward C. Curtis and Verne S. Curtis in an attempt to give legal color to such use of said funds for investments in the notes and securities aforesaid." The court did not find the allegations of the second charge were proved. The language indicates clearly that the court considered that the above findings settled the case against the defendants, and

that he considered it illegal for the State treasurer to deposit money in a private bank in violation of the statute of 1908. That question was also one of the questions passed on by the master in chancery, whose theory of the case was that the Curtises were merely the agents of Small in the loaning of said funds, and proceeded to decide the case on the doctrine of agency but did not find the allegations of the second charge to be proved, thereby abandoning the consideration of the allegations of the second charge, which must be sustained before there can be any finding against the defendants jointly and be proved beyond all reasonable doubt. This court in its opinion makes the finding, apparently, that the unlawful conspiracy and the fraud charged were proved, but neither the master in chancery nor the circuit court made any such finding, and the defendants' counsel filed proper exceptions upon those grounds and have urged them upon this court as grounds for reversal. This court is not a court of original jurisdiction in bills for an accounting in equity, and it has no jurisdiction to absolutely settle such a matter of fact on review without first having before it a finding as to such fact by the master, approved by the court, or by the court under the evidence in the record. The question now is, Did the lower court find that the defendants were jointly liable because of the fact that they had entered into a conspiracy to defraud, and had defrauded, the State of money or funds to which it was legally entitled? and the answer should be no.

The State's counsel abandoned the actual charges made against the defendants in the second count, both in the lower court and in this court. They state positively in their brief filed in this court that their theory now is that the Grant Park Bank and the Curtises were but agents of the State treasurer in the loaning of the funds placed in their hands by the treasurer, and that there should be an accounting for all interest and profits earned on State money as the result of these direct transactions by the State treasurer

with the packers and other persons from whom packers' notes and other securities were purchased by the Curtises for Small, as treasurer. This change of position by the State's counsel no doubt accounts for the finding of the master on their theory of agency, and for the failure of the trial court to make a finding that the allegations in the second charge in the bill were proved. No such theory is disclosed by the allegations of the bill, and the State is not now entitled to an accounting on that theory. If allegations had been made in the bill on this theory of agency, or if the State should be permitted to now contend against the defendants on that theory, before the Curtises could be held liable as the agents of Small in these transactions, Small being himself but an agent or trustee of the State, the State would be required to prove that the Curtises, as agents of Small, knew that he was intending to defraud the State of the interest and profits that it would be entitled to recover on this theory, and that they participated with him in his fraudulent intent and scheme and aided him in defrauding the State. Such would simply amount to a charge of a felony against Small and the Curtises, and would also have to be proved beyond a reasonable doubt and would be an entirely different charge from the one made in the bill. The State cannot be permitted to recover, for the foregoing reasons, upon such new theory and charge. Besides, the evidence in the case shows conclusively that the Curtises bought every note and security they did buy with the funds loaned them by Small, as treasurer; that they handled such securities as their own property, and retained and used for their own private purposes the discount or profits realized by them on such securities, except the amount of such discount and profits paid to Small for the State's interest and profits and which was accounted for by Small to the State, and if he did not so account fully, there is not a scintilla of evidence in the record that the Curtises knowingly assisted him in any way in thus defrauding the State.

We now call attention to the fact that there are two distinct charges in this bill: The first a charge against Small, only, which is required to be proved simply by a preponderance of the evidence; the second a charge against the three defendants jointly, which must be proved beyond a reasonable doubt; and further, that there is a distinct prayer for relief in the bill which applies to the charge against Small, only, and the other prayer for relief applicable only to the second charge against the three defendants; and finally, that the prayer for relief applicable to the second charge closes with this language: "That said defendants, Len Small, Verne S. Curtis, and Etha G. Curtis, administratrix, to the extent of their respective liabilities, may be decreed to pay to the complainant the amount found due to such complainant upon such accounting," concluding with a prayer for other and further relief as may be proper. The word "respective," as used in this second prayer of the bill, indicates clearly that the prayer is for a several and not a joint accounting, as is contended by the defendants' counsel in this case. As counsel for appellants contend, the word "respective," as used in this prayer for relief, is defined to mean, "singly or severally considered; singly, in the order designated." The author of the dictionary then uses these words to indicate that word's use: "they answered respectively to their names; the first, second and third seats belonged to John, James and William, respectively."

We recognize the rule in equity that bills for an accounting should be construed liberally and that in an equitable accounting pecuniary or money damages may be recovered. We want particularly, however, to call attention to the fact that in a decree for an accounting it should be merely for an equitable accounting by the defendant or defendants if the bill is sustained, and that the court in the first instance merely fixes the basis for an accounting. On review of a bill for an accounting this court should confine its decision

to the question whether or not the complainant below was entitled to a decree for an accounting, and if so, then the court cannot go farther than to merely fix the basis of the accounting. We take the position that it is not proper for this court on such review to make any specific finding whatever as to what amounts should be accounted for or as to the amounts owed by the defendants below upon any item of accounting. The court in its decision should not prejudice the defendants by going further than indicated by us. The court apparently holds, or indicates to the lower court out and out, that as to certain loans by Small to the Curtises the lower court should find, on the remanding of the cause, that those loans purchased certain Ridgely National Bank stock, and that the defendants in the accounting before the court should be charged with that amount of money as to such particular item. There are other findings in the court's decision of similar character that have no proper place therein and can only tend to prejudice the defendants in the final accounting, which we contend ought not to be done. In its decision the court in no way indicates that the defendants are entitled to any credit whatever for the amount Small paid into the State treasury as interest and profits realized by him, whether such payments concerned either the first or second charge in the bill.

We have already clearly shown, we think, that the acts of Small charged against him as to the manner of reporting interest and profits collected by him are not unusual, because in making his reports he followed exactly the same form used by his predecessors. We call attention to the fact that he followed the action of his predecessors strictly as to the time of making his first report of interest collected, but he filed his second report at least eight months earlier in his successor's term than did any of his predecessors, they all having made their second report and payment into the treasury on September 30 of the year their successors made their first report of interest collected. It is also proved that none

of his predecessors itemized any more particularly than did Small such interest or profits collected by them.

In this dissent we are directing special attention to what we consider as errors of the majority of the court in their findings and as to the decree entered on the second count of the bill. Our contention on the second count is, that the evidence fails to show beyond a reasonable doubt, or even by a preponderance of the evidence, that the Curtises and Small are found, or can legally be found, to be jointly liable thereon and should make a joint accounting. Our further contention is, that if there is a showing in the record (which we do not concede) that the defendants should jointly account to the State, the basis of accounting herein fixed by the majority of the court is entirely wrong, when viewed from any angle of the case. The finding and conclusion of the court are that the three defendants should account jointly for the entire interest and profits received by all of them in the transactions under what is called the "safe account." In no event can the defendants be decreed to pay a greater amount of damages to the State than the actual or pecuniary damages sustained by the State. The damages awarded by the majority of the court are in the nature of punitive or exemplary damages, which are never allowed in equity. We undertake to say that no well-considered decision of any court of last resort can be found that has awarded punitive or exemplary damages in a proceeding in equity. We call attention particularly to the fact that the only case cited by this court as authority for its decision awarding damages in this case, (*Farwell* v. *Great Western Telegraph Co.* 161 Ill. 522,) is not a case in which the court sustained a joint liability. This court refused to apply the general rule of joint liability, but did hold that the wrongdoers in that case were all severally liable for the amount of damages actually sustained. There is not a single paragraph or sentence in that whole opinion which recog-

nizes the rule that more than the actual damages sustained can be recovered in a court of equity, either on a joint or several liability. In that case the court did not compel the defendants to forfeit any rights they really had, but the holding was that they would be entitled to recover whatever was their equitable part of the assets of the corporation, but that they should be liable for the actual damages inflicted upon the other parties by their gross frauds.

We have not been able to find a single case which holds that in a court of equity, on a simple bill for an accounting, where no question of legal rights is to be considered, or in any other case in which legal rights are considered, any more than pecuniary damages or compensatory damages may be awarded, whether the finding of liability was joint or several. The defendants' counsel cite a number of cases that are applicable to this case on the question of damages, some of which we will now consider.

In *United States* v. *Bernard,* 202 Fed. 728, the court recognized the general rule that where a court of equity has entertained jurisdiction of a controversy for any purpose or on any ground it may retain jurisdiction for the purpose of administering complete relief or doing complete justice with respect to the entire adjustment of the subject matter in controversy, even to the extent of allowing damages. But the court in its opinion says: "In an action of trespass, where the injury is wanton or malicious or gross and outrageous, or is done against the protest of the plaintiff or in known violation of the law, the court may permit the jury to add to the measured compensation of the plaintiff further damages by way of punishment or example. * * * But the function of the court in equity goes no further than to award, as incidental to other relief or in lieu thereof, compensatory damages. It has no authority to assess exemplary damages. By applying to a court of equity for relief the complainant waives all claim to vindictive damages."

In *Bank* v. *Kern,* 8 Pa. Dist. 72, the court said: "Decrees in equity, even when based upon frauds and conspiracies, are given for the amounts out of which the injured parties have been defrauded, and not for punitive damages, fines or penalties, nor are double recoveries allowed." That case was sustained by the Supreme Court of Pennsylvania in 193 Pa. St. 59.

The Supreme Court of Wisconsin, having under consideration the question as to recovery of exemplary, vindictive or punitive damages, in the case of *Karns* v. *Allen,* 135 Wis. 148, 15 Ann. Cas. 543, said: "After considerable search we have been able to find no case where exemplary damages were allowed by a court of equity, and while our investigation shows a great dearth of authority in point on the subject, the cases which in any way touch the question appear to lean to the doctrine that a court of equity should award only compensatory damages." The court further said: "The damages which may be recovered in an equitable action, under our decisions are compensatory and not exemplary damages. We think no decision of this court can be found where in an equitable action exemplary damages were allowed." To the same effect is *Bird* v. *Railroad Co.* 8 Rich. (S. C. Eq.) 46.

Compensatory damages have reference only to damages actually sustained by a party litigating: They are usually referred to in equity as pecuniary damages, or such damages as a party actually sustains in money value. This case is simply for an equitable accounting. In that class of cases equity recognizes the action as one in which pecuniary or money damages may be, and most always are, awarded, if damages are awarded at all. No question of legal rights, as a rule, ever enters into the consideration of such a case. No such rights enter into the consideration of the case now before us. The defendants' contention that the damages awarded in this case are excessive and in the nature of punitory damages or penalties should be sus-

tained, and if sustained three per cent interest on the loans by Small to the Curtises (the largest rate of interest paid to him by any other bank) is the utmost that should be allowed to be recovered in any view that may be taken, unless the evidence should show that Small received a greater amount of profits and interest than three per cent on the money loaned to the Curtises, and in case that is shown, then the utmost amount of recovery is the amount that Small himself actually received and appropriated to his own use. There is no reason, from an equitable standpoint, why the Curtises should be decreed to forfeit all interest received under their contract with Small.

We think there is also merit in the contention of the defendants that no joint decree or judgment can be entered against Etha G. Curtis, administratrix, and the other two defendants. In *Eggleston* v. *Buck,* 31 Ill. 254, it is said: "The rule is well settled, if a contract is several, or joint and several, the administrator of the deceased may be sued at law in a separate action, but he cannot be sued jointly with the survivor, because one is to be charged *de bonis testatoris,* and the other *de bonis propriis.*" It is apparent that the rule ought to be applied to a case in equity, and particularly to the case now before us. It is shown by the record that no judgment or decree can be entered against the administratrix except a decree or judgment payable in due course of administration out of subsequently discovered assets of the estate of Edward C. Curtis, deceased, because of the fact that the time for filing claims against that estate has long since passed, as provided by statute. Regardless of that fact, a joint judgment cannot be legally or equitably entered against an administrator or administratrix, even in cases where there was a joint liability between the deceased and one or more other persons on a joint and several liability. The character of judgment is not the same, and cannot be the same, against the administratrix and the

other defendants jointly, because they are not in the same manner liable on a joint obligation.

We here append two tables, which show the complete transactions between Small, as treasurer, and the Curtises or the Grant Park Bank, concerning the loans of public moneys to them by Small, so far as shown by the record:

| Line | Item | Date | Returns to treasurer | Loans to G. P. Bk. | Treasurer's collateral | Discount | Re-discount |
|---|---|---|---|---|---|---|---|
| 1 | 1 | April 21, '17 | | $50,000 | $50,000—Swift | $1,150.00 | |
| 2 | 2 | April 27, '17 | | 250,000 | 50,000—Swift | 1,284.72 | |
| 3 | 2 | | | | 50,000—Morris | 1,156.25 | |
| 4 | 2 | | | | 50,000—Wilson | 1,156.25 | |
| 5 | 2 | | | | 100,000—Armour | 2,350.00 | |
| 6 | 4 | May 11, '17 | | 300,000 | 300,000—Armour | 7,833.33 | |
| 7 | 5 | May 18, '17 | | 300,000 | 50,000—Wilson | 1,284.72 | |
| 8 | 5 | | | | 100,000—Swift | 2,569.44 | |
| 9 | 5 | | | | 150,000—Armour | 3,854.17 | |
| 10 | 6 | May 25, '17 | | 100,000 | 100,000—Morris | 2,125.00 | |
| 11 | 7 | July 6, '17 | | 300,000 | 100,000—Swift | 2,697.91 | $3,033.33 |
| 12 | 7 | | | | 150,000—Armour | 4,025.00 | |
| 13 | 7 | | | | 50,000—Morris | 845.84 | 3,800.71 |
| 14 | 7 | July 7, '17 | | | 30,000—Armour* | | |
| 15 | 8 | July 13, '17 | | 300,000 | 100,000—Morris | 1,555.54 | 7,601.42 |
| 16 | 8 | | | | 100,000—Armour | 2,597.22 | 3,016.67 |
| 17 | 8 | | | | 100,000—Swift | 2,569.44 | 3,033.33 |
| 18 | 9 | July 14, '17 | | 400,000 | 150,000—Swift | 3,833.33 | |
| 19 | 9 | | | | 150,000—Armour | 3,833.33 | |
| 20 | 9 | | | | 100,000—Morris | 1,513.89 | 7,601.42 |
| 21 | 10 | July 25, '17 | | 300,000 | 100,000—Morris | 1,388.89 | 7,601.42 |
| 22 | 10 | | | | 100,000—Swift | 2,555.56 | |
| 23 | 10 | | | | 100,000—Armour | 2,541.67 | |
| 24 | 11 | July 27, '17 | | 300,000 | 100,000—Armour | 2,583.33 | 1,508.33 |
| 25 | 11 | | | | 100,000—Swift | 2,555.56 | |
| 26 | 11 | | | | 100,000—Morris | 1,319.46 | 7,601.45 |
| 27 | 51 | July 26, '17 | | | 20,000—Swift | 500.00 | 603.33 |
| 28 | 12 | July 30, '17 | | 400,000 | 150,000—Morris | 1,958.34 | 11,402.14 |
| 29 | 12 | | | | 150,000—Armour | 3,812.50 | 4,525.00 |
| 30 | 12 | | | | 100,000—Swi't | 2,555.56 | 3,016.70 |
| 31 | 13 | Aug. 3, '17 | | 400,000 | 400,000—Swift | 5,000.00 | |
| 32 | 51 | Aug. 6, '17 | | | 27,000—Unknown* | 675.00 | 690.00 |
| 33 | 15 | Sept. 8, '17 | | 300,000 | 50,000—Cudahy | 882.29 | 1,508.33 |
| 34 | 15 | | | | 100,000—Wilson | 2,245.80 | 3,033.33 |
| 35 | 15 | | | | 100,000—Wilson* | 2,654.20 | 3,083.33 |
| 36 | 15 | | | | 50,000—Wilson | 1,327.08 | 1,541.67 |
| 37 | 16 | Sept. 11, '17 | | 300,000 | 300,000—Swift | 2,583.33 | |
| 38 | 1 | Oct. 25, '17 | $50,000 | | | | |
| 39 | 6 | Oct. 27, '17 | 100,000 | | | | |
| 40 | 2 | Oct. 30, '17 | 50,000 | | | | |
| 41 | 2 | | 50,000 | | | | |
| 42 | 2 | | 50,000 | | | | |
| 43 | 13 | Nov. 2, '17 | 400,000 | | | | |
| 44 | 2 | | 100,000 | | | | |
| 45 | 16 | Nov. 13, '17 | 300,000 | | | | |
| 46 | 4 | Nov. 16, '17 | 300,000 | | | | |
| 47 | 56 | | | | 27,500—Swift | 825.00 | 740.34 |
| 48 | 5 | Nov. 21, '17 | 50,000 | | | | |
| 49 | 5 | | 100,000 | | | | |
| 50 | 5 | | 150,000 | | | | |
| 51 | 17 | Dec. 10, '17 | | 200,000 | 200,000—Swift | 2,400.00 | 6,033.33 |
| 52 | 12-B | Jan. 31, '18 | | | 31,500—Armour | 945.00 | |
| 53 | 7 | Jan. 7, '18 | 150,000 | | | | |
| 54 | 9 | Jan. 17, '18 | 150,000 | | | | |
| 55 | 9 | | 150,000 | | | | |
| 56 | 10 | Jan. 25, '18 | 100,000 | | | | |
| 57 | 10 | | 100,000 | | | | |
| 58 | 11 | Jan. 29, '18 | 100,000 | | | | |
| 59 | 56 | Mar. 30, '18 | | | 15,000—Swift | 450.00 | |
| 60 | 56 | April 8, '18 | | | 28,000—Armour* | 854.00 | |

| Item | Date | Returns to treasurer | Loans to G. P. Bk. | Treasurer's collateral | Discount | Re-discount |
|---|---|---|---|---|---|---|
| 18 | April 10, '18 | ----------- | $500,000 | $250,000—Wilson___ | $13,270.87 | ---------- |
| 18 | April 12, '18 | ----------- | ---------- | 13,950—Wilson___ | 740.50 | |
| 19 | April 16, '18 | ----------- | 750,000 | 1,000,000—Armour__ | 52,305.56 | ---------- |
| 19 | | ----------- | ---------- | 55,000—Armour___ | 2,876.81 | ---------- |
| 21 | April 17, '18 | ----------- | 500,000 | 500,000—Armour___ | 26,055.56 | ---------- |
| 22 | April 18, '18 | ----------- | 500,000 | 500,000—Armour___ | 25,958.33 | ---------- |
| 22 | | ----------- | ---------- | 55,000—Armour___ | 2,855.42 | ---------- |
| 23 | April 19, '18 | ----------- | 500,000 | 500,000—Armour___ | 25,569.44 | ---------- |
| 25 | April 20, '18 | ----------- | 500,000 | 500,000—Armour___ | 25,472.22 | ---------- |
| 25 | April 22, '18 | ----------- | ---------- | 50,000—Armour___ | 2,547.22 | ---------- |
| 26 | April 23, '18 | ----------- | 500,000 | 500,000—Swift_____ | 25,123.30 | ---------- |
| 27 | April 25, '18 | ----------- | 500,000 | 500,000—Swift_____ | 24,835.60 | ---------- |
| 27 | | ----------- | ---------- | 55,000—Swift_____ | 2,731.91 | ---------- |
| A. | May 1, '18 | ----------- | 100,000 | Nat'l Secur.*_____ | 238.89 | |
| 29 | May 2, '18 | ----------- | 500,000 | 500,000—Swift_____ | 18,083.30 | $5,055.55 |
| 30 | May 3, '18 | ----------- | 500,000 | 500,000—Swift_____ | 16,041.67 | 8,555.50* |
| 30 | May 6, '18 | ----------- | ---------- | 35,000—Swift_____ | 1,225.00 | |
| 31 | May 7, '18 | ----------- | 500,000 | 500,000—Swift_____ | 13,513.90 | 9,333.33 |
| 32 | May 16, '18 | ----------- | 500,000 | 500,000—Armour___ | 12,736.11 | 10,402.72 |
| 33 | May 17, '18 | ----------- | 500,000 | 500,000—Armour___ | 15,652.78 | |
| 33 | | ----------- | ---------- | 30,000—Armour___ | 939.17 | |
| 34 | June 1, '18 | ----------- | 500,000 | 500,000—Armour___ | 17,013.89 | 4,083.33* |
| 35 | June 3, '18 | ----------- | 500,000 | 500,000—Armour___ | 17,694.44 | 3,888.80* |
| 35 | | ----------- | ---------- | 35,000—Armour___ | 1,238.61 | |
| 36 | June 7, '18 | ----------- | 500,000 | 500,000—Swift_____ | 15,652.80 | ---------- |
| 37 | June 11, '18 | ----------- | 500,000 | 500,000—Swift_____ | 20,322.61 | ---------- |
| 38 | June 18, '18 | ----------- | 500,000 | 400,000—Swift_____ | 6,533.33 | ---------- |
| 38 | | ----------- | ---------- | 100,000—Swift*____ | 4,763.90 | ---------- |
| B. | June 24, '18 | ----------- | 60,000 | 60,000—Arm. Ds__ | 1,990.00 | ---------- |
| 41 | July 2, '18 | ----------- | 500,000 | 500,000—Cudahy___ | 18,666.67 | ---------- |
| 42 | July 5, '18 | ----------- | 500,000 | 500,000—Cudahy___ | 18,375.00 | ---------- |
| 7 | July 7, '18 | $30,000 | ---------- | ---------- | ---------- | ---------- |
| 7 | | 100,000 | ---------- | ---------- | ---------- | ---------- |
| 43 | July 10, '18 | ----------- | 500,000 | 500,000—Swift_____ | 17,888.88 | ---------- |
| 44 | July 11, '18 | ----------- | 500,000 | 500,000—Swift_____ | 17,597.22 | ---------- |
| 15 | July 15, '18 | 50,000 | ---------- | ---------- | ---------- | ---------- |
| 45 | July 15, '18 | ----------- | 500,000 | 500,000—Cudahy___ | 17,402.78 | ---------- |
| 46 | July 16, '18 | ----------- | 400,000 | 500,000—Swift_____ | 17,305.43 | ---------- |
| 8 | July 18, '18 | 100,000 | ---------- | ---------- | ---------- | ---------- |
| 51 | July 31, '18 | ---------- | 98,500 | 500,000—Swift_____ | 12,055.60 | 3,629.60 |
| 51 | Aug. 6, '18 | 27,000 | ---------- | ---------- | ---------- | ---------- |
| 17 | Aug. 20, '18 | 200,000 | ---------- | ---------- | ---------- | ---------- |
| 15 | Sept. 12, '18 | 100,000 | ---------- | ---------- | ---------- | ---------- |
| 15 | | 50,000 | ---------- | ---------- | ---------- | ---------- |
| 38 | | 400,000 | ---------- | ---------- | ---------- | ---------- |
| 56 | Oct. 1, '18 | 27,500 | ---------- | ---------- | ---------- | ---------- |
| 56 | | 15,000 | ---------- | ---------- | ---------- | ---------- |
| 56 | Oct. 8, '18 | 28,000 | ---------- | ---------- | ---------- | ---------- |
| 33 | Oct. 25, '18 | 500,000 | ---------- | ---------- | ---------- | ---------- |
| 33 | | 30,000 | ---------- | ---------- | ---------- | ---------- |
| B. | Oct. 31, '18 | 60,000 | ---------- | ---------- | ---------- | ---------- |
| 30 | Nov. 2, '18 | 35,000 | ---------- | ---------- | ---------- | ---------- |
| 36 | Nov. 16, '18 | 500,000 | ---------- | ---------- | ---------- | ---------- |
| C. | Nov. 22, '18 | ---------- | 175,000⁑ | ---------- | ---------- | ---------- |
| 35 | Dec. 2, '18 | 35,000 | ---------- | ---------- | ---------- | ---------- |
| D. | Dec. 20, '18 | ---------- | 100,000 | 160,783.33—Thread bonds | | |
| 29 | Dec. 27, '18 | 500,000 | ---------- | ---------- | ---------- | ---------- |
| 23 | Jan. 7, '19 | 500,000 | ---------- | ---------- | ---------- | ---------- |
| 25 | | 500,000 | ---------- | ---------- | ---------- | ---------- |
| 37 | | 500,000 | ---------- | ---------- | ---------- | ---------- |
| 18 | Jan. 10, '19 | 250,000 | ---------- | ---------- | ---------- | ---------- |
| 18 | | 13,950 | ---------- | ---------- | ---------- | ---------- |
| 19 | | 55,000 | ---------- | ---------- | ---------- | ---------- |
| 22 | | 55,000 | ---------- | ---------- | ---------- | ---------- |
| 25 | | 50,000 | ---------- | ---------- | ---------- | ---------- |
| 27 | | 55,000 | ---------- | ---------- | ---------- | ---------- |
| E. | | 214,050 | ---------- | ---------- | ---------- | ---------- |
| | Totals_____ | $7,430,500 | $16,883,500 | ---------------- | $604,122.67 | $125,923.75 |
| | | | Total discount and re-discount_____ | | ---------- | $730,046.42 |

In the above table we show in the fifth column, counting from the left, the loans of public funds made by Small to the Curtises or the Grant Park Bank, and the dates of those loans appear in the third column, opposite the loans. In the sixth column are shown the securities or collateral filed with Small by the Curtises, and the date on which each security was filed is indicated in the date column, or third column from the left. These securities were most generally packers' notes, bought by the Curtises from Swift & Co., Morris & Co., Wilson & Co., Armour & Co. and Cudahy & Co. Packers' notes purchased from Swift & Co. are indicated simply by the word "Swift" written at the right of the amount of the collateral. We also simply use the word "Morris" to indicate Morris & Co., "Wilson" to indicate Wilson & Co., "Armour" to indicate Armour & Co. and "Cudahy" to indicate Cudahy & Co. The amount of discount the Curtises realized on each collateral note or other security is indicated in the column designated "Discount." "Re-discount," in the next column, indicates that the security was re-loaned and re-discounted, and the amount of the discount realized during Small's term is the sum of these two columns, or $730,046.42. In the second column we give the same item number to each transaction as is used in the table in the majority opinion. We have five items in our table that are not found in the table in the majority opinion, and we designate these items as A, B, C, D and E. To prevent repetition the same date in the date column is not repeated, and each item below any date having a blank space below it is of the last preceding date.

The following table, with its headline, is self-explanatory as to most of it. The third column indicates the notes or securities turned over to Sterling by Small, and the date of each is indicated in the date column. The due date is indicated in the sixth column, headed "Due date," and the date each item was paid to the treasurer is indicated in the column headed "Date paid." The discount collected dur-

ing Sterling's term is indicated in the last column. The line column and the item column simply indicate the source of the notes or securities when they were turned over to Sterling by Small, and these two columns refer to items and lines in our first statement.

SECURITIES RECEIPTED FOR BY FRED E. STERLING, TREASURER, TO LEN SMALL, TREASURER, JANUARY 13, 1919.

| Item | Date | Security | Source of security | Due date | Date paid | Discount Sterling's term |
|---|---|---|---|---|---|---|
| 12A. | Aug. 8, '18 | $300,000—Swift | $50,000 Line 12 | Demand | Nov. 1, '20 | ---------- |
| 12A. | Sept. 4, '18 | 300,000—Swift | 100,000 " 15 | Demand | Nov. 1, '20 | ---------- |
| ----- | ---------- | ---------- | 100,000 " 20 | ---------- | ---------- | ---------- |
| ----- | ---------- | ---------- | 100,000 " 21 | ---------- | ---------- | ---------- |
| ----- | ---------- | ---------- | 100,000 " 26 | ---------- | ---------- | ---------- |
| ----- | ---------- | ---------- | 150,000 " 28 | ---------- | ---------- | ---------- |
| 46 | July 16, '18 | 500,000—Swift | 100,000 " 17 | Demand | Nov. 1, '20 | ---------- |
| ----- | ---------- | ---------- | 400,000 " 98 | ---------- | ---------- | ---------- |
| 51 | Dec. 2, '18 | 500,000—Swift | 100,000 " 24 | June 15, '19 | Aug. 11, '21 | $14,064.84 |
| ----- | ---------- | ---------- | 150,000 " 29 | ---------- | ---------- | ---------- |
| ----- | ---------- | ---------- | 100,000 " 30 | ---------- | ---------- | ---------- |
| ----- | ---------- | ---------- | 98,500 " 100 | ---------- | ---------- | ---------- |
| ----- | ---------- | ---------- | 31,500 " 52 | ---------- | ---------- | ---------- |
| ----- | ---------- | ---------- | 20,000 " 26 | ---------- | ---------- | ---------- |
| 19 | Jan. 10, '19 | 500,000—Swift | 500,000 " 63 | Aug. 11, '19 | Aug. 11, '20 | 20,708.33 |
| 20 | Jan. 10, '19 | 500,000—Swift | 500,000 " 63 | Aug. 20, '19 | Mar. 1, '21 | 21,583.33 |
| 21 | Jan. 10, '19 | 500,000—Armour | 500,000 " 65 | Sept. 9, '19 | Sept. 12, '19 | 23,625.00 |
| 22 | Jan. 10, '19 | 500,000—Armour | 500,000 " 66 | Sept. 22, '19 | Sept. 22, '19 | 24,791.67 |
| 26 | Jan. 10, '19 | 500,000—Swift | 500,000 " 71 | Oct. 10, '19 | Feb. 2, '21 | 26,541.70 |
| 27 | Jan. 9, '19 | 500,000—Swift | 500,000 " 72 | Mar. 20, '19 | Sept. 22, '19 | 6,806.00 |
| 30 | Dec. 17, '18 | 500,000—Swift | 500,000 " 76 | June 25, '19 | Dec. 26, '19 | 16,041.72 |
| 31 | Jan. 7, '19 | 500,000—Swift | 500,000 " 78 | Mar. 3, '19 | Mar. 4, '19 | 5,347.20 |
| 32 | Jan. 10, '19 | 500,000—Swift | 500,000 " 79 | Sept. 2, '19 | Mar. 5, '20 | 22,847.00 |
| 34 | Nov. 25, '18 | 500,000—Swift | 500,000 " 82 | May 25, '19 | Mar. 1, '21 | 13,416.67 |
| 35 | Dec. 2, '18 | 500,000—Swift | 500,000 " 83 | June 15, '19 | Feb. 2, '21 | 15,069.53 |
| 41 | Jan. 10, '19 | 500,000—Cudahy | 500,000 " 91 | Feb. 20, '19 | Feb. 21, '19 | 3,986.11 |
| 42 | Jan. 10, '19 | 500,000—Cudahy | 500,000 " 92 | Aug. 5, '19 | Mar. 3, '21 | 20,125.00 |
| 43 | Jan. 10, '19 | 500,000—Swift | 500,000 " 94 | Nov. 3, '19 | Nov. 5, '19 | 28,875.00 |
| 44 | Jan. 8, '19 | 500,000—Swift | 500,000 " 95 | Mar. 10, '19 | Sept. 12, '19 | 5,939.49 |
| 45 | Jan. 10, '19 | 500,000—Cudahy | 500,000 " 97 | Aug. 25, '19 | Aug. 26, '19 | 22,069.44 |
| D. | Dec. 20, '18 | 100,000—T.Bnds. | 100,000 " 116 | ---------- | Jan. 18, '21 | ---------- |
| | Totals | $9,700,000 | $9,700,000 | ---------- | ---------- | $291,929.35 |

Small's term ended January 11, 1919, on Saturday, and on the following Monday, Andrew Russel, Auditor of Public Accounts, issued his official certificate that the balance in the several funds of the State treasury at the opening of business on Monday, January 13, 1919, was $19,567,-109.05. On the same day Fred E. Sterling, as State treasurer, issued his official receipt to Small for the full sum certified to by the auditor under his official seal, and Sterling's receipt recites that the funds received by him con-

sisted of certificates of deposit aggregating $15,735,000. This receipt contains a list of all the banks in the State that were treated and considered under the account known as the "vault account," and gives the specific amount each of said banks had on deposit and had given certificates of deposit to Small. The total amount in those banks is shown to be $6,035,000, $3,000,000 of which was deposited in the bank of Dunlap, Russel & Co., of Jacksonville. The remainder of the total sum represented the total amount of certificates of deposit on the Grant Park Bank, amounting to $9,700,000. The receipt further recites that the remainder of the funds turned over by Small to Sterling consisted of checks of Small, as treasurer, on ten banks in which he kept his open or checking accounts, specifying the amount of the checks upon each one of the ten banks, and also further cash items which total $3,832,109.05, making a grand total of $19,567,109.05. This receipt shows the total number of banks in which Small had State funds at the close of his term to be one hundred and thirty-eight, including the Grant Park Bank, which is a clear indication that the witnesses in this case were probably mistaken in estimating the total number of banks to be more than two hundred. We particularly call attention at this point to the fact that the State introduced the auditor's certificate aforesaid and the receipt of Sterling aforesaid, and that the State was apprised of all the banks and the addresses of such banks in which funds were deposited, and had the ready means, had it desired, to put in evidence the testimony of the parties controlling said banks for the purpose of ascertaining the total amount of interest paid by them to Small. We also now call attention to the further fact that the evidence in the record reveals the name of every packer and every other company from whom the Curtises bought packers' notes or other securities with loans made them by Small, as treasurer. In fine, the State had the ready means of proving every cent of interest collected by Small from all the banks

319—34

in which he made deposits, with the exception of the Grant Park Bank. The burden was on the State to show that Small had not accounted for all the interest paid to him. The total of the interest paid by all other banks, deducted from the amount of interest paid into the treasury by Small, would necessarily show the amount of interest the Curtises paid him. The State has apparently omitted in several instances to put evidence into the record that would explain fully several items it now claims the evidence does not clear up, and it contents itself with saying that the defendants did not introduce such evidence, the burden of introducing which was on the State. Apparently a number of items could have been more fully explained, had the State seen fit to do so, that were carried into Sterling's office during his term.

In our first table there are listed in the column designated as "Treasurer's collateral," fifteen notes, all of which are packers' notes and identified as such, except the one which is marked "unknown," in line 32. These small packers' notes were bought by the Curtises and put up with Small as collateral, and all of them, excepting one $30,000 note, were purchased by the Curtises with what the State and the majority of the court in their opinion refer to as interest from the large notes purchased by the Curtises and listed in the same column. As a matter of fact, these notes were purchased with the same character of funds as the large notes were,—that is, purchased with money coming directly from the State treasury. The packer's notes were discounted at four and one-half, five, five and one-quarter, six and seven per cent discount. Of all the notes purchased by the Curtises only three drew interest by their terms, and those are the notes described in our table of notes turned over to Sterling and listed as "demand" notes in items 12A and 46 and provided for six per cent interest. The total discount on the notes purchased by the Curtises during

Small's term, including re-discount, only amounted to $730,-046.42, and we included in that discount, discount up to the last day of his term. We do not think the discount the Curtises collected on the securities turned over by Small to Sterling, and under their agreement with Sterling that he would make loans to them of State funds, should be considered as discount earned in Small's term, as it was all discount collected in Sterling's term and under a new agreement with him. The record discloses that the notes turned over to Sterling were re-loans made by him to the Curtises on the last day of Small's term, under a similar arrangement with Sterling that the Curtises had with Small for the loaning of State funds.

There are four of the fifteen small notes above described by us that are in dispute by the parties to this suit. It is admitted by both parties that the other eleven small notes are notes purchased regularly by the Curtises with either discount or money loaned to them by Small. The four of these notes that are in dispute are designated by stars.

The first of these notes is the one for $30,000, in line 14 of our first table. The evidence in the record clearly shows that this note was purchased by E. C. Curtis with either his own private funds or funds of the Grant Park Bank that did not come from the treasury, and the State admits it was not purchased with funds loaned by Small. This note was evidently deposited with Small as additional security or collateral, and the record shows, without question, that when this note became due it was collected by Curtis in the usual way that he collected all these notes, the proceeds were paid to Small, as treasurer, through the Fort Dearborn National Bank, and the Grant Park Bank account, or the safe account in the treasurer's office, was credited therewith. It was probably intended as a payment of interest when paid. This note could not have been purchased by Curtis with discount on the packers' notes purchased by him as collateral to loans from Small preceding

the date of this note, as the total discount collected by him up to that time would not amount to anything like the face of this note and would be less than half of it. It will also appear that we have not included any discount for the loan and re-loan of this note, simply because it was not purchased with money coming out of the State treasury or the proceeds thereof. There can be no question, however, that the Curtises are entitled to credit for the amount of this note paid to Small, as treasurer.

The second disputed note is the $27,000 note described in line 32 of our first table. The evidence as to this note is not sufficient to indicate whose note it was. We have been influenced in placing this note in the table for the reason that on August 6, 1918, $27,000 was paid into the treasury through the Fort Dearborn National Bank by a check of V. S. Curtis, which was received by him from the collection teller of the Live Stock Exchange Bank. Further light is thrown on this note by the fact that on the day it was loaned there is found the record of a check for the discount payable to E. C. Curtis by the Live Stock Exchange Bank, where the packers' business was transacted. The record also shows a check for discount on a re-loan of the note to E. C. Curtis by the Live Stock Exchange Bank. The purchase of this note by Curtis is further shown by the fact that on the date it was purchased there was withdrawn from the account of the Curtis Trust Company at the Grant Park Trust and Savings Bank an amount exactly sufficient to purchase a note for $27,000 with the discount on the note. At the time this note was purchased there was ample discount in Curtis' hands to purchase such a note. There is just one element of doubt as to it. The evidence discloses that the Grant Park Trust and Savings Bank was one of the banks in which Small had made a deposit of public funds. It is possible that this might have been a payment by V. S. Curtis or a return by him of a part of the deposit in the Grant Park Trust and Savings

Bank. We sustain the State's claim on this note that it should be considered as a note of the Curtises or the Grant Park Bank and as purchased with funds loaned to them by the State treasurer.

The next small note in dispute is the $15,000 note of Swift & Co. described in line 59. The note register of Swift & Co. shows that this note was payable to the Grant Park Trust and Savings Bank, which, if not otherwise explained, would show no connection with the Curtises or the Grant Park Bank, but on the day after this note was due it was paid to E. C. Curtis and by him deposited to the account of the State treasurer at the Fort Dearborn National Bank. There is the same element of doubt about this note as about the $27,000 note, but we have listed it here as a probable note of the Curtises or the Grant Park Bank. E. C. Curtis was an officer of the Grant Park Trust and Savings Bank. We think that in case of doubt, such as exists as to this note and the $27,000 note, it ought to be determined for the State that this is a note of the Curtises or the Grant Park Bank under the condition of the record, and that the burden is thrown on the defendants to show that it was not a note of the Curtises or the Grant Park Bank, if that be their claim. It would seem from the history of this note that evidence ought to be obtainable that would render the question beyond doubt. We have given the whole of the evidence that now appears in the record, so far as we have been able to find it, as to these two notes.

The note for $28,000 described in line 60 of our table is a note of Armour & Co. payable to E. C. Curtis. This note was purchased with a draft of the Grant Park Trust and Savings Bank deposited by Curtis at the Live Stock Exchange Bank. The note was paid on its due date and the proceeds deposited to the treasurer's account at the Fort Dearborn National Bank by Curtis. Although the source of the funds with which this note was purchased cannot be traced to any certain amount of State money or discount

therefrom, it is clear that it was a payment by the Curtises or the Grant Park Bank to Small, as treasurer, and should be included in this table. Since it was paid to Small on its due date, it follows that it was deposited with him as additional collateral on the date it was purchased. The history of this note is exactly the same as the history of other notes purchased by drafts from the Grant Park Bank by Curtis. It was undoubtedly a note of the Curtises or the Grant Park Bank.

The table in the majority opinion contains a $7500 "unknown" note described in line 7, an $8500 "unknown" note described in line 11, and a $30,000 Swift note described in line 84. There is little evidence in the record that there were ever any such notes as the $7500 and $8500 notes. All that the record shows is a payment by the collection teller at the Live Stock Exchange Bank to E. C. Curtis of $7500 on November 14, 1917, and of $8500 on November 21, 1917. No doubt Curtis received these amounts as discounts on some other notes or as collections of some notes. These collections are not even shown to be discounts or proceeds of discounts of packers' notes. The evidence simply shows that Curtis collected these amounts, and there is no evidence whatever that he or the Curtises or the Grant Park Bank ever paid any such amount into the State treasury or that any such notes were deposited with Small as treasurer, or otherwise. They therefore should not be considered as having any bearing on this case. As to the $30,000 note, the record shows that it was a Swift note purchased with discount or proceeds of discount from moneys loaned the Curtises or the Grant Park Bank by Small, as treasurer. What E. C. Curtis, or the Curtises or the Grant Park Bank, did with the proceeds of this note is not disclosed by the record. It is certain that they were never paid to Small and the note ought not to be further considered in this record. The Curtises had the complete right, under their contract with Small, to retain the proceeds of

this note and do with them as they please. We will further say with reference to the $7500 note, that on November 15, 1917, (the day after the above amount was paid upon this alleged unknown note,) that amount was deposited with the Grant Park Trust and Savings Bank to the account of the Grant Park Bank, and E. C. Curtis bought a draft for $7073.75 from the Grant Park Trust and Savings Bank, and with that draft, and a check on the Grant Park Bank account in the Grant Park Trust and Savings Bank for $19,600, he purchased the $27,500 Swift note described in line 47 of the above table. This $27,500 note was deposited with Small as treasurer, and was paid into the treasury October 1, 1918, and the account of the Curtises, or the safe account, was credited with this amount in the treasurer's office. There is no dispute about this last note being deposited with Small and collected by him.

On May 1, 1918, Small loaned the Curtises $100,000, which is mentioned in line 74, (our item A,) and is the first large star item in the table. With this $100,000 E. C. Curtis purchased three cashier's checks at the Fort Dearborn National Bank, for $50,000, $30,000 and $20,000, respectively. With the $30,000 and $20,000 checks he purchased two drafts on the Grant Park Trust and Savings Bank for like amounts. There is no further evidence in the record as to what disposition he made of these two drafts, but it is certain that he retained them for his own use or for the use of himself and brother. He deposited the remaining $50,000 cashier's check at the National City Bank and purchased the following bonds or securities: Bethlehem Steel, $10,000; American Foreign, $10,000; Chicago Great Western, $20,000; British, $10,000, and Anglo-French, $10,000. The entire cost of these bonds or securities was $49,761.11. The remainder of the $50,000 deposit was paid to Curtis by a cashier's check of the National City Bank, amounting to $238.89. We have charged this $238.89 in the discount column to the Curtises or the Grant Park Bank as a profit

on money received from the State treasurer. There is no evidence in the record as to whether these securities were placed in Small's hands as collateral, and we have treated them as not having been deposited with the treasurer but have merely written the words "National securities" in line 74, to call attention to the history of this item. The record does not disclose what the Curtises or the Grant Park Bank did with those securities. So far as we can find from the record, it is certain that they were never deposited with Small. The evident reason for the Curtises retaining this $100,000 is to be found in the fact that on the date this loan was made to the Curtises they had deposited with Small a total of $407,950 in securities more than the loans they had taken out at that time. This excess was made up of twelve of the fifteen small notes already spoken of, found in lines 14, 27, 32, 47, 52, 59, 60, 62, 64, 67, 70 and 73. The Curtises had a right to retain this $100,000 and do with it as they saw fit. They already had up as collateral more than was necessary to secure the loans that were in their hands and pay all interest they owed Small.

On and after August 12, 1918, Small and the Curtises began and continued to collect or cash packers' notes theretofore deposited as collateral in excess of their liability to Small for the purpose of their final settlement, which appears to have been made on January 10, 1919, the day before Small's term ended. On September 8, 1917, Small loaned $100,000 to the Curtises, with which they purchased a $100,000 Wilson note, which is the star item mentioned in line 35. This note was put up as collateral with Small and became due on February 11, 1918, and on that day the loan was renewed and extended to August 12, 1918, the second note being also put up as collateral with Small. This latter note was cashed by E. C. Curtis on its due date, and with the proceeds of this note he purchased a certificate of deposit on the Grant Park Trust and Savings Bank. The State's counsel contend that with the proceeds of this note

Curtis purchased $97,988.34 of the stock of the Ridgely National Bank. Curtis had other certificates of deposit on the same bank at the same time as the one in question. It may be true that he purchased with the certificate of deposit in question, and other certificates of deposit, Ridgely National Bank stock, but the main fact is that Small allowed Curtis to take the proceeds of that note because Curtis on August 12, 1908, had on deposit with Small as extra collateral all of the fifteen small notes aforesaid, the last three deposited being the $35,000 Swift note mentioned in line 77, the $30,000 Armour note in line 81 and the $35,000 Armour note in line 84. The Curtises had a perfect right to retain the proceeds of this latter note for the same reason that they retained the proceeds of the $100,000 loan.

As to the $100,000 Swift note in line 88, which is another of the star items, the evidence in the record does not definitely and conclusively show its history and resting place. The State's counsel have the following to say concerning this note: "The $100,000 note in this item came due February 18, 1919,—about a month after Small's term expired,—and it continues to be attended by unusual circumstances. It was brought to the Live Stock Exchange before maturity, registered in the collection teller's tickler, collected at maturity, and the proceeds paid to Curtis (E. C.) per requisition by cashier's check which bears Curtis' endorsement, and, instead of the clearing house stamp of the Fort Dearborn National, we note the endorsement of E. C. Curtis and the Grant Park Trust and Savings Bank and the clearing house stamp of the Continental and Commercial National, dated February 20, 1919." We agree with counsel for the State in the main in what they say about this Swift note but do not at all agree with their conclusion that this note was turned over by Small, as treasurer, to his successor as part of the $9,700,000 in notes and securities delivered by Small to Sterling, as treasurer. We will conclusively show later, we think, that this is not the fact. We

agree with counsel for the State that his note was deposited with Small by the Curtises or the Grant Park Bank, and that it remained in his custody until his final settlement with the Grant Park Bank or the Curtises, on January 10, 1919. We think it is evident that on that day, for the purpose of a final settlement, the Curtises cashed this note, paying to Small the full face value of the same, and that they retained it until its due date, in February, 1919, and then collected it and applied it to their own use. This will be further explained later. What the Curtises or the Grant Park Bank did with this demand certificate, or the proceeds thereof, the record does not disclose, and so far as we view the matter it is not important to determine what the Curtises did with it. It is certain that after they cashed it and paid Small for it it was their property, and the record does not trace any of the proceeds of it to Small.

The next star item is in line 89, and is described as a $60,000 loan to the Curtises or the Grant Park Bank and secured by $60,000 face value of Armour debentures. The facts shown in the record concerning these debentures or bonds are these: On June 24, 1918, $60,000 was loaned to the Curtises or the Grant Park Bank by the State treasurer. With this $60,000 Curtis purchased from the Live Stock Exchange Bank $60,000 of Armour debentures for $1990 less than their face value. The debentures were deposited with Small as collateral, and on October 31, 1918, Curtis sold these debentures and returned the $60,000 to the State treasurer through the Fort Dearborn National Bank in the way he usually re-paid other loans. We have charged the $1990 discount to the Curtises or the Grant Park Bank in the discount column, line 89.

It is further shown by the evidence that Small and E. C. Curtis were both directors of the First Trust and Savings Bank of Kankakee. At a meeting of the directors of that bank, at which Small and Curtis were present, it was decided by the directors to purchase these Armour debentures,

then being placed on the market. An order for these de-
bentures was made by that bank in pursuance of the deci-
sion of the board of directors. The order was canceled by
the bank June 18, 1918. Curtis then told Small that he
would take the debentures if Small would accept them as
collateral for a loan of $60,000. Small agreed to accept
them as collateral and loaned Curtis $60,000 on June 24,
1918, to purchase the debentures, as already stated. The
debentures were purchased by Curtis and were paid for by
him June 29, 1918, and forwarded to Small, at Curtis' di-
rection, by the Continental and Commercial Trust and Sav-
ings Bank or the bank from which they were purchased,
and Small received these debentures from that bank and
receipted for them on July 10, 1918. (See complainant's
Exhibits 2034 and 913-3, abst. 1667.) These debentures
remained in Small's hands as collateral for the loan until
October 31, 1918, and on this latter date Small purchased
the debentures from Curtis and paid him out of his per-
sonal funds by cashier's check on the First Trust and Sav-
ings Bank, as testified to by Small. Curtis then paid to
Small, through the Fort Dearborn National Bank, $60,000
in payment of said loan on the debentures, by exchange on
the Corn Exchange National Bank of Chicago, and the safe
account, or the account of the Curtises or the Grant Park
Bank, was credited with this payment. (See complainant's
Exhibits 1178 and 37-R, abst. 1667.) Small testified posi-
tively in confirmation of his payment to the Curtises for
these debentures and that he paid for them out of his own
private funds. The record thus completely answers the con-
tention of the State in regard to the transaction as to these
debentures. There is no other evidence in the record that
is contradictory of the foregoing. It shows absolutely that
so far as the Curtises or the Grant Park Bank are con-
cerned they fully re-paid Small for this loan. The conten-
tion of the State that Small paid for these debentures out
of State funds is based on surmise and conjecture. The

record does not even furnish a shadow of evidence that the Curtises were in a conspiracy with Small to defraud the State in these transactions, and we cannot accept the bare assertion of the State that Small was guilty of defrauding the State thereby. Curtis ordered the debentures delivered direct to Small when he purchased them, for the sole reason that they were not then ready for delivery to Curtis. If Small did really defraud the State by paying for these debentures out of State money, of which fact there is no evidence in the record, that would have no tendency to convict the Curtises of a conspiracy. They had discharged all their obligation as to the debentures and the loans secured by them, and that was the end of it as to them.

The next star item to be considered is as to the transactions between Small and the Curtises or the Grant Park Bank and Sterling and Miller, as successors to Small, with reference to item D, described in line 116. The record as to these transactions shows the following: On December 20, 1918, $100,000 was loaned by Small, as treasurer, to the Curtises or the Grant Park Bank. To this $100,000 Curtis added $1000 and purchased a cashier's check for $101,000 at the Fort Dearborn National Bank. He deposited this $101,000 check with the National City Company and purchased $100,000 of American Thread bonds for $100,-783.33, and received a draft or a check for the remainder of the $101,000, or $216.67. (See complainant's Exhibit 195, abst. 1675, and Exhibits 1391-92-93, abst. 1854.) These thread bonds were deposited with Small as collateral to the loan, and the evidence shows conclusively, we think, that they remained on deposit with him as collateral and that he turned the loan and the collateral over to his successor, Sterling, as indicated in item D,—the last item in the second table. Small's testimony is to the effect that these thread bonds were owned by the Curtises and were in the possession of Verne S. Curtis as owner on the last day of Sterling's term, when the certificate of purchase secured by these

bonds was turned over to Miller. Miller testified that he had a photographic copy made of all the certificates of deposit of the Grant Park Bank that were turned over to him by Small for Sterling, as treasurer, and of all securities that accompanied those certificates of deposit as collateral on January 10, 1921, the last day of Sterling's term. The copies of these certificates of deposit were put in evidence by the State, and they are copied into the record on pages 1677-78 of the abstract as Exhibits 954 to 973, inclusive. The certificate or copy of the certificate of deposit which was secured by the thread bonds in Sterling's hands is Exhibit 973, at page 1677 of the record, is signed by V. S. Curtis, cashier, and is in this language:

"$100,000    GRANT PARK BANK, E. C. Curtis & Bro. Proprietors.
GRANT PARK, ILL., *January 11th, 1920.*

"This certifies that Fred E. Sterling, State Treas., has deposited in this bank One Hundred Thousand Dollars in current funds, payable to the order of himself on the return of this certificate properly endorsed. Five days demand. Maturity twelve months. Interest at 2% per annum. No. 71."

It will be noted that the above certificate fell due on the last day of Sterling's term. We will further consider this item later.

The last of the star items is the loan of $175,000, described in line 114, and which loan was made by Small to the Curtises or the Grant Park Bank on November 22, 1918. So far as the record shows, no packer's note or other collateral was put up by the Curtises at that time. They had already put up as collateral $307,950 more than they had borrowed in money before this loan was made. This left in Small's hands $132,950 in collateral more than the amount of cash he had loaned on the date of this last loan. It is evident that on January 10, 1919, Small and the Curtises had their final settlement for interest due Small and for all matters between them, as already stated. All of the fifteen small notes, aggregating $507,950, had been cashed by Small and the proceeds credited to the safe account or the Grant

Park Bank in the way that all other notes had been cashed and credited to the safe account, except three $55,000 notes, one $50,000 note and one for $13,950, which were cashed January 10, 1919, (their due date,) along with the $250,000 Wilson note described in line 61, which was also then due. The Curtises then paid Small in cash $214,050 on the same day, all of which payments amounted to $693,000 and are shown in lines 121 to 127, inclusive. As we have already shown, Small at this time had the $100,000 Swift note described in line 88, which was not due on January 10, 1919, but was due the following February. This note was not delivered by Small to Sterling as one of the $9,700,000 notes turned over to Sterling, as we have fully and satisfactorily shown, and because of that fact the $100,000 packer's note secured by the thread bonds was the only note of that size turned over to the Curtises by Small, as is admitted by the State's counsel. After paying off the loan that secured this note the Curtises then retained it as their property, because it was shown clearly that they cashed it and retained it for their own purposes when it became due. This left the remainder of the cash payment by the Curtises at the sum of $114,050, as the balance that was considered due from them to Small at that date, or the last day in Small's term.

As we have cast the accounts between Small and the Curtises or the Grant Park Bank the showing is as follows: The total amount of loans made by Small to the Curtises is $16,883,500. As against that sum the Curtises returned to Small, as treasurer, up to the last day of his term, a total of $7,430,000, being the sum total of the collateral that was cashed and returned to Small. In addition to this latter sum Small had in certificates of deposit from the Curtises or the Grant Park Bank a total of $9,700,000, secured by packers' notes and other securities, all of which were turned over to Sterling, his successor, and for which Small was receipted by Sterling, as already stated. The evidence fur-

ther shows that Sterling then extended all these loans for the Curtises or the Grant Park Bank to definite dates, shown in our second table in the column headed "Due date," except the demand notes or demand loans shown in that table, which includes item D, the last item in the second table. The total amount of credits, therefore, that the Curtises or the Grant Park Bank had against Small was the sum of $7,430,500 paid to Small in notes collected by Small and in cash, and the further sum of $9,700,000 in certificates of deposit, packers' notes and other securities turned over to Sterling, making such sum $17,130,500, or $247,000 more than the entire amount of loans obtained from Small. This last sum of $247,000 represents the total amount of interest on loans collected by Small from the Curtises during his entire term according to our interpretation of the evidence in this case.

It may be noted that we agree exactly with the decision of the majority of the court as to the total amount of loans made by Small to the Grant Park Bank, but the court failed to take into consideration the full amount the Curtises or the Grant Park Bank had paid to Small as treasurer, although the same is shown by their table item for item, and in addition to that their table shows additional amounts paid by the Curtises or the Grant Park Bank to Small which we have shown should be discarded for reasons already stated. It will be further seen that we have charged the Curtises with, or have shown that the Curtises or the Grant Park Bank collected, a total of discounts during Small's term of $730,046.42. Deducting from this amount the $247,000 that the Curtises or the Grant Park Bank paid Small as interest on the sums borrowed by them, leaves a remainder of $483,046.42 as the total profits realized by the Curtises during Small's term. We further state, in conclusion, as to these matters of settlement, that the cash sum of $214,050 which the Curtises paid to Small on the last day of his term, as noted in line 127, was paid from the cash discount they

collected on the $9,700,000 re-loaned by Sterling, as treasurer, to them on their new arrangement for loans with Sterling. It will also be noted that the loans and re-loans to the Curtises or the Grant Park Bank by Small do not amount to anything like the total sum of $30,000,000, and the total discounts collected from those loans do not amount to anything like $1,000,000, and the court in reaching those conclusions included the re-loans by Sterling to the Curtises and the amount of discount collected on those re-loans by the Curtises, as shown in our second table. This is a showing that the Curtises or the Grant Park Bank started off with Sterling with loans of $9,700,000 by him to them which were secured by packers' notes and the thread bonds in the same amount, and we can see no reason why the transactions between the Curtises and Sterling can have anything whatever to do with Small, as the Curtises had settled with him. The matters were all closed incidents as to him, and after that time he represented Sterling as an employee.

The real controversy as to the facts is concerning the disposition of the loans described in the five large items, amounting to $535,000, referred to as star items, or items A, 15, 38, C and D, in lines 74, 78, 88, 114 and 116 of our first table. The State does not controvert the fact that the Curtises purchased the National securities described in line 74 and that they retain them, and that there is no evidence that traces them to the hands of Small, either as collateral or to him as owner; and the State does not dispute the facts that the Curtises retained the other $50,000 of this loan and that there is no evidence in the record that any part of this loan was traced into Small's hands. The State's evidence confirms the facts concerning this item as we have stated them. The State's counsel do not controvert any of the facts we have stated as to the Wilson loan or note described in line 35. They admit that the second Wilson note was collected August 12, 1918, by E. C. Curtis, and that the Curtises retained the $100,000, returning none

of it to Small. They admit that the Swift note described
in line 88 was deposited with Small as collateral when that
loan was made, and that the note was collected on its due
date in February, 1919, by E. C. Curtis, while Sterling
was treasurer, and that none of that money was traced into
Small's hands. The only presumption that we have drawn
from all these transactions, so far, is as to this note, and
that is, that it was delivered to the Curtises on January 10,
1919, by Small when they had their final settlement; and
this is drawn from the fact that it was in the possession of
the Curtises when they cashed it and applied it to their own
purposes, and such presumption, we think, is warranted by
the facts admitted by the State and proved. It is said that
this last note was not held by Sterling on the last day of
his term and that it could not have been collateral to the
$100,000 note turned over to Miller, as treasurer, and that
is true.

Every fact that we have stated as to the item described
as a loan of June 24, 1918, secured by the Armour deben-
tures mentioned in line 89, was proved by the State, as
shown by exhibits on pages 1663-1668 of the abstract, ex-
cept the testimony of Small that he purchased the deben-
tures with his own funds in October, 1918, when the Cur-
tises re-paid this loan with the money which he paid them
for the bonds. The State proved by evidence that Small
did pay the Curtises for the debentures and every other fact
testified to by Small concerning the debentures, and its real
contention, apparently, is that he did not corroborate his
testimony with other evidence that the funds he used in
payment for the debentures were his own funds. The State
assumes, therefore, against the positive testimony in the
record, that these bonds were at all times the property of
Small, against his evidence and its evidence to the contrary.

As to the transaction regarding the thread bonds, in line
116, the State's counsel state in their brief that these bonds
"probably were regarded as taking the place in the safe

319—35

account of the $100,000 Swift note, and the proceeds of the remainder were regarded as the profits of the loans to the packers." This is mere supposition against all the facts proved by the State and against other facts in evidence. Both counsel have apparently been in doubt as to whether the Swift note already mentioned, or the thread bonds, secured the only $100,000 loan turned over to Sterling by Small. The facts, we think, settle beyond doubt that the $100,000 note was secured by the thread bonds; that that note was further extended in Sterling's term; that he had it at the close of his term, secured by the thread bonds, and that the thread bonds were the property of Verne S. Curtis at that time. The State's counsel have made proof that coupons on these bonds for $9000 were collected by the Fort Dearborn National Bank and credited to the account of the Grant Park Trust and Savings Bank, and they introduced Exhibit 333, which confirms that fact. They introduced further evidence showing that the Grant Park Trust and Savings Bank issued its demand certificate for $9000 but state that the payee is unknown. They offered Exhibit 1382, which proves that the Grant Park Bank issued a certificate for that amount, and this certificate is in the extended list of the same demand certificates of deposit out of which they show that E. C. Curtis was paying for stock in the Ridgely National Bank from August, 1918, to about January 17, 1919. This is certainly evidence that the Curtises were the owners of these bonds, and determines the further fact that Small was neither the owner nor in possession of them as his property during Sterling's term.

The further facts concerning the thread bonds were, that Sterling's successor, Miller, declined to make any new contract with Verne S. Curtis for further loans from State funds or to extend any of the Sterling loans on packers' notes, but stated, in substance, that he would accept all of the certificates of deposit of the Grant Park Bank for the Curtises, secured by the packers' notes and other securi-

ties, and would collect them himself. All of them were due at that time, and Small (representing Sterling) and Curtis assented to Miller's proposition. The collateral was all in Chicago, and Curtis and Small went to Chicago to get it to deliver to Miller. They overlooked or omitted to get the thread bonds, and when Miller checked over the collateral he noticed it, and remarked that the security was short on the $100,000 certificate. Small turned to Curtis and said, "Oh, yes; that was secured by the thread bonds." He then said to Miller that those securities were bulky and they did not bring them but would secure him with other securities. Small then gave Miller other securities that were satisfactory to him, and within two days thereafter paid Miller this $100,000 and took the original certificate of deposit of the Curtises and held it for payment to him by Curtis. The evident reason for Small's action in paying to Miller this loan was because he had turned it over to Sterling and was under obligation to see that it was made good. The thread bonds were a different character of security than the packers' notes and could not be then collected from the obligors because not due. Miller had already stated that he would collect the securities. At any rate, this testimony tends strongly to show that these thread bonds were the securities for the $100,000 note in Sterling's hands. There is no evidence to the contrary, and it cannot be legally assumed that these bonds belong to Small in the face of all this evidence.

After all, there was really very little controversy between the counsel for the State and the defendants as to the facts proved in the record, even as to the four items we have just discussed. The real point of difference is in the conclusions drawn from the facts. It is also true that there is not a great deal of difference between the court's findings from the facts in the case and our findings except as to the two items concerning the thread bonds and the Armour debentures. The court holds in its opinion that the question whether or not the Grant Park Bank was a real bank is

not material in the case, but it passes on that question and holds that it was not a real bank. It seems to me that Judge Heard has demonstrated in his dissent that the Grant Park Bank was a private bank and that the bank or institution was the Curtises. It cannot make any material difference whether or not the Curtises constituted a private bank. They gave Small a certificate of deposit properly executed by E. C. Curtis as president of that bank, or by Verne S. Curtis as cashier, for every loan Small made them. We have already set forth a copy of one of these certificates in our discussion of the thread bonds, which copy was given Sterling, as treasurer. Small received the same character of certificates of deposit for the loans he made the Curtises. The certificates bound both of the Curtises when signed by either Verne S. Curtis as cashier or by E. C. Curtis as president, and an action at law could have been sustained against them by Small, as treasurer, as they were given to him for loans made to them. (*Kavanagh* v. *Bank of America,* 239 Ill. 404.) Every loan by Small to the Curtises was of the same character as all the other loans by him. The account we have cast between the Curtises and Small in our table shows that these loans were handled by both parties as loans are usually dealt with. It shows that the Curtises were to pay interest to Small, and that they did pay to him $247,000 of interest. The evidence and this account further show that the Curtises dealt with the discount they received in the sale of these notes as their property, and that Small regarded it and treated it as their property. Small had just as much legal right to loan to the Curtises as individuals as he had to lend to them as bankers. So it matters little whether the Curtises be regarded as private bankers or simply as individuals, because the statute of 1908 was held void by the affirmance of Judge Jones' decision. We think it is unfortunate that the court did not pass on this question outright, because it is a real question in the case.

As we interpret the small notes in this accounting there is no difference between them and the large notes except as to size or amount of the loans expressed in the small notes. We say this because of the manner of their purchase by the Curtises. When they received a loan from Small, E. C. Curtis sometimes deposited the money in the Grant Park Bank or in its account with the Fort Dearborn Bank. A number of times he did not do this, but it made no difference whether he deposited the money or did not deposit it to the account of the Grant Park Bank. The transaction amounted to the same thing. If he deposited the money in that account he checked it out and bought Fort Dearborn cashier's checks. If he did not deposit the money in the account he took the draft of Small that was sent to him and with that draft obtained cashier's checks of the Fort Dearborn National Bank and deposited these checks in the Stock Exchange Bank of Chicago and received credit for the same. That bank, which is the bank that sold the packers' notes, then sold him a packer's note of the face value of the loan he received from Small, and after deducting the discount the bank gave him credit for the remainder of his deposit, which was of the same character as the funds with which he bought the packer's note,—that is to say, it came directly from the State treasury. It was not discount, although the remaining amount of money he had equaled the amount that the note was discounted. He continued discounting notes as he continued to borrow money in the same manner as before, and when the remnants of the money loaned by him reached a sufficient amount he bought a small packer's note, and these small packers' notes were bought just as certainly with money direct from the State treasury as were the larger notes. Therefore we say that the small notes were not interest notes or notes purchased with discount or interest any more than were the larger notes. On no note the Curtises thus purchased were they paid any discount by the packers. They were given a note that had

the discount in it, and they collected the discount when the note was collected. So in dealing with these notes we think they should be considered in that way.

The small notes were evidently put up with Small as further or additional security. The Curtises were handling a considerable amount of money, and Small, if his testimony is to be believed, was seeing to it that the loans to the Curtises were well secured. We call attention to the fact that Small testified that in the very beginning the Curtises entered into a contract with him by which they were to file with him, and did file with him, quite an amount of collateral, consisting generally of bank stock, and by the contract this collateral was to stand good for any loan he might thereafter make the Curtises. While Small did not state the amount of this collateral, he did state that it was several times the amount of the first loan, which was a $50,000 loan. This collateral must then, if his testimony is true, have amounted to as much as $150,000 or more—at least $100,000. When the Curtises bought their first $50,000 packer's note it was at once filed with Small as security, and so with all the other packers' notes the Curtises purchased. If his testimony is true he was well secured every time he made a loan to the Curtises. A glance at our tables will show that Curtis very shortly commenced to place with Small the small notes as additional collateral, and some of them were finally collected by Small, apparently for interest the Curtises owed him. For these reasons we think the court is in error in stating that Small was not well secured by the Curtises at the time these loans were made.

The transactions appear to be criticised because Small, when he wanted any note collected for use in the treasury, delivered it to the Curtises a few days before it was due and they collected it from the packers and paid the proceeds at once to Small and they were credited in their account in the treasurer's office under the head of "Grant Park Bank" or safe account. The character of these loans

made it necessary that they be collected in this way. Small testifies that he always in such case delivered the collateral to the party putting it up for collection. The Curtises could not pay any other way except by cashing a loan. They did not have sufficient capital of their own to cash the large number of notes that were cashed. It is certain that Small was not betrayed by thus trusting to the honesty of the Curtises to cash the loans.

We have examined into these transactions carefully. We have weighed well the reasons of the court for its conclusion drawn against these loans to the effect that they were all Small loans, and that the large loans and the small loans eventually were paid to him. We see no evidence, in looking over the account or the table we have made of transactions between Small and the Curtises, that Small made his first payment of interest and balanced that payment by charging the Curtises with $307,000 in the safe account. We call attention to the fact that on September 30, 1918, when Small made his first payment of interest, only two of the small notes were due, and they amounted to only $57,-000. The next small note paid was on October 1, 1918, for $27,500, so it is certain, we think, that Small did not pay his interest out of any notes taken from the Curtises or from the proceeds thereof. We have already discussed this matter of payment of interest by Small and do not care to extend the discussion. The only way that Small could square his account or balance his first payment of interest after he was charged with it upon the public records of the treasury was by obtaining a similar credit on the same records. In order to obtain that credit he would have to have the warrants of the auditor to pay out that money before his credit would be recognized on the public records. This is so because the auditor at all times knew exactly the amount of money paid into the State treasury. He knew by his books that that money was paid on his order to the treasurer to receive the money, and he knew equally well

that for every dollar Small paid out of the treasury he gave his warrant for that payment.

In the summer of 1918 E. C. Curtis and another party were working on a merger of the Ridgely National Bank and the Farmers National Bank, both of Springfield. The other party we will refer to in this transaction as the third party, because he has no interest in the other transactions mentioned in the record. Small asked Curtis and the third party what the Ridgely stock could be bought for, and they told him that it could be bought for a little more than book value. Curtis asked Small to get into the transaction with them, and after some conversation Small indicated his willingness to buy stock provided Curtis would attend to the business details. Small indicated that he would be willing to participate to the extent of $100,000, saying that he would like to have five hundred shares in the new bank after consolidation. Curtis then suggested that they put in Small's name all the stock bought, and that he should hold it in the proportion of two-fifths for himself, two-fifths for Curtis and one-fifth for the third party, and that each one should pay that proportion of the cost of the stock. Curtis made the suggestion with the idea that he could make better deals in the name of Small than he could in the names of the other parties. There was no secrecy about these transactions either before or after they were agreed on, and Curtis began purchasing the stock of the Ridgely National Bank in August, 1918, and the purchase thereof was concluded some time in January, 1919. The transaction agreed on was that the money derived from the liquidation of the Ridgely Bank should be used to pay for stock purchased in the new bank, the Ridgely-Farmers State Bank. There is no controversy about the parties being interested in the transaction in the proportions already set forth. Small was to pay over to Curtis his $100,000 to pay for the first stock, and Small's testimony is to the effect that he paid every dollar of that amount to Curtis to be handled

in the transaction.   His testimony is that he used $40,000
of Liberty bonds and other negotiable securities that he had
in his possession to pay for his stock.   He is corroborated
by the fact that Curtis' demand certificates of deposit in
the Grant Park Trust and Savings Bank were increased
constantly as the purchases of the stock by Curtis went on.
When Curtis began the purchase of this stock, in August,
his credit balance appears to have been $93,247.34, and the
showing is that this account continually increased from that
time to January, 1919, when the first purchases were com-
pleted.   The third party was to pay $50,000 toward the pur-
chase of this stock, and it is shown that on January 9, 1919,
$50,000 was added to the credit side of Curtis' account.

It is contended by the State that on August 8, 1918,
a Wilson note was collected by Curtis, as we have already
stated, and that the proceeds from the collection of that
note were placed in the demand certificate account, and that
the payments for the Ridgely stock were made out of the
$100,000 derived from the Wilson note.   This note, of
course, originally was purchased with State funds, and we
have already detailed the facts concerning that note.   We
think the evidence shows or tends to show that the proceeds
of the $100,000 Wilson note were used in those purchases,
but it cannot be definitely stated what particular items or
credits in Curtis' account had been used to make these pay-
ments.   Our view of the matter is that the $100,000 pro-
ceeds of the Wilson note were Curtis' individual property,
and that he might legally use this money, the same as any
other property he had, in his private enterprise.   So far as
Small is concerned, he is only interested as to the manner
in which the stock was paid for.   If his testimony is true,—
and we think it is corroborated by competent evidence in the
case and he is an unimpeached witness,—then there is no
showing as to him, or even as to Curtis, thus far, that any
of such funds were taken out of the treasury for the pur-
pose of completing this transaction.   If this deal had been

an unlawful or corrupt deal, as the State's counsel seem to think it was, it appears to us that it would not have been so openly and so publicly transacted. All the stock was in the first place taken out in the name of Small, and the final stock in the Ridgely-Farmers State Bank was divided among the three parties in the proportions already named. The evidence also shows that Small was financially able to make such payments from his own personal property or funds.

We may further say in regard to this transaction that it is clearly shown, as we understand the evidence, that Curtis had in his hands much more than was necessary to pay for his own stock and for the stock of the other two parties. After those payments were made a dividend was declared on the Ridgely National Bank stock and applied to the credit of each of the three parties to the transaction, so that the final result was that the cost of Small's two-fifths of the stock and of Curtis' two-fifths was a little less than $85,000 and the cost of the third party's stock less than $43,000.

The formation of the new bank took place in February, 1919. This was during Sterling's term of office as treasurer. It is contended by the State that the liquidation of the old bank was not quite completed when the new bank was formed and that the liquidating dividend on the old stock was not received until some time later; that during this short interval of about two weeks Curtis concluded the transaction by using money borrowed by him from the treasurer, Sterling. It is not shown by the evidence what securities, if any, Curtis deposited with Sterling for this loan, and the most that is contended for by the State on this question is that Curtis used in the short interval aforesaid money that he borrowed from the State through Sterling, as treasurer, to complete the deal. There is no contention that Curtis borrowed this amount of money out and out for this purpose. The contention is, that after borrowing $200,000 from Sterling he used a portion of the money to

complete the transaction as to the Ridgely Bank stock. We do not think this evidence ought to invalidate the transaction as to any one of these parties, and particularly as to Small and the other party to the transaction. The evidence shows that they paid for their stock, or that is the tendency of the evidence, and there is no showing,—at least no sufficient showing,—that Small did not pay for his stock as he testified he did. Small at that time was not State treasurer and was not the custodian of State funds, and it is not contended that he purchased any of the stock himself with such funds.

The State has invoked the doctrine of presumption against the despoiler of evidence that was in his possession. It is the rule that where a party to a suit has intentionally destroyed material evidence in a case every presumption will be indulged against him. However, this presumption does not relieve the opposite party from the burden of proving his case, but only has the effect, where the evidence is vague and uncertain, of raising a presumption against the party who has destroyed evidence which would have made the facts clear. This rule was laid down in the case of *Hudson* v. *Hudson,* 287 Ill. 286. The records destroyed in this case were all private records, but they were records that were in the possession of the defendants and the rule applies here. It is not necessary that the intention of the party be to destroy the records for the purposes of the case in hand or one likely to be brought. It is the intentional destruction of records that raises such a presumption. In some cases the presumption is not applied where it appears positively that no intentional wrong was intended against another suitor. We think the rule applies in this case, though there is but little evidence for applying the doctrine.

The evidence as to the transactions between Small and the Curtises and the packers is pretty clearly shown. There are some facts reaching into the treasurer's office during the term of Sterling that might have been more fully cleared

up by the complainant, and it does appear in this case that the State could have shown the amount of interest collected on the accounts outside of the safe account and also the amount collected from the Curtises. We think the evidence shows that the thread bonds and the National securities were traced into the hands of the Curtises, and the evidence does not show that those bonds, or the proceeds thereof, were traceable into the possession of Small as an individual owner. It is also clear that E. C. Curtis at his death was still the owner of the Ridgely-Farmers State Bank stock, or two-fifths of the stock bought by himself, Small and the third party. The evidence shows that the Curtises paid to Small $247,000, as already stated, as interest on the money borrowed by them from him. We may be in error as to the $27,000 note above discussed and that it should not be charged as interest collected by Small from the Curtises. If that is true, then the amount of interest paid by them is $220,000. We may also be in error as to the small $15,000 note being paid by the Curtises to Small as interest. If we should be in error as to both notes, it is still clearly shown that the Curtises have paid Small $205,-000 as interest. This leaves the necessary inference that Small collected as much as $203,010.12 interest on all the other accounts he had in banks that were drawing interest, and if only $205,000 was paid in for interest on the safe account then the remainder of the $450,010.12 was paid on all the other accounts. It is not our intention to preclude an investigation by the lower court as to what was the real amount paid by the Curtises to Small for interest.

As the decree of the court is affirmed and the cause remanded for an accounting it seems to us there ought to be an indication in the opinion and remanding order that Small and the Curtises cannot be jointly held to account for the interest or discount paid to Sterling for loans made to them by Sterling at the beginning of his term and which loans extended entirely into his term on a new agreement. Small

having failed to itemize his receipts of interest in his two reports, as required by the statute, upon that ground a decree might be entered requiring him, alone, to make an itemized account of all interest and pay to the State such sum, if any, which may be found not heretofore to have been accounted for and paid by him; but it would be manifestly unjust and inequitable for a court of equity to hold the Curtises jointly liable to again pay over $200,000 which the evidence shows they have already actually paid to Small as treasurer, $30,000 of which the State admits was their own private property or money.

Therefore, for the reasons herein stated, and for all the reasons assigned in the dissenting opinion of Mr. Justice Heard, I most respectfully dissent from the decision of the court.

Mr. JUSTICE HEARD, also dissenting:

The evidence in this case should be considered in exactly the same manner as any other case, and in so doing the same rules must be applied as though this were an ordinary suit between two individuals instead of a suit between the State of Illinois on one side and the Governor of the State on the other. It is elementary that the complainant having filed its bill, basing its right to relief on certain specific allegations, to sustain a decree in its favor the burden rests upon it to prove, by evidence, the material allegations of its bill in manner and form as therein alleged. It is not incumbent on the defendants to disprove them. We have repeatedly held that liability cannot rest upon surmise, guess or conjecture, nor upon a choice between two theories equally compatible with the evidence, but must rest upon competent evidence fairly tending to prove the same. It cannot rest, in this case, upon any presumption,—much less upon presumption based upon presumption,—because presumptions of fact are not evidence nor can they be weighed as evidence, (*People* v. *Cochran*, 313 Ill. 508,) but

can only take the place of evidence in the absence of evidence as to the specific fact sought to be presumed. No presumption as to liability can be considered or weighed in this case, as Small has testified to a state of facts absolutely inconsistent therewith, and he is corroborated by other undisputed evidence.

Various legal questions, some of them having apparent merit, are raised in the answer of Small and discussed in his brief and argument, any one of which, if solved in his favor, would be a bar to this suit. Many of these questions are not discussed or mentioned in the majority opinion. The opinion does, however, discuss and cite authorities in opposition to Small's contention that appellee is by the verdict of not guilty in the criminal case estopped from again litigating the question whether a conspiracy existed between Small and the Curtises, the charge and parties being the same in each action and both actions arising out of the same transactions. It is to be noted that in none of the cases cited from this State are, as in this case, the parties and the issues the same. In each case the suit was brought by an individual,—not by the State,—to recover private damages alleged to have been sustained by the individual by reason of the commission of the criminal offense. The cases cited can therefore have no application to this case. The opinion also cites section 21 of division 2 of the Criminal Code, which provides: "Nothing in this act contained shall be so construed as to prevent the party injured from having and maintaining a civil action for all damages and losses that he may have sustained in consequence of the commission of any criminal offense herein provided for; and no court shall allow or entertain the plea that the private injury is merged in the crime, or in any manner affected thereby." It is apparent from a mere reading of this section that it has no application to the question here involved. There is here no plea that a private injury was merged in a crime, but it is contended that in a suit be-

tween the same parties the identical question here sought to be litigated,—*i. e.*, the question of the existence of a conspiracy between Small and the Curtises,—had been litigated, and that appellee is therefore, by reason of estoppel by verdict, barred from again litigating the same question. I will not, however, further discuss these legal questions, which are more or less technical, but will confine myself to the merits of the case as disclosed by the evidence and base this opinion thereon.

Small held the office of State treasurer of Illinois,—an office of the executive department of the State created by the constitution,—and was by the constitution required to give a bond. His liability to account for all moneys coming into his hands and without loss or defalcation pay the same over to his successor in office, less such sums as he had legally paid out, was absolute. He was an insurer of the safety of the funds. Being such constitutional officer and such insurer of the funds, the legislative department of the State was without power to control him in the matter of the safeguarding of the funds in such manner as to increase his risk as insurer. The constitution did not prescribe the place where he should keep such funds nor the manner of their keeping. The legislature, by reason of its constitutional restriction, could not do so. Its only power in the premises was to protect the State by requiring a bond, requiring the keeping of books of account, and prescribing the manner of the payment of funds into and out of the treasury and the method of accounting therefor. To this end there was legislative action as to each of these matters. By section 12 of chapter 130 (Hurd's Stat. 1917) it was provided: "He shall keep regular and fair accounts of all moneys received and paid out by him, stating, particularly, on what account each amount is received or paid out." The accounts of receipts and expenditures being required by law to be kept were official records. Being the only ones required by law to be kept they were the only official books

of the office. It has been frequently held by this court that books kept by an officer which are not required by law to be kept, but which he keeps in the office for his own convenience and information and for the convenience and information of his assistants in the office, are not official books but the private books of the officer.

When Small entered upon the duties of his office as State treasurer there was upon the statute books of this State the following: "That the State treasurer shall deposit all moneys received by him on account of the State within five days after receiving same in such banks in the cities of the State as in the opinion of the treasurer are secure and which shall pay the highest rate of interest to the State for such deposits. The money so deposited shall be placed to the account of the State treasurer." (Hurd's Stat. 1917, chap. 130, par. 22.) It is contended by appellants that this section of the statute is unconstitutional. In the majority opinion it is said with reference to this question: "There is no attempt in this proceeding to make any application of this statute which will prejudicially affect the interest of any of the appellants, and its validity or invalidity is therefore wholly immaterial to the issues of this case." Its constitutionality, however, is a material question in this case, as in the bill filed herein the specific unlawful acts charged were, "that said defendant, Small, did not comply with the requirements of the statute of the State of Illinois as to a large part of the public moneys in his possession by virtue of his said office, and did not deposit such large part of said public moneys in banks in the cities of the State of Illinois, and turned over such large part of said public moneys to the control of said Edward C. Curtis and Verne S. Curtis," and the execution by them of pretended certificates of deposit purporting to be issued by the Grant Park Bank when there was in truth and in fact no such bank as the Grant Park Bank. A demurrer was filed to this portion of the bill by the defendants on the ground that this

section of the statute was unconstitutional, and upon a hearing Judge Norman L. Jones sustained the demurrer, holding the statute to be unconstitutional. Without discussing the question as to whether or not this statute was an unconstitutional attempt on the part of the legislative department to interfere with the executive department, this statute was clearly discriminatory in conferring special privileges upon banks in cities. By its provisions the deposit could not be made in banks in villages, incorporated towns or unincorporated territory. It is a matter of common knowledge that in this State there are villages, such as Oak Park, having a population of over fifty thousand, while the great majority of cities in the State have populations of less than one-half that number. This act was therefore rightly held invalid, and its provisions cannot be considered as having any bearing in this case.

A vast amount of testimony was taken before the master in chancery in an evident attempt to trace the State's funds through the hands of the Curtises, to impress upon such funds, wherever traced, the State's ownership and sequester the funds, and in furtherance of such an attempt an extensive tabulation, substantially the tabulation found in the majority opinion, has been presented to us by appellee. As the net result of this mass of evidence the master made his finding of ultimate facts. He did not find that the appellants had entered into an unlawful combination, conspiracy or confederacy. He did not find that Small had ever received a dollar of the interest, discounts or profits upon the funds turned over to the Curtises. The ultimate facts which he did find with reference to the funds were, that "various large sums of the State's funds were transferred by the defendant Small to the defendant Verne S. Curtis and one Edward C. Curtis, now deceased, the said Edward C. Curtis and Verne S. Curtis doing business usually in such transactions as the Grant Park Bank; that such funds were used in most instances by the said Curtises

319—36

for investment in various notes of Armour & Co., Swift &
Co., Morris & Co., Cudahy & Co. and Wilson & Co., and
various sums were received by the said Edward C. Curtis
and Verne S. Curtis during said period as and for interest
and discounts upon said public funds, for which no account-
ing has been made to the State of Illinois." None of these
facts were in dispute but were alleged in the answers of
appellants. The master also found "that the alleged Grant
Park Bank referred to in this case was not in fact a bank,
but a mere agency used and operated by the said Edward
C. Curtis and Verne S. Curtis for the handling and invest-
ment of the public funds of the State of Illinois." To these
facts he sought to apply the doctrine of sequestration and
recommended an accounting. It is evident, however, that
this doctrine could not be applied, as the evidence introduced
by the State showed indisputably that the funds to which
this doctrine could be applied, if applicable at all,—*i. e.,* the
funds transferred by Small to the Curtises,—had every dol-
lar been paid back into the State treasury.

The master did not recommend a decree in accordance
with the prayer of the bill, as stated in the majority opin-
ion. He did not find a joint liability, but found that Small
should account for all the interest, discounts and profits
earned on the public funds during his term as State treas-
urer. He also found "that the defendants Verne S. Curtis,
and Etha G. Curtis as administratrix of the estate of Ed-
ward C. Curtis, deceased, should account to the complain-
ant in this proceeding for all interest, discounts and profits
collected upon the public funds of the State of Illinois by
the said Edward C. Curtis or Verne S. Curtis, or by the
so-called Grant Park Bank, or any one for them or either of
them." He recommended a decree "in accordance with the
foregoing recommendation." This was not a recommen-
dation for a decree finding an unlawful conspiracy or an
unlawful or fraudulent confederacy or combination nor a
recommendation for a decree fixing joint liability on the

part of appellants, but was a recommendation for a several accounting. The court in its decree does not find that any of the interest, profits or discounts on these funds had been received by Small and retained by him for his private gain and not accounted for to the State. The decree does not find, as stated in the majority opinion, "that large sums of money were collected by the Curtises for the benefit of Small," but does find that they "received from said investments divers large sums of money as interest or discount, which were appropriated to the use and benefit of the said Len Small, Edward C. Curtis and Verne S. Curtis, or one or more of them." Nor does it find that Small and the Curtises entered into an unlawful confederacy, as stated in the majority opinion. The decree found that appellants entered into a fraudulent combination, plan or scheme through and by which State funds were transferred to the Curtises by Small, and found that appellants were jointly and severally "liable for and obligated to pay over at once to the State of Illinois all discount, interest, profit or income paid to and received by them or any one of them for the alleged Grant Park Bank" from the use of such funds.

Before a decree for joint liability can be sustained upon this bill it must be shown that Small and the Curtises entered into an unlawful plan or scheme to not account to the State of Illinois for moneys due the State, and also shown that each one of them was knowingly a party to such scheme. Even if it be conceded,—which it is not,—that Small at the time he turned the moneys over to the Curtises did not intend to account to the State for interest or profits received by him and that he has not done so, before there can be a joint liability the evidence must show that each of the Curtises knew of such intention and were conspiring with Small to accomplish such intention. Mere proof that State moneys were turned over to the Curtises, that they knew the funds to be State funds and that they derived

profits therefrom will not suffice. If that were the rule, then every one of the two hundred or more banks throughout this State which had borrowed State funds from the State treasurer could be compelled to account to the State for the profits derived by them from the funds loaned to them, because in each instance the bank borrowing the money knew the funds to be State funds and procured the loan to be made for its individual gain. It is the law, as stated in the majority opinion, that where liability arises from an intentional wrongful act of several parties conspiring together, each is liable for all resulting damages; but the law is equally well settled that before a party can be subjected to such joint liability it must be shown not only that the act was wrongful and the result of the conspiracy, but that the party sought to be held jointly liable was a party to the conspiracy. When the Curtises made their arrangement with Small they were not dealing with a person whom they knew to be a mere stakeholder, custodian or bailee of funds, having no legal right to loan them, or with a person who they knew had no right to loan funds and therefore chargeable with notice of the illegality of the transaction, but they were dealing with a person who they knew had a right to loan the funds and whom the legislature by a statute was seeking to compel to loan the funds.

The larger portion of the majority opinion consists of an attempt to prove the amount of funds turned over by Small to the Curtises and to trace those funds. That there was an arrangement made between Small and the Curtises, that large sums of the State funds were transferred to the Curtises, that the Curtises derived large profits therefrom, and that not all of such profits and income was turned over to the State treasury, is not disputed. Those facts are alleged in the answer of Small and testified to by him. Proof of these facts, alone, does not constitute ground for joint liability to account. The same facts were true with reference to every other bank which had State funds. The State

did not attempt to show what the arrangement was under which the funds were loaned to the Curtises. It is conceded that there is no direct evidence of any unlawful agreement, but it is said in the majority opinion that a conspiracy can be proved by circumstantial evidence, and that where a conspiracy is once established every act and declaration of each member in furtherance of the common design is in contemplation of law the act and declaration of all the members, and is therefore original evidence against each of them. But it is likewise true that before any act and declaration of one member of a conspiracy can be used as evidence against another who is alleged to be a co-conspirator, the conspiracy itself must be first established by evidence. A conspiracy must be proved like any other fact. To justify the conclusion that a conspiracy existed there must be evidence of some agreement or joint action toward accomplishing the object of the conspiracy. (*People* v. *Holtz,* 294 Ill. 143.) If a conspiracy existed in this case it was a criminal conspiracy and one punishable by imprisonment in the penitentiary. The undoubted rule in such case is, that before a conspiracy can be established by purely circumstantial evidence the guilt of the accused must be so thoroughly established as to exclude every reasonable hypothesis of his innocence. (*Purdy* v. *People,* 140 Ill. 46; *People* v. *Ahrling,* 279 id. 70.) Where, in a case in which a conspiracy is sought to be proved by circumstantial evidence, the evidence, when considered all together, can be explained upon any reasonable hypothesis other than the existence of the conspiracy, it is the duty of the court to find that such conspiracy did not exist.

Small testified as to the arrangement and his reasons for entering into it. He testified that he had been State treasurer at a former time and assistant treasurer of the United States, and knew the danger incident to the custody of public funds and his absolute liability for any loss; that he believed it to be his duty to place the funds in his hands at

interest; that he went to see the officers of several of the
largest banks in Chicago, giving their names; that while
they were willing to take the money on deposit they all re-
fused to give him indemnity or collateral security; that he
advised with his brother, a former judge of the circuit court,
and told him that the large Chicago banks refused to put
up collateral, and he replied that he did not know that it
would be worth anything if they did, because there was a
grave question whether a bank organized under the national
banking laws could take some of its assets and give them
to a depositor, making him, in effect, a preferred depositor
or creditor of the bank; that they talked about private
banks, and his brother said there was no question but that
a private bank could do it, because it was not under the
same restrictions as a State or a National bank, and that
everything a private banker owned,—all of his property,—
was back of the depositors in the bank; that he talked with
a good many other persons besides Judge Small, as he was
anxious to see that every cent of the State's funds was pre-
served; that he talked with his predecessor and with sena-
tor Curtis, and went over the matter with him; that Curtis
(E. C.) finally told him that if he wanted to deposit the
money in Curtis' private bank he would take care of those
funds which could not be deposited permanently, and would
put up such collateral as he would indicate and pay a rea-
sonable rate of interest upon the money so deposited; that
the Grant Park Bank was a private bank owned by Ed-
ward C. Curtis,—not that the Grant Park Bank was doing
a general banking business; that before making the first
deposit E. C. Curtis deposited with him a large amount of
bank stock and other securities as general security, to apply
on any certificate of indebtedness and any deposit which
might be made during his term of office; that thereafter he
made deposits in the Grant Park Bank; that these deposits
were made by draft mailed from the Springfield office; that
in each instance before the draft was mailed Curtis gave him

a certificate of deposit of the Grant Park Bank therefor; that in every instance Curtis gave him collateral therefor; that he had no interest in any of this collateral except as their custodian as security for the State's funds. There was no secrecy about the making of these deposits.

Harry C. Luehrs, who was cashier in the treasurer's office from 1905 to 1915, when he became assistant treasurer, (a position he retained until August 1, 1922,) while a witness called by the State, testified: "There was no secrecy about the opening of the safe account. It was established openly, as much as the 'vault account' or the 'open account.' Certain drafts that were issued were charged to the safe account, the same as any other account. There appeared on the tickler each day any fluctuations each day, the same as any other account. The fact that the safe account existed was known to such employees as made entries with respect to the vault account, and such employees had equal opportunities of knowing of the safe account. From time to time drafts were sent to the Grant Park Bank. It was done in the course of business at the office," and that the name of the Grant Park Bank appeared on the records in the office in Springfield.

Edward C. Beck, a witness for the State, who had been connected with the treasurer's office from 1909 to 1913 as assistant treasurer and from 1915 to the time of the trial as cashier, testified: "The tickler showed the amount of money in the safe account during the term of the defendant Small. As far as my duty was concerned, the safe fund was kept in the same manner as the vault account. One account was kept just as open as the other, and each account was subject to the examination of any person in the office of State treasurer during the term of defendant Small. There was no secrecy about the entries relating to the safe account."

Edward Trobaugh, an employee of the treasurer's office and at the time of testifying a United States deputy col-

lector, a witness for the State, testified that in the treasurer's office during the Small administration there was kept a book of daily balances called the "tickler," the entries in which showed the balances which were made at noon each day, and that such entries showed the condition of the account of each fund in the office at noon on that day. He also testified: "There were entries made in the tickler that had to do with the Grant Park Bank. They were made under the name of 'Total.' At the time I made such entries under 'Total' I knew that they referred to transactions with the Grant Park Bank. I knew by information received from Mr. Beck or Mr. Luehrs. Those entries were made in the course of business in the same fashion other business was made concerning other banks, excepting others were kept under another head, but the entries were made in the same course of business as other entries relating to other banks. I did not know it as the safe account during Small's term. The designating of various accounts as 'vault account,' 'safe account,' 'total,' was a mere matter of book-keeping, as I understood it. The entries concerning the Grant Park Bank were made in the same due course of business as other entries, were open to the inspection of employees of the office." He also testified: "During the six months I worked in the cage as assistant paying teller I am pretty sure I drew some drafts to the Grant Park Bank. That was done in the course of business and in the same manner as drafts were issued to the other banks. Transactions in the Grant Park Bank were noted in the draft register and in the tickler. I wouldn't say they were not noted in other records. I didn't mean to say there were no other records kept of transactions with that bank. The entries as to the Grant Park Bank in the tickler or any other record were made in the same way as the entries concerning other banks. Those entries were made openly in the course of business, the same as other entries were made. The draft register was openly kept as any other record in the office of

the State treasurer, and the drafts to the Grant Park Bank
were entered in the same manner as any other drafts were
entered."

It is urged by appellee that it is a circumstance in its
favor that this arrangement was made by Small personally
and not with subordinates in Springfield. It certainly should
not militate against a public officer that he gave his personal
attention to the details of an official matter of importance.
Much money might be saved the State if other public offi-
cers would give their personal attention to the duties of
their office and not delegate them to subordinates.

Another circumstance suggested by appellee is, that the
collateral, and the only record of it, were kept by Small in
"his private safe in his private office above his bank in Kan-
kakee." As we have seen, Small, as a constitutional officer,
was an insurer of the absolute safety of the funds. The
constitution did not, and the legislature could not, designate
a place in which he should keep the funds and collateral in
his hands, but of necessity the entire matter of the safe-
guarding of the funds and collateral was delegated to the
discretion of the officer. The evidence of the clerks in the
treasurer's office, called as witnesses by the State, is to the
effect that the quarters in the office in Springfield were too
limited to keep all the collateral and transact all the busi-
ness of the office there, and that "during the first few
months of Small's term there were practically no facilities in
the office to accommodate the collateral." Small, as treas-
urer, maintained an office in Springfield, one in Kankakee
and one in Chicago. Luehrs testified that the Chicago office
was established during the term of Smulski as treasurer,
many years before, and had been maintained by all succeed-
ing State treasurers, and that during the terms of all of
the treasurers part of the collateral was held in some safety
deposit box in Chicago. According to Small's testimony,
part of the collateral received from the various banks was
kept in a safety deposit box in Chicago and part in a safe

in the office in Kankakee. That Small did not claim any
personal interest in this collateral, and that the safe was
not "his private safe in his private office," as stated in the
opinion, is manifested by the fact that as State treasurer
he kept this safe and its contents insured in the name of
the State treasurer, for the benefit of the State, in the sum
of two million dollars against robbery and burglary, which
insurance policies are exhibits as evidence in the case.

Two facts are stated in the majority opinion as reasons
why the moneys loaned to the packers were not call loans
and that Small's version of the arrangement with the Cur-
tises was not correct: First, that while E. C. Curtis was
laying the foundation for the loans to the packers he told
them that he was acting as the financial agent for a string
of banks which he and his associates controlled, and that
he pooled the funds of these banks and bought notes for
large sums directly because he could loan the surplus of
the several banks to better advantage than they themselves
could, and because he could make more favorable terms to
the borrower by giving him advance notice if he found it
necessary to have the loan paid when the note was due. It
is to be noted that this statement of Curtis is somewhat
evasive as to the source of the funds which he was actu-
ally loaning. The evidence of disinterested parties shows
that Curtis was connected with fifteen or twenty banks in
different parts of the State and that the packers' notes were
high-class securities, and even if the notes were taken for
definite times they were readily convertible into cash. This
is evidenced by the rate of interest which they bore. The
failure to disclose the true source of the funds to the pack-
ers is a circumstance readily explainable on a reasonable
theory consistent with innocence, and cannot, therefore, be
considered a circumstance proving a conspiracy. Curtis
could hardly be expected to tell the parties from whom he
was trying to get four and a half or five or a larger per cent
interest that he had borrowed the money from the State and

was only paying two per cent. It is fair to assume that none of the other two or three hundred banks in the State who had State funds, when they loaned such funds at five or six per cent interest, disclosed to the borrowers that the funds were State funds upon which they were only paying two or three per cent.

The second fact, which the opinion calls the more important fact, is, that "in no instance during the two years was any of the $30,000,000 loaned to the packers called by the treasury before the note was due. Almost all the loans were discounted for a definite period, usually six months or less. The agreement made by E. C. Curtis with the packers that money would be available for definite periods and that the payment of the notes would not be demanded without due notice was carried out." The packers do not testify to such agreement. While it had been Small's experience in his former term, and the experience of former treasurers, as shown by the testimony of Luehrs, that the expenditures of the State at certain seasons of the year were such that sudden demands required the keeping of liquid balances, it is a matter of common knowledge that early in Small's term this country entered into the World War and that in this State a policy of rigid economy was adopted. Large contemplated improvements for which moneys were being provided were temporarily abandoned, and by reason thereof vast sums of money were accumulated in the State treasury which otherwise would have been paid out. There was, therefore, no necessity to call any of these loans before they were due.

It is stated as a circumstance that these packers' notes were delivered to E. C. Curtis at times for collection from two to six days before they became due, and that during such times the deposit was not secured. There is no competent evidence in the case showing that Curtis had the notes in his possession for such periods, but even if it were shown, the deposit was not unsecured, as Small had not only the

certificates of deposit, for the redemption of which Curtis' entire property was liable, but he also had Curtis' bank stock and general collateral, which had been given him as security for any loan which might be made during Small's term as treasurer. The State was not unsecured. It had Small's official bond, amply sufficient to cover any loss. If Small trusted Curtis and lost thereby the State was not interested, as it was amply protected by the official bond. That Small trusted Curtis could not be a circumstance tending to prove a conspiracy, but rather the opposite. It would tend to prove that Small considered Curtis an honest man, rather than a man who was engaged in a conspiracy to rob the State. The evidence shows, moreover, that the Chicago banks had large sums on deposit which were entirely unsecured, where the risk was more hazardous.

An attempt is made to show that the Grant Park Bank was not a bank, and stress is laid upon the fact that "twenty-two people, who had lived and transacted business in Grant Park and that section of Kankakee county for many years and who were well acquainted with the Curtises, testified that the Grant Park Bank went out of existence in 1898, and that they had not heard of its doing any business since; that checks were generally used in the transaction of business in Grant Park, and that they had never since 1898 seen a check drawn on the Grant Park Bank." The existence or non-existence of the Grant Park Bank as a bank is not material in this case, as Small had as much right, under the law, to loan the funds to the Curtises as individuals as he had to any bank. Prior to January 1, 1921, any person, partnership, association or corporation (except corporations prohibited from exercising banking powers) could without notice to any person, and without a permit or charter from the State or United States, become a bank solely by the exercise of banking powers. A private bank might or might not be a bank doing a general banking business. It did not need a habitat, and many private banks had none,

and their business was conducted on the streets, in private homes or wherever the proprietor happened to be. A bank is not necessarily a place or a building but is an institution or business. Private banks were abolished in this State by statute and went out of business January 1, 1921. Whenever, prior to that time, the question arose as to the existence of a private bank, the only question to be determined was, Were the powers of a bank exercised? The location of the bank, the number of its clientele or the notoriety of its existence was not a factor to be considered. In *Reed* v. *People,* 125 Ill. 592, it is said: "The ordinary and usual powers exercised by banks are to discount notes and receive deposits. They may, and often do, possess other powers, but these are the ordinary and usual powers conferred upon and exercised by banks and bankers." In *Oulton* v. *Savings Institution,* 17 Wall. 117, it is said: "Banks, in the commercial sense, are of three kinds, to-wit: First, of deposit; second, of discount; third, of circulation. * * * Modern bankers frequently exercise any two or even all three of those functions, but it is still true that an institution prohibited from exercising any more than one of those functions is a bank in the strictest commercial sense."

The undisputed evidence in the case shows that some years ago Alonzo Curtis and his son E. C. Curtis formed a co-partnership under the firm name and style of "Grant Park Bank," for the purpose of carrying on a private banking business. Such co-partnership was authorized by law at that time to conduct such business, and for some years they conducted quite an extensive private banking business. While from 1908 to 1917 the business was dormant and not much private banking business was transacted by the bank, the evidence does show conclusively that some business was done, and that in 1917 there were still outstanding, unpaid, some certificates of deposit of the Grant Park Bank, and that there were loans made by the bank which were still outstanding, and that the affairs of the bank had not been en-

tirely closed. There was, therefore, on Saturday, April 21, 1917, in existence, a co-partnership under the name and style of "Grant Park Bank," organized for the purpose of doing a private banking business and authorized by law to do such business. That this partnership existed and did a banking business from April, 1917, until January 1, 1921, is demonstrated by the evidence. It received deposits aggregating millions of dollars, issued certificates of deposit therefor, made loans, discounted bills, made collections, and in general did all those things that a private bank was authorized to do and which we have seen constituted the transaction of a banking business. The Grant Park Bank was recognized as existing as a private bank by all the employees of the treasurer's office, where its name appeared openly upon the books and papers. Letters containing drafts were frequently forwarded by mail to the Grant Park Bank and none of these letters were ever returned, so that it is evident that the postal authorities there knew of the existence of the Grant Park Bank. It had bank accounts in its name in different banks, and its endorsements were honored by the various banks for many million dollars. Its checking account at the Fort Dearborn National Bank did not, as stated in the majority opinion, remain the same at all times except for the interest on its daily balances, but the State's evidence shows that on one occasion the Grant Park Bank overdrew its account at the Fort Dearborn National Bank $96,906.46. This is evidence that the Fort Dearborn National Bank considered the Grant Park Bank not only as existing, but as a reliable and trustworthy institution.

It is mentioned as a circumstance that none of the public moneys deposited with it were loaned in its name, and that none of the interest or discounts on the loans to the packers were paid by the packers to the Grant Park Bank. In whose name the loans to Swift & Co., Armour & Co. and Cudahy & Co. were made is not disclosed by the record, as the Swift notes were made payable to their treasurer

and by him endorsed in blank, and the Armour and Cudahy notes were payable to themselves and endorsed in blank, and that when paid they were paid generally to the Live Stock Exchange Bank, or some other bank with which they had been left for collection. If the fact that the name of the Grant Park Bank does not appear in the transactions is a circumstance tending to show that it had nothing to do with the transactions, how much more potent evidence that Small had no interest in these transactions is the fact that in all the mass of testimony about these matters Small's name was never mentioned in connection therewith and that none of the packers ever saw him or heard of his having any interest in or connection therewith, and that, though it is claimed that the payment of all these notes has been traced, there is no document or witness tracing any part of these funds into his individual account, and all payments of principal and interest to Small, as treasurer, by the Curtises, are shown by the State and by Small to have been paid into the State treasury and accounted for. On the other hand, the remainder of the discounts and interest on the funds which are traced are traced into the hands of one or the other of the members of the co-partnership which existed under the name and style of "Grant Park Bank," and are shown to have been applied to purposes in which Small, neither as an individual nor as State treasurer, had any interest.

In determining the question whether or not there was actually in existence a private bank known as "Grant Park Bank," the definition of a bank,—i. e., "an institution authorized to receive deposits of money, to lend money and to issue promissory notes, (usually known by the name of bank notes,) or to perform some one or more of these functions,"—must be kept in mind. The inquiry is not whether or not there was a building known as Grant Park Bank. The Grant Park Bank was a private bank that only accepted deposits and loaned money after 1898. If the pri-

vate bank or institution was a co-partnership the individuals composing the partnership were the institution or bank and they were doing business under the name and style of "Grant Park Bank," and that institution could be sued or could defend a suit at law or in equity in the actual names of the individuals composing the co-partnership doing business as Grant Park Bank. If only a single individual (Edward C. Curtis) was conducting a private bank known as Grant Park Bank, then the bank or institution was Edward C. Curtis, and it could only be legally sued as Edward C. Curtis, and it would be proper to follow his name with the words, "doing business as Grant Park Bank." In no instance could the bank be sued directly as Grant Park Bank, whether it was one individual or was composed of two or more individuals who were co-partners. If the Grant Park Bank at any time was operated only by E. C. Curtis as a private banker, then the Grant Park Bank was E. C. Curtis, and the bank was wherever Curtis could be found in Illinois transacting the business of Grant Park Bank. "Grant Park Bank" was merely the trade or business name of the bank and was not a person in law, whether an individual or a co-partnership conducted the business. It was not a person within the meaning of the law. A corporation or an individual is a person or entity in law that may sue and be sued, but a co-partnership is not such a person or entity. No authorities are necessary on this proposition, particularly in Illinois, which is a common law State and governed by common law principles, in the main, in pleading and practice. In the absence of a statute the right of an individual to engage in the banking business in all or any of its departments would be unrestricted. An individual who is engaged in receiving deposits of money and in lending money or discounting notes is engaged in the banking business, and it was his right to do those things until the statute was passed in this State prohibiting the existence of private banks. *Reed* v. *People, supra; Wedes-*

*wciler* v. *Brundage,* 297 Ill. 228; *Oulton* v. *Savings Institution, supra;* I Bouvier's Law Dict. 228; *Henderson Loan Ass'n* v. *People,* 163 Ill. 196.

It is definitely established by the evidence that there existed from about 1891 up to January, 1921, a private bank known and designated as "Grant Park Bank." The evidence shows clearly and conclusively that as originally organized the bank was a co-partnership, composed of Alonzo Curtis and E. C. Curtis. The State proved by its witness H. J. Grounewoud that this private bank was assessed in Kankakee county, in which Grant Park is situated, in 1891 as "A. Curtis & Sons;" in 1892 as "Curtis & Son (Bank);" in 1893 as "A. Curtis & Son (Bank);" in 1894 to 1897, both years inclusive, as "Grant Park Bank." It was never assessed as a bank after 1897, according to this witness, but the fact that it was not assessed as a bank can have nothing to do with the question whether or not the bank continued to exist.

Twenty-two witnesses who testified for the State on the question as to whether or not the Grant Park Bank existed after 1897, practically all agree that this bank was organized by Alonzo Curtis and his son E. C. Curtis, and did business as a private bank until the organization of the Grant Park National Bank in 1897 or 1898, and that this bank was conducted in the general store of Alonzo Curtis, or of Alonzo Curtis and his sons, by E. C. Curtis. During that period this private bank had a habitat, and it had books and fixtures,—at least a safe,—and it received money for deposit, loaned money and cashed checks on it for its depositors and others, who also, no doubt, had pass-books, as ordinary depositors have, in which their deposits were noted, as well as their canceled checks. When the National Bank was organized the Curtises became stockholders in that bank,—in fact, it was organized by the Curtises and others. The National Bank became the owner of all the furniture and fixtures of the private bank and of all its

319—37

accounts, and it had charge of the building so far as the running of the bank was concerned; but it is also shown by the evidence for the defendants that Alonzo and E. C. Curtis did not dissolve their co-partnership or the private bank, but continued to do business as a private bank in the same building in which was conducted the National Bank, up until the death of Alonzo Curtis, some time in 1900. Marie A. Campbell, who was seventy-three years of age at the time she testified for the defendants, was an aunt of E. C. Curtis and sister of his mother. She testified that after the death of Alonzo Curtis, E. C. Curtis' mother assigned to him her interest in the Grant Park Bank. E. C. Curtis, after the death of his father, conducted this private bank as sole proprietor and in the name of "Grant Park Bank," according to the testimony of the witnesses who best knew the facts. After the organization of the Grant Park National Bank the Grant Park Bank never had any furniture or fixtures as a bank, except several private deposit boxes in other banks, in which were kept the promissory notes and other valuable instruments. It was not a bank that issued checks or cashed checks drawn on it by others, for the reason that its deposits were not subject to check, except in a few instances, perhaps, where checks were drawn on its deposits in other banks.

The facts we have just recited concerning this private bank are not seriously disputed by any one of the twenty-two witnesses who testified for the State or by any other witness. Their testimony was simply confined to statements that they had never seen a check or received a check drawn on the Grant Park Bank after about 1898, and that they did not know of the existence of this private bank after 1898. Every one of them admitted, on cross-examination, that E. C. Curtis and his father, or E. C. Curtis, might have been conducting a private bank known as Grant Park Bank after 1898, and that they might have accepted deposits in that bank not subject to check, and that they might

have loaned the money so deposited with them or bought commercial paper with it.

Cass J. Hayden, of Momence, a banker connected with the Momence State and Savings Bank, testified for the defendants that he lived in Grant Park more than twenty years and was assistant cashier of the Grant Park National Bank; that E. C. Curtis was cashier and Alonzo Curtis president of the National Bank after it was organized, and that he continued with the Grant Park Trust and Savings Bank after it was organized as successor to the National Bank, about 1898, and that he began with the National Bank in 1898. He testified that shortly after the National Bank was organized there was a savings bank organized by the stockholders of the National Bank and was chartered by the State; that the Grant Park Bank continued to do business as Grant Park Bank from 1898 until about 1900, during which time it was operated by E. C. Curtis until the death of Alonzo Curtis, and Alonzo and E. C. Curtis were the owners of the bank; that the Grant Park Bank continued in operation from the organization of the National Bank, about the year 1898, until about the year 1916 or 1917,—at the time the trust company built its building and moved into it; that he knew that the Grant Park Bank accepted deposits and made loans of money, and that E. C. Curtis was the party who conducted that bank before and after the death of his father; that the savings bank was organized because the National Bank could not do that kind of business, and that it went out of business when the National Bank was succeeded by the Grant Park Trust and Savings Bank, about 1897, and became the owner of all the furniture and fixtures of the National Bank and of the lease of the building in which it was conducted; that Curtis occupied a small room in that bank building during the existence of the National Bank, and continued to do so after the organization of the State Bank, in which Curtis kept his private matters, and that Curtis also kept a book or

books in connection with his private bank; that the savings bank also had books in which it kept its accounts, but it owned no furniture or fixtures and had no control over the building in which it transacted its business; that Curtis had no employees while running the private bank, but Miss Julia Bissett, an employee of the National Bank and afterwards of the State Bank, sometimes assisted him; that Curtis also discharged his duties as an officer of the National Bank and of the State Bank; that the savings bank did not issue certificates of deposit at all. Hayden also identified defendants' Exhibits 17 and 18, and testified that the first six lines on the back of Exhibit 18 were in the genuine handwriting of E. C. Curtis and the next three lines were in the handwriting of Miss Bissett, and that the remaining writing on that exhibit was that of E. C. Curtis; that Exhibit 17 was written by Miss Bissett, but that it bears the genuine signature of E. C. Curtis; that he has seen Curtis write hundreds of times and knows the signature to each exhibit is his true and genuine signature. He also testified that he knew that E. C. Curtis made loans and accepted deposits in the Grant Park Bank, because he helped him to make the loans; that Curtis also issued certificates of deposit; that the Grant Park Bank carried an account in the Grant Park Trust and Savings Bank and in the National Bank, and it only accepted deposits from depositors who would not deposit their money in any bank at the rate of interest paid by the Grant Park National Bank and the Grant Park Trust and Savings Bank.

Ernest B. Griffin, a witness for the defendants, connected with the Curtis Trust Company since 1916 and also a stockholder and director of the Grant Park Trust and Savings Bank, and who is connected with twelve or thirteen banks in which he is interested as a director and stockholder, in quite a number of which banks E. C. Curtis was also a stockholder, testified that he had known Curtis thirty years and had seen him write frequently. Norman Griffin,

his brother, also a witness for the defendants, testified that he is assistant cashier of the Grant Park Trust and Savings Bank and has been since about 1908, and that he had known E. C. Curtis many years and was well acquainted with his handwriting. Both of these witnesses corroborated in every respect the witness Hayden as to the history and operation of the Grant Park Bank and who composed it from its organization up to 1917, and as to the fact that this bank was operated as a private bank from its organization to said date and conducted by E. C. Curtis. To repeat their testimony in detail would be simply to repeat the testimony of Hayden as to the existence of the bank and as to the manner in which it was conducted. They stated positively that the Grant Park Bank's deposits were not subject to check, and that it carried deposits with the Grant Park National Bank and the Grant Park Trust and Savings Bank. They also identified and testified concerning Exhibits 17 and 18 in the same manner as did Hayden, and confirmed Hayden's testimony that the Grant Park Bank only accepted deposits from depositors who would not deposit their money at the rate of interest paid by the Grant Park National Bank and its successor, that its deposits were not subject to check, that it usually loaned its money on real estate, and that they knew it did make such loans. Ernest B. Griffin further testified that he on several occasions borrowed money from the Grant Park Bank and paid seven per cent interest on the loans; that in 1903 or 1904 he borrowed $5000 of that bank for a year or more, and that in 1913 he borrowed at one time $1000 and at another time $4000, and about the same time borrowed $500 and $1000. Both witnesses testified as to others depositing money in the Grant Park Bank and that it made loans to other parties; that E. C. Curtis generally conducted his private business in a small room in the building occupied by the Grant Park National Bank and the Grant Park Trust and Savings Bank, and that he had no employees after 1908, but that

Miss Bissett, an employee of the other banks, sometimes assisted him in drawing certificates of deposit or crediting payments of interest thereon, and that he had rented in the bank aforesaid several boxes, in which he kept his private papers.

The following witnesses testified as in this paragraph stated: Adolph Schroeder testified that he deposited money in the Grant Park Bank at four per cent interest, and that he made such deposits from 1900 to 1911 and accepted certificates of deposit of the same character as Exhibits 17 and 18; that the first certificate of deposit was for $400 and the second for $450, and that his deposits increased in amount; that the last one was for $1000, which was cashed in 1911, and for which he received a draft for $1000 on the Grant Park Trust and Savings Bank; that he was also a depositor, depositing small sums in the other two banks, for which deposits he held their pass-books, but his testimony makes it clear that he deposited in the Grant Park Bank also. Augusta Wangerin testified that she deposited money in the Grant Park Bank at four per cent interest before and after 1900, and received the same kind of certificates of deposit as shown by Exhibits 17 and 18. She is corroborated in her testimony by Hayden and Norman Griffin. Marie A. Campbell testified that she deposited $500 in the Grant Park Bank in 1897, and continued to have money in that bank until 1901; that in 1901 she deposited $2000 in that bank and received a certificate of deposit signed by E. C. Curtis; that she continued to deposit in the bank by renewals until 1914 and then drew out $1000 and the remaining $1000 in April, 1915, at which time she bought a bungalow; that she also borrowed $1000 of that bank through E. C. Curtis, which note ran for a year at six per cent, when it was paid; that in the same year she deposited $1500 in the Grant Park Bank, receiving a certificate of deposit signed by E. C. Curtis; that in April, 1917, she made a further deposit of $1500 in that bank, and car-

ried the last two certificates of deposit in that bank until the last of May or first of June, 1918, at which time she drew out $1500, and in 1919 she withdrew the remaining $1500; that on the certificates of deposit she received four per cent interest all the time. L. T. Fitzgerald, an insurance agent who lived in Kankakee, in the summer of 1917 made a deposit of $200 and received a certificate of deposit for the same signed by E. C. Curtis; that he made this deposit with the expectation that he might handle some of the insurance of Curtis, but drew out the deposit about two months after it was made. Ole T. Olson testified that he lived in Springfield; that he borrowed $1200 of the Grant Park Bank; that it was paid to him by E. C. Curtis, and he re-paid it to Curtis at the Lafayette Hotel, in Kankakee; that he gave a note for the sum borrowed. At the time he testified he was an appointee of Small in the Department of Agriculture as superintendent of plant industry.

Defendants' Exhibit 17, heretofore mentioned, is in this language:

"GRANT PARK BANK                               No. 1436.
*Grant Park, Ill., Apr. 30, 1908.*
"Mrs. Jane Young has deposited in this bank eight hundred eighteen and 18-100 dollars, $818 18-100, payable to the order of herself in current funds on the return of this certificate properly endorsed. With interest at the rate of six per cent per annum. This deposit is not subject to check.
                                  EDWARD C. CURTIS, Pt."

This certificate of deposit is endorsed as follows: "Int. paid to March 1, 1909," with similar interest endorsements for the years 1910 to 1917, both inclusive. "April 19, 1913, received on the within $500. Note paid dated March 15, 1907," with a "Paid" stamp on its face, "Feb. 16, 1920, Grant Park Trust & Savings Bank, Grant Park, Ill."

Exhibit 18 is in the same form as Exhibit 17, and bears date March 4, 1905, in favor of Mrs. Jane Young, amount $3000, signed by A. Curtis & Son. It is endorsed as follows: "'This certificate is issued in lieu of No. 1352, which

is supposed to be lost, and is not transferable. Int. paid to March 4, 1906." Similar interest endorsements follow for the years 1907 to 1919, both inclusive.

The above exhibits are an original certificate and a duplicate, both of which were signed by E. C. Curtis and were found by Norman Griffin among some of Curtis' papers after his death, in his desk. The evidence shows that the original of which Exhibit 18 is a duplicate was supposed to be signed in the lifetime of Alonzo Curtis. The further testimony is that these certificates of deposit were cashed after the death of Mrs. Young by her son, who lived in Iowa, and as administrator he deposited the proceeds thereof in the Grant Park Trust and Savings Bank, where they remained for about a year.

There were a number of witnesses who testified to the fact that Edward C. Curtis was a private banker during his lifetime and during the time mentioned as the existence of the Grant Park Bank, and that he was known by private bankers throughout Illinois and recognized by their association as a private banker. There is other testimony in the record that the Grant Park Bank accepted money on deposit, issued certificates of deposit for the same and loaned the money or bought commercial paper with the deposits, but the foregoing is sufficient evidence for my purpose. It could not be expected that every person who deposited money with that bank or borrowed money of it could be located and his testimony secured, as Curtis died in 1920 and private banks went out of existence two years or more before this evidence was taken. It was not claimed by the defendants that the Grant Park Bank had as extensive deposits as some larger private banks or made the loans that such private banks made. The claim is that it was a private bank. The amount of the deposits in the private bank or the amount of loans it made did not determine whether or not it was a bank. Neither was it necessary that such a

bank have a habitat or have furniture and fixtures, as is well decided by this court and other courts of this country.

The evidence in the record does not establish to a certainty when Verne S. Curtis became a co-partner with his brother, E. C. Curtis, in the conduct of the Grant Park Bank. The evidence does show, as appears from his acts and declarations in the record, that he was a partner of E. C. Curtis in the conduct of that bank in April, 1917, and up to the death of E. C. Curtis, in 1920, and that as the sole survivor of that co-partnership he acted as the Grant Park Bank after the death of Curtis. The evidence further shows that E. C. Curtis was president and Verne S. Curtis cashier or secretary during the time they conducted the bank and the operations spoken of as transpiring during the years 1917 and 1918, and later, beginning with April, 1917.

Much has been said about the fact that Verne S. Curtis in April, 1917, when he ordered supplies for the Grant Park Bank from Marshall H. Jackson, told him that he wanted him to treat the matter in confidence, because he did not want the other local bank to know "what they were up to." There was one bank in Grant Park at that time that was not connected with the Grant Park Trust and Savings Bank, and that was the Farmers State and Savings Bank. The Curtises, perhaps, had their private reasons for not wanting one of the local banks to know they were going to operate the Grant Park Bank in loaning the funds of the State, but there is absolutely no evidence in the record that Small knew anything about how the Curtises felt about the matter or that he conducted his transactions with the Grant Park Bank in a secret manner, and under the law, as heretofore stated, this declaration of Verne S. Curtis could not be considered as evidence against Small.

There seems to be an attempt to support the decree, not on the ground that the evidence in the case shows Small to have received interest which he has not accounted for,

but because if certain other evidence which was not produced had been produced it might have shown a liability to account. Reference is made in the opinion to the alleged destruction of certain books and papers which were in the treasurer's office during his term. There is no evidence in the record that Small ever had any of these books or papers in his possession after the expiration of his term or that he destroyed them. No witness testified to having any personal knowledge on the subject. Two or three witnesses who were in the office during the succeeding term testified that they presumed some books and papers were sent to Small after the expiration of his term of office because it had been the custom to send such books and papers to his predecessors. On this subject a witness for the State testified as follows: "I was cashier in the State treasurer's office from 1905 to 1915, when I became assistant treasurer, in which position I remained until August 1, 1922. I have no independent recollection of sending any record to the defendant Len Small at the expiration of his second term. My testimony in that regard is based only upon a custom I say prevailed with reference to the delivery of records to the predecessors of Len Small. The records so sent to the predecessors of Len Small were records kept for the benefit or use of the State treasurers. When I came in the office there was no such record. I created all of them for the purpose of handling the business as it increased. There were but three employees when I came there, now there are some twenty-five, and it is the natural course of events that made certain other memorandums or records necessary, which were added as they came along. I would say they were for the use of all employees connected with the office and the State treasurer. We had a record which carried all entries having to do with the receipt of moneys into the office of the treasurer and another record carrying entries showing all items of disbursements; and up until the time I left the office those were the only records kept

in the office of the treasurer of Illinois which were treated as official records, and the records which were delivered or sent as a matter of custom to retiring treasurers were considered by the treasurers and myself as records wholly apart from the official records. The cash book showed the receipts and disbursements of that office. That book was never sent out or delivered to any retiring State treasurer, and as far as I know the cash books for the period of time I served in that office were, and are now, a part of the records in the office of the treasurer of the State of Illinois. That would also be true of the ledger. It was in the ledger that the entries from the cash book were posted. Those books contain a complete record of receipts where the Auditor of Public Accounts had issued his official order to receive, and on the disbursement side all items of disbursements where the auditor had actually issued his warrant. Those records were complete as far as actual receipts and disbursements of the office were concerned." One witness testified that about three months after the expiration of Small's term he saw a watchman put the tickler and the cash register in a box and nail up the box but did not see him take them out or know what was done with them. Small testifies he did not see them after the expiration of his term of office.

Upon this evidence we are asked to presume that these books and papers were sent to Small from the fact that it was the custom to send them to former treasurers. Upon the presumption of their being sent we are asked to presume that they were received by Small, which is basing a presumption upon a presumption. From this last presumption, when the documents were not produced upon the trial, we are asked to presume that they were destroyed or suppressed so that they could not be used as evidence, from which presumption we are asked to presume that if they had been produced they would have shown something detrimental to Small, and using this last presumption as a basis we are asked to presume that they showed that Small had

received income, profits or interest for which he had not accounted, notwithstanding the fact that he testified positively that he had accounted for and paid into the treasury all the interest he had received.

In *Globe Accident Ins. Co.* v. *Gerisch,* 163 Ill. 625, it is said: "The law is that a presumption cannot be based upon a presumption, for there is no open and visible connection between the facts out of which the first presumption arises and the fact sought to be established by the dependent presumption. (*Douglass* v. *Mitchell,* 35 Pa. St. 440; *United States* v. *Crusell,* 14 Wall. 1; *United States* v. *Ross,* 2 Otto, 281.) In the case last cited it is said, in passing upon this question: 'Such a mode of arriving at a conclusion of fact is generally, if not universally, inadmissible. No inference of fact or of law is reliable drawn from premises which are uncertain. Whenever circumstantial evidence is relied upon to prove a fact the circumstances must be proved, and not themselves presumed.'" In *Rumbold* v. *Royal League,* 206 Ill. 513, it is said: "The law never presumes the existence of a fact which must be affirmatively shown from the mere absence of facts showing the negative."

In the majority opinion it is said: "Proof of the fact that a public official having custody of public funds loaned these funds to others with a secret arrangement respecting the payment of interest and that in reporting interest collected he did not reveal the source of the payments, without more, would be sufficient to justify an order to account." This is not a correct statement of the law. There must be affirmative proof that he had not reported all the interest he had received, and the bill must be predicated upon such failure to make such specific report. The bill in this case contains no allegation of a failure to make monthly specific reports as a ground for an accounting, and a decree for an accounting cannot, therefore, be sustained on any such ground. Even if it had done so the present decree could

not be sustained. It is a decree fixing joint liability. The Curtises were not public officials, and were not required by law to make, nor could they make, official reports of interest collected, revealing the source of the payments.

In the majority opinion it is said: "Where a treasurer or other public official has the custody of public funds and such funds earn interest, he. is required by the settled law of this State to turn such interest into the public treasury as soon as it is received by him. (*County of Lake* v. *Westerfield*, 273 Ill. 124; *Hughes* v. *People*, 82 id. 78.) This is now, and has always been, the law in this State without regard to a statute on the subject." This does not state the law with exactitude. It is only in case the interest is received by him that it is his duty to account therefor. If the funds are loaned by him to others and such funds are placed at interest at a higher rate than is paid him by the borrower, he is only required to turn into the public treasury such interest as he receives. The majority opinion also says: "This liability to account for profits made on public funds is the same whether the interest or discount is paid to the officer directly as such, or whether it comes to him indirectly as a partner or stockholder in a bank where public funds are deposited.—*Whitney* v. *Peddicord*, 63 Ill. 249." He is only liable to account for such share of the profits as he himself receives and not for profits made by another, even though that other be his partner.

In the *Westerfield case, supra,* and *Hughes case, supra,* the public officer had admittedly received interest which had not been turned into the public treasury, yet in each case the official was held liable only for the amount which he himself had actually received. *State* v. *McFetridge,* 20 L. R. A. 223, involved the State treasurer of Wisconsin, who had admittedly received interest on public funds from banks and which he had not paid into the State treasury. It was there held that both the deposit and the stipulation for the payment of interest were in themselves lawful, even

though both the bank and the treasurer intended that the latter should retain the interest as his own, and that as soon as he received the interest money it belonged, with the principal, to the State, but he was not held liable for profits which the bank made on such deposit. That case contains a number of references to other cases holding public custodians liable for the interest received, and in all of them the liability was the amount actually received by the public officer. Following the same line is *Rhea* v. *Brewster*, 130 Iowa, 729, 8 Ann. Cas. 389, where the clerk of the court was held liable for the interest received by him on the money but the liability was for what he himself actually received. The same is true of *Eshelby* v. *Board*, 66 Ohio St. 71, 63 N. E. 586, with respect to a school treasurer. In that case the doctrine that the increment follows the principal was made to apply only to the interest actually received by the treasurer. In Michigan, although it was held that the deposit on interest was in itself unlawful, the county treasurer was held liable only for what interest he had actually received. (*Board of Supervisors* v. *Veherke*, 128 Mich. 202, 87 N. W. 217, 92 A. S. R. 450.) The *Mc-Fetridge case* was followed by holding the treasurer liable only for what he had actually received, in *Adams* v. *Williams*, (Miss.) 52 So. 865, 30 L. R. A. (n. s.) 855. In no case in the United States involving the collection of interest on public funds was an official held liable for more interest than he had actually received.

In *Whitney* v. *Peddicord, supra,* (the case cited by the majority opinion on this subject,) Smith and Peddicord were executors of the last will and testament of John Whitney, deceased, and Peddicord was a partner in a banking house with one Burrows. The executors had deposited moneys which they held as such executors in the bank of Peddicord & Burrows and the moneys were used in the business of the bank. On the question of an accounting for interest on the funds used by the bank the court said:

"It is a familiar principle that an executor or administrator who has used the trust funds to his own profit is chargeable with such profits, if they can be ascertained, or in lieu thereof, with interest on the sum used. (*Rowan* v. *Kirkpatrick,* 14 Ill. 1.) Under this rule, while Smith is not liable, Peddicord should be personally charged with six per cent interest since the war, on such proportion of the average deposits with the firm of Peddicord & Burrows of the funds of the estate as was used for his benefit. If he received one-half the profits of the banking house he should be charged with interest on one-half the average amount of the money of the estate kept on deposit; and the same rule should be applied if he had a different interest in the business. It would be unjust to charge him with interest for such portion of the profits on these deposits as was received by his partner, Burrows." What is said with reference to the liability of these parties applies with equal force to the liability of appellants. It would be unjust to charge Small with interest for such portion of profits on these deposits as was received by the Curtises, and it would be unjust to charge the Curtises with interest for any portion of the profits on these deposits which was received by Small. This authority cited in support of the majority opinion does not support the same but is an authority against the decree in this case, which fixes a joint liability of all the appellants for interest received by anyone for them.

The evidence does show that Small received interest on public funds, paid it into the State treasury and made report thereon, and in the matter of payment and of reporting he followed exactly the custom established by a long line of predecessors. The evidence in the record shows that each State treasurer from 1907 to 1921 made two reports of interest received, without itemizing them, and it shows that the treasurer from 1907 to 1909 received for interest on public funds $169,514.97; the treasurer from 1909 to

1911, $90,306.42; the treasurer from 1911 to 1913, $166,-
221.93; the treasurer from 1913 to 1915, $180,953.92; the
treasurer from 1915 to 1917, $142,614.31; Small reported
as his receipts on public funds from January 8, 1917, to
September 30, 1918, $306,424.33, and from September 30,
1918, to the end of his term, $143,585.79, making a total
of $450,010.12 during his term, being an amount greater
than the combined receipts from this source of any two of
his predecessors. These reports were made to the various
Governors, the books and accounts audited by the State
Auditor of Public Accounts, and no complaint was made as
to the correctness of the methods nor were the reports chal-
lenged in any way. The bill in this case is not based on
any failure to file an itemized account of interest received
on public funds. The decree shows upon its face that it
is not based on any such failure, and, being a decree fixing
a joint liability, it could not be based upon any such failure.

Small has held many positions of responsibility and trust.
He has been a supervisor, clerk of the circuit court, trustee
of a State hospital, State senator, State treasurer for two
terms, assistant treasurer of the United States, and has been
twice elected Governor of the State of Illinois, the latter
time being after the commencement of this suit. These
facts are cited; not that his case should receive by reason
thereof any greater consideration than that accorded to the
case of the humblest citizen of the State, but that in the
consideration of this case the same rules might be applied.
He testified as a witness in this case. It has always been
the rule that when a man is called upon to give evidence,
his business, occupation, social position in life, the positions
of trust, honor and responsibility which he has held, may
be shown, so that in considering his testimony the court
and jury may know his situation in life and the repute in
which he has been held, on the theory that a man of sub-
stance, who has enjoyed the trust and esteem of his fellow-
citizens, is less liable to commit perjury than one less fortu-

nately situated.   He testified, positively and unequivocally, that he had not entered into an arrangement with the Curtises to receive money, income, discount or profits from the public funds for his own gain; that he had not received any income, profits or discounts therefrom for his private gain; that from time to time he had received interest on the public funds turned over to the Curtises in the same manner and at the same rate that he had received interest on the State funds from all the other banks throughout the State, and that he had accounted for the entire amount so received as a part of the $450,010.12 accounted for by him. He is not contradicted in his testimony by any witness, document or exhibit.   His reputation for truthfulness and honesty is not impeached.   Under these circumstances we have no right to disregard his testimony but must accept it.   On this subject the law is thus laid down by Mr. Justice Caton in *Robertson* v. *Dodge,* 28 Ill. 161 : "The only question would seem to be, Was the jury justified in disregarding the testimony of this witness?   He was not impeached in the least in any way, so far as this record shows. Indeed, there is no intimation that he is not a truthful man. Can a jury, from mere caprice, entirely disregard the testimony of a witness unimpeached in any way?   This they cannot lawfully do, although they are the judges of the credibility of witnesses.   They must judge of that fact, as of any other in the case, from evidence."   On the same subject, in *Chicago and Alton Railroad Co.* v. *Gretzner,* 46 Ill. 75, Mr. Justice Breese said: "This court has said that a jury cannot willfully or from mere caprice disregard the testimony of an unimpeached witness; that while they may judge of the credibility of a witness they must exercise their judgment whilst doing so, and not their will, merely. *Robertson* v. *Dodge,* 28 Ill. 161."   On the same subject, in *Larson* v. *Glos,* 235 Ill. 584, Mr. Justice Cartwright said: "There is nothing in this record which would justify a jury in discrediting and rejecting the testimony of Timke.   It is

319—38

true that a court or jury is not bound to believe a witness when, from all the other evidence or from the inherent improbability or contradictions in the testimony, the court or jury is satisfied of its falsity; (*Podolski* v. *Stone,* 186 Ill. 540;) but a jury cannot willfully or from mere caprice disregard the testimony of an unimpeached witness. (*Chicago and Alton Railroad Co.* v. *Gretzner,* 46 Ill. 75.) Where the testimony of a witness is uncontradicted, either by positive testimony or by circumstances, either intrinsic or extrinsic, and the witness is not impeached, the testimony cannot be rejected even by a jury. The witness in this case was not contradicted or impeached, and the facts testified to were not improbable in themselves or in connection with any circumstances in the case."

The same rules govern a judge in the trial of a law case in which a jury is waived, and the same rules govern a chancellor in passing upon the facts in a case in chancery. Neither the judge nor the chancellor in such case can from mere caprice disregard the testimony of a witness upon any material matter who is uncontradicted by positive evidence or by circumstances and who is not impeached; and particularly is this so where the evidence of the witness is not unreasonable or improbable or is corroborated by other credible evidence or circumstances. Such has always been the rule announced by this court, and the rule is supported by the weight of authority, if not universally so.

Not only is Small not contradicted or impeached on the subject, but he is corroborated by other evidence not mentioned in the majority opinion. Luehrs, who had charge of the interest account in the treasurer's office, testified: "The amount collected by myself included all other accounts—interest-producing accounts. There was only one left that interest could be derived from. That would be the safe account. The gross amount in the form of interest derived from the deposit of public funds for the last

three months of the term of defendant Small was $143,-585.79. I cannot state the total amount in the treasury the last three months of that term. My best recollection would be that the daily average balance in the treasury of Illinois for those months would be eighteen to twenty-two million dollars. The average daily balance would be about $19,000,000 during that period. That is my best recollection. Interest on that sum at the rate of two per cent for the period of three months would be $95,000." So that, according to his testimony, $48,000 of the $143,585.79 consisted of interest on the Curtis or Grant Park Bank loans. In speaking of the $306,424.33 payment he says: "I cannot form a judgment as to how much more it was; that is, I cannot form a judgment as to how much more interest was paid in that was derived from the vault account. My judgment is that it came from the safe account. I have no positive knowledge, but I am positive that the amount of interest paid in exceeded the amount that was paid in on account of the vault account." While this witness can not give the amount of interest on the safe or Grant Park Bank account which was paid into the treasury, he does give the basis upon which interest was charged to all the banks,—*i. e.,* upon their daily balances. The evidence in this case discloses what the daily balances were, not only on the safe account but upon all the other interest-bearing accounts, and when interest is figured on such daily balances it is seen that the amount paid into the State treasury covers the amount due from all interest-bearing accounts, including the safe account.

For these reasons, and for the reasons assigned in the dissenting opinion of Mr. Justice Duncan, I am compelled to dissent from the conclusion reached by the majority of the court.